UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Case No. 22-cr-15 (APM) |
| | : | |
| KENNETH HARRELSON | : | *Previously Included in* |
| | : | |
| Defendant | : | Case No. 21-cr-28 (APM) |
| | : | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF KENNETH HARRELSON'S MOTION FOR REQUIRED DISCLOSURE OF EXCULPATORY INFORMATION</u>

Defendant, Kenneth Harrelson, through the undersigned counsel, Bradford L. Geyer, presents this Memorandum of Law in support of his motion for this Court to enter an Order that the U.S. Government disclose to the Defendant – promptly by August 22, 2022, the following information necessary to the Defendant's defense pursuant to pretrial discovery under Rules 6(e)(3)(C) and 16(a)(1)(A) of the Federal Rules of Criminal Procedure, Rule 16 of the same, and *Brady v. Maryland,* 373 U.S. 83 (1963) and progeny, stating as follows:

## I. INTRODUCTION

Defendant Kenneth Harrelson asks once again for exculpatory information which the Government was and is compelled to provide even in the absence of a request. Harrelson, by counsel, has repeatedly requested exculpatory information. This motion presents more specific and particularized demands but is not the first demand upon the U.S. Government for specific examples of what the Government is already required to provide (ECF 225-1).

Sergeant Kenneth Harrelson, Ret. can only now be seen on video, in spite of a systemic effort to make it so difficult to access and review the video record that unfortunately has only been made possible through delay, logistical hurdles and protective orders.

After almost leaving and going home to Florida on January 5, 2022, on January 6th, 2022, Harrelson arrived late to the Ellipse for the President's speech and, consistent with Secret Service directives that had been communicated to Kelly Meggs, he and James Dolan came wearing a tee shirt and baseball cap. Harrelson performed security in the morning and served as an anchor on the last security detail that arrived at the "bloody angle" between Suspicious Actors near the Senate and around the planters in front of the East Steps. Salted in the crowd in between both groups were trained influencers who were joined to remove or knock over barriers in an efficient and astonishing 40 seconds as captured on video recordings and who guided the unsuspecting to walk towards the East Steps. By this time, coordinated attacks, barrier and signage removal had already begun in the West and a change in incident response from USCP to MPD under the leadership of Robert Glover, had resulted in police resources in the East being drawn down. Harrelson rolled up into a huddle with the protectees six minutes before the coordinated attack occurred and as the protectees made inquiries and searched in vain for the stage and equipment for what was an officially approved event. When the coordinated attack occurred—minutes later--there was weak USCP presence and Suspicious Actors marched in columns that to many lacking context and with efforts engaged in earlier to provide benign explanation for what they were seeing, for a time seemed to have been led by police. The mixed signals and confusing sight picture and influencing operations by trained Suspicious Actors had an irresistible, magnetizing effect and over 1,000 people walked to the East steps. Mr. Harrelson and Mr. Dolan eventually walked to those steps to find their protectees who had bounded forward and seemed to have disappeared into a peaceful, but lumbering crowd.

Mr. Harrelson never attacked police or engaged in vandalism -- he actually can now be seen responding to the scene and defending police. He knew nothing of sedition or insurrection and the record, all his known communications and actions, now seen on video, now confirm this. He responded as anyone would expect. Whereas prosecutors have focused on misinterpreting and making unfounded assumptions about comments made by other Defendants, the prosecutors have

found no comments by Defendant Harrelson capable of being turned into something negative or different from what was intended.

The legal theory is simple: Others committed the crimes that have been attributed to Mr. Harrelson and these "Suspicious Actors" can be seen on video, most of it under protective order, attacking police and working in coordinated ways to engage in the crimes alleged against the Oath Keepers that they themselves did not commit. Many of these activities occur in two areas where the Capitol inexplicably does not have surveillance video: 1) on any part of the exterior Columbus Doors level—*the main entrance to the Capitol*--and 2) anywhere around where Mr. Harrelson and other Oath Keepers came to the defense of a US Capitol Police Officer and diffused a dangerous situation.

We are 18 months into having to pry disclosures from the Government. This has caused dramatic misunderstandings of events by prosecutors of record and defense counsels alike born of what can only be described as systemic failures by the Government's discovery clearing house, the Capitol Siege Unit ("Siege Unit). The Siege Unit being overwhelmed has not been timely in *Brady* disclosures to trial staffs that are necessary for Defendants to put on defenses. It has been undersigned counsel's observation that assigned Government counsel are always responsive and professional, but proper *Brady* disclosures can only occur *AFTER* prosecutors first receive the disclosures from the Capitol Siege Unit which must earlier receive them from investigative and other agencies. AUSAs cannot provide what other elements of the Government have not forwarded to them. Now, since we filed 225, 225-1, 225-2 and 225-3, two expert witnesses have made their presence known to defense counsel and to put on any kind of a vigorous defense, we have an even more pressing need to impress upon the Government that it must comply with its Brady obligations in full now or join a defense motion to postpone this trial.

## II.  GOVERNING LAW:  *BRADY* and Other Obligations

The Defendants are entitled to the documents and the evidence, to the extent potentially or here likely to be exculpatory information as required by *Brady v. Maryland, 373 U.S. 83 (1963) ; See also, USA v Theodore F. Stevens*, No. 1:08-CR-00231-EGS, U.S. District Court for the District of Columbia, Memorandum and Opinion by Judge Emmett Sullivan, (Docket No. 257, December 22, 2008); *United States v. Sitzmann*, 74 F.Supp.3d 128, 133 (D.D.C. 2014)

"[S]uppression by the prosecution of evidence favorable to a Defendant upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Sitzmann*, 74 F.Supp.3d at 134 (*quoting Brady v. Maryland,* 373 U.S. 83, 87 (1963)).

Even apart from a Rule 29 motion to dismiss at trial, an actual conviction after trial can be overturned on appeal for violation of *Brady* if evidence favorable to the accused for exculpatory or impeachment purposes was suppressed by the government which prejudiced the accused. *Id.*   Favorability to the accused means exculpatory or impeachment value. *Id.* Suppression by the government can be an intentional or inadvertent failure to disclose the evidence. *Id.* at 137.

If an appeal court determines the suppressed evidence is material, that there is a reasonable likelihood the evidence could have impacted the jury's judgment, then a new trial is required. *Sitzmann*, 74 F.Supp.3d at 134. However, the defendant must raise at least a colorable claim that the material contains evidence "favorable to him and material to his claim of innocence." *Id.*  Prejudice to the Defendant means a "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 134 (*citing Strickler v. Greene*, 527 U.S. 263, 280 (1999)).

And courts in in this jurisdiction disfavor narrow readings by prosecutors as to their

obligations under *Brady*. *United States v. Saffarinia*, 424 F.Supp.3d 46, 57 (D.D.C.), *supported by United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).

When the Defendant requests *Brady* materials

> **"The government cannot meet its *Brady* obligations by providing the defendant with access to 600,000 documents and then claiming that the defendant should have been able to find the exculpatory information in the haystack."**

*Saffarinia*, 424 F.Supp.3d at 85.

Under *Brady*, evidence may still be material and favorable despite being inadmissible, provided it could lead to admissible evidence. *Saffarinia*, 424 F.Supp.3d at 91.

Rule 16 of the Federal Rules of Criminal Procedure requires that:

> \* \* \*
>
> Rule 16. Discovery and Inspection
>
> (d) Regulating Discovery. (1) Protective and Modifying Orders. At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal. (2) Failure to Comply. If a party fails to comply with this rule, the court may: (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances.

Local Rule 5.1 "DISCLOSURE OF INFORMATION" prescribes that:

> (a) Unless the parties otherwise agree and where not prohibited by law, the government shall disclose to the defense all information "favorable to an accused" that is "material either to guilt or to punishment" under Brady v. Maryland, 373 U.S. 83, 87 (1963), and that is known to the government. This requirement applies regardless of whether the information would itself constitute admissible evidence. The information, furthermore, shall be produced in a reasonably usable form unless that is impracticable; in such a

circumstance, it shall be made available to the defense for inspection and copying. Beginning at the defendant's arraignment and continuing throughout the criminal proceeding, the government shall make good-faith efforts to disclose such information to the defense as soon as reasonably possible after its existence is known, so as to enable the defense to make effective use of the disclosed information in the preparation of its case. (b) The information to be disclosed under (a) includes, but is not limited to: (1) Information that is inconsistent with or tends to negate the defendant's guilt as to any element, including identification, of the offense(s) with which the defendant is charged; (2) Information that tends to mitigate the charged offense(s) or reduce the potential penalty; (3) Information that tends to establish an articulated and legally cognizable defense theory or recognized affirmative defense to the offense(s) with which the defendant is charged; (4) Information that casts doubt on the credibility or accuracy of any evidence, including witness testimony, the government anticipates using in its case-in-chief at trial; and 132 (5) Impeachment information, which includes but is not limited to: (i) information regarding whether any promise, reward, or inducement has been given by the government to any witness it anticipates calling in its case-in-chief; and (ii) information that identifies all pending criminal cases against, and all criminal convictions of, any such witness. (c) As impeachment information described in (b)(5) and witness-credibility information described in (b)(4) are dependent on which witnesses the government intends to call at trial, this rule does not require the government to disclose such information before a trial date is set. (d) In the event the government believes that a disclosure under this rule would compromise witness safety, victim rights, national security, a sensitive law-enforcement technique, or any other substantial government interest, it may apply to the Court for a modification of the requirements of this rule, which may include in camera review and/or withholding or subjecting to a protective order all or part of the information. (e) For purposes of this rule, the government includes federal, state, and local law enforcement officers and other government officials who have participated in the investigation and prosecution of the offense(s) with which the defendant is charged. The government has an obligation to seek from these sources all information subject to disclosure under this Rule. (f) The Court may set specific timelines for disclosure of any information encompassed by this rule. (g) If the government fails to comply with this rule, the Court, in addition to ordering production of the information, may: (1) specify the terms and conditions of such production; (2) grant a continuance; (3) impose evidentiary sanctions; or (4) enter any other order that is just under the circumstances.

With *Brady*, constructive knowledge matters. In *Youngblood v. West Virginia*, 547 U.S. 867 (2006) the Supreme Court made it clear that "a Brady violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the Brady duty to

disclose extends to impeachment evidence as well as exculpatory evidence, and Brady suppression

occurs when the government fails to turn over even evidence that is *'known only to police*

*investigator and not to the prosecutor.'* 'Such evidence is material if "there is a reasonable possibility

that had the evidence been disclosed to the defense, the result of the proceeding would have been

different",' although a 'showing of materiality does not require demonstration by a preponderance of

the evidence that disclosure of the suppressed evidence would have resulted ultimately in the

defendant's acquittal.' The reversal of a conviction is required upon a 'showing that the favorable

evidence could reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict.'"

The scope of the requirements of *Brady v. Maryland,* 373 U.S. 83 (1963), is very broad.

*See* United States Justice Manual (USJMM) § 9-5.001. For instance, a "prosecutor must disclose

information that is inconsistent with any element of any crime charged" and --

> "… must disclose information that either casts a substantial
> doubt upon the accuracy of any evidence---including but not
> limited to witness testimony—the prosecutor intends to rely
> on to prove an element of any crime charged, or might have
> a significant bearing on the admissibility of the evidence.
> This information must be disclosed regardless of whether it
> is likely to make the difference between convictions and
> acquittal of the defendant for a charged crime."

*Id.*

The disclosure requirement, "applies to information regardless of whether the

information subject to disclosure would itself constitute admissible evidence." Id.

It is highly relevant that the Defendant is explicitly asking for specific information, not

passively hoping that the prosecution will notice and think to disclose information on its own

initiative.

> "The test of materiality in a case like *Brady* in which specific
> information has been requested by the defense is not necessarily the

same as in a case in which no such request has been made...." [14]

*United States v. Agurs*, 427 U.S. 97, 106, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976)

> " The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the Defendant and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.  * * *"

*Moore v. Illinois,* 8212 5001, 408 U.S. 786, 794-795,  92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)

> "If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we  focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no  significant difference between cases  in which there has been merely a general request for exculpatory matter and cases, like the one we  must now decide, in which there has been no request at all. The third situation in which the Brady rule arguably applies, typified by this case, therefore embraces the case in which only a general request for "Brady material" has been made."

*United States v. Agurs*, 427 U.S. 97, 107, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976).

> "The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt.20 Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed."

*Id.* at 112.  To extend this point, the U.S. Supreme Court is saying that the requirement that a Defendant be presumed innocent until proven guilty beyond a reasonable doubt is a principle that applies to all aspects of the case, including whether a failure to disclose potentially exculpatory information violates the Due Process Clause.

> "Impeachment evidence, however, as well as exculpatory evidence,

> falls within the *Brady* rule. See *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Such evidence is "evidence favorable to an Defendant," *Brady*, 373 U.S., at 87, 83 S.Ct., at 1196, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. Cf. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend")."

*United States v. Bagley*, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985).

Prosecutions alleging conspiracies carry the "inevitable risk of wrongful attribution of responsibility to one or more of the multiple defendants." *United States v. Dennis*, 384 U.S. 855, 873 (1966). Under these circumstances, it is imperative the defense, the judge, and the jury be assured "the doors that may lead to truth have been unlocked." *Id.*

> In our adversarial system rarely is the prosecution justified in having "exclusive access to a storehouse of relevant fact" and exceptions to this notion must be justified by the "clearest and most compelling of considerations."

*Id.* at 873-874.

Determining usefulness can only be made by an advocate for the defense. *Id.* at 875. The trial judge's function is limited to determining if a case for production has been successful and supervising the process. *Id.*

Closely associated with the federal rule are several U.S. Supreme Court decisions which hold that a defendant has a right to the testimony of witnesses even appearing before a federal grand jury when he can show a particular need for this testimony. *See, United States v. Dennis*, 384 U.S. 855 (1966); *United States v. Proctor & Gamble*, 356 U.S. 677 (1958).

> "Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them."

*Gregory v. United States* 369 F.2d 185, 188 (D.C. Cir. 1966). See also, Model Code Of Prof'l Responsibility Rule 3.8(d).

Here, even government officials or agents and law enforcement officials – although employees of government – are equally the witnesses of the Defendants as they are of the prosecution.

## III. ARGUMENT

Either the prosecution has already fully investigated these matters and has all of this information in electronic or expanding "redwell" folders already or the prosecution will not be ready to go to trial on September 26, 2022. Either the Government can immediately transmit the requested items or the prosecution must drop the charges or seek a continuance. As grounds for the foregoing, Defendant states the following:

A.    The information respectfully demanded is required for Harrelson's defense under *Brady v. Maryland* under pain of the dismissal of this case in its entirety before or after trial, under Rule 29, or on appeal.

B.    Defendant is entitled to due process of law which includes the right to prepare for trial and to be heard before a neutral decision-maker, including the constitutional right to participate in his own defense such as by preparation of his presentation for trial. The massive complexity of actions among 10,000 persons demonstrating at the Capitol and a highly unusual video-intensive case necessitates Harrelson's personal involvement in reviewing video to identify persons shown and to piece together the accurate sequence of events in different places and even gaps. C.    Potentially, reasonably, exculpatory evidence includes information that might lead to locating additional witnesses by investigation prompted by the disclosures.

C.    Potentially exculpatory information must be disclosed sufficiently in advance of trial to allow defense counsel and Defendant to research its content and implications to prepare effective cross-examination and to subpoena witnesses.

D.    The Defendant is entitled to call witnesses in his defense, to prove that other person or persons – not him – are actually guilty of some or all of the charges mistakenly brought against him. That is, Defendant is entitled to raise reasonable doubt that **_other_** persons actually committed the crimes that Harrelson is erroneously accused of. This is not that others share equally in guilt, but that the Government misidentified who did what and therefore is just completely wrong. For example, the Government has pushed the strange idea that everybody was the leader of what they claim happened on January 6, 2021. The fact that people other than Harrelson were in fact the leaders proves **_that he was not_**. This defeats charges of conspiracy and intent. The Oath Keepers are charged with "leading" an "attack" that others already "lead" before Harrelson and others arrived. That is, these Defendants are simply not guilty.As the Honorable Judge Amit Mehta ruled in open court on or about April 8, 2022, most or all of the charges brought against the Defendant and the allegations that constitute those charges are unusually sensitive to the trier of fact (the jury) deciding what was the Defendant's intent.

E.    Here, Judge Mehta necessarily had to reach more than an idle opinion that only theDefendants' intent is the real issue in order to then proceed to deny motions about a continuance and acceleration of discovery. Judge Mehta ruled upon several motions based upon the idea that only the Oath Keepers' intent matters, making it an official interpretation.

F.    Here, the Oath Keepers Defendants did not obstruct or attempt to obstruct an official proceeding that had already been disrupted by the discovery of pipe bombs at 12:50 PM EST on January 6, 2021, by other unrelated demonstrators pushing across police lines and moving barricades as early as 1:15 PM EST, the recess of the Joint Session of Congress at 2:18 PM EST, and necessarily a decision by the U.S. Capitol Police significantly prior to 2:18 PM to set that recess in motion.[1]

Therefore, the intent of the Oath Keepers in arriving at the U.S. Capitol at 2:32 PM according to the Grand Jury except for 2 lone early arrivers Harrelson and Dolan at 2:00 PM EST is critical.

G.    Separated from other Oath Keepers as they left the Ellipse, Harrelson and Dolan followed their VIP protectees up the East central stairs, while the doors remained closed and locked, and ended up singing sang the national anthem at the top of the stairs with others.

H.    An expert witness with decades of relevant experience engaged by Harrelson will analyze and opine that the behavior observed of the Oath Keepers demonstrated no intent, no plan, no coordination, no directed activity, whereas the behavior of other people does show a coordinated plan with signature characteristics that can be observed in the East and the West of. The clear conspiracy planned in advance by suspicious actors shows that what happened at the Capitol was not arranged or caused by Harrelson or his co-Defendants but instead by Suspicious Actors some of which he has showcased.

---

[1]     The two houses of Congress are required to convene in a Joint Session at or about 1:00 PM EST every four years on January 6, 2021. But once having gaveled in the session, Congress was free to schedule further proceedings any way it wished and could have recessed at 1:10 PM.

I.  The evidence will show that the U.S. Capitol Police issued six different permits in December 2020 authorizing rallies to be held on the U.S. Capitol grounds at the same time as the Joint Session of Congress.

J.  The evidence will show that Harrelson escorted specific, known, identified VIPs, who will testify at trial, who were traveling to the demonstration where Alex Jones and Ali Alexander would speak, at "Lot 8" of the Capitol grounds in the corner near the Supreme Court.





K.    Public promotion pinpointed the location for demonstrators to gather as shown in the "screen grab" from the "Way Back Machine" archive site. The map is enlargeed by counsel:



L.    By contrast, Harrelson and other co-Defendants are falsely accused without evidence of leading, conspiring or organizing attendance at the Capitol. Others actually did what Harrelson did not do. Evidence of who did do these things may prove Harrelson did not.

M.    As documented in ECF 225-2 and 225-3, that Defendant Harrelson intends to

reinforce with supplemental discovery and the assistance of two or more experts that will document the actual plan and conspiracy to deploy rally attendees as force multipliers that the Oath Keepers played no part in, there was a plan to attack the Capitol, but not by Harrelson. The Government frames Harrelson as the Conductor of the orchestra when he did not even play in a strings section or a brass section, but was merely a member of the audience. Any evidence that the Government has that someone else instead of Harrelson planned and did what Harrelson is being accused of would be exculpatory that he is not guilty.

N.     Generally, Harrelson is entitled to evidence that would show any inconsistency in witness' testimony closer in time to the events at issue or unfettered by pressure contrasted with coerced testimony after a sustained period of psychological pressure, fear, negotiation, or defeatist counsel.

O.     Defendant is entitled to call witnesses in his defense, to cross examine witnesses, or rebut evidence of some or all of the elements of the charges against him. He is entitled to evidence that might show the ability of witnesses to know or remember what they claim to have witnessed. He is entitled to evidence that might help separate almost 2 years of intensive and continual news coverage from the witness' actual recollections of events.

P.     Due to the near certainty in this particular case of the prosecution attempting to patch together a case using video recordings, he is entitled to all views from all angles of the same scene in all video recordings, which might show that the impression given by the prosecution's video view is erroneous, including showing what happened before and after.

Q.    Given the U.S. Capitol Police's official estimate that there were 10,000 demonstrators present near or around the U.S. Capitol that afternoon, at a time when masks were almost universally required by government mandate, the probability of the prosecution misidentifying people involved in some or all of the actions complained of is a near certainty. Given the significant challenge of the prosecution identifying the actions of persons and their individual actions out of a crowd of 10,000, the Defendant is entitled to any video recordings, descriptions of events, reports, messages, etc. that might separate mistakes from reality. For example, some accounts clearly confuse events in the West from the East.

R.    Simply because an extraordinarily large crowd unrelated to Harrelson got out of control (by no act or omission of Harrelson) is not valid evidence of the charges against Harrelson or other co-Defendants. The Government must prove that Harrelson committed a crime, not "someone" did.

S.    The Government accuses the Defendants including Harrelson of obstructing or attempting to obstruct the Joint Session of Congress on January 6, 2021, and attempting to prevent _by force_ on January 6, 2021, the transfer of presidential power that took place automatically by operation of law on January 20, 2021. Judge Amit Mehta admitted (adopted as true) in April 8 questioning of the prosecution that no presidential power is transferred on January 6 every four years and nothing happens on January 20 every four years to transfer presidential power except the rotation of the planet Earth causing the local time in Washington, D.C. to change from 11:59 AM to Noon and then to 12:01 PM Eastern Standard Time. A new President must take an oath, but that oath does not make him or her President.

T.    The Government has intentionally confused political opinions, analyses, or conclusions about _who_ is entitled to become the next President with the transfer of power to that President-Elect. That matters because the former is an opinion guaranteed by the First Amendment while the latter is a felony punishable by 20 years in prison.

U.    Harrelson is entitled to evidence, documents, and video that may reasonably be necessary (even if not to perfection) to "impeach" or undermine the testimony of the prosecution witnesses and other evidence as to some or all of the elements of one or more crimes alleged against him. (As an example, still photographs give a different impression then actual video. See, e.g.,

**https://www.youtube.com/watch?v=cMr1GKhC5bY** .)

## IV. SPECIFIC DEMANDS FOR DOCUMENTS AND CIRCUMSTANCES

### A.    SPECIFIC REQUESTS – Details Of Columbus Doors And East Rotunda Doors

The prosecutors seem quite devoted to their claim that Harrelson and other Defendants "breached" the East Rotunda Doors [2] clearly trying to induce the idea that the Defendants and/or the crowd with them violently broke open the doors.

From this erroneous claim, now refuted by actual video evidence, the Government seeks to infer intent to obstruct the Joint Session's official proceeding, damage to property, and jostling or brushing past police officers. Of course, none of that is true and cannot be sustained by a fair

---

[2]    Recall that the massive, solid-bronze Columbus Doors, 17 feet high and weighing 10 tons, and the East Rotunda doors are mounted in the same entrance, with the Columbus Doors seated in front of the East Rotunda Doors. These doors mounted in two layers are on the East side at the top of the central stairs, above the carriage entrance on the ground level.

and full presentation of the facts. Certainly nowhere can this be discerned from the video record. But many of the criminal charges may all lack viability if Harrelson's behavior showed no intent to approach, enter, or break into the Capitol as opposed to spontaneous events.

Harrelson has just now been approached by an expert witness who will testify about the operation of these doors, to potentially show, after receiving proper discovery including access rights to inspect and test the doors that (a) none of the Defendants or the crowd were capable of breaking open the doors, (b) the doors were not broken open,[3] (c) the doors could only be opened from inside, (d) the doors could only be opened by the intervention of someone activating the doors from the security controls inside the building.

Harrelson is entitled to evidence proving that he did not do what he is accused of. Harrelson cannot be guilty of "breaching" (i.e., breaking into) the East central doors at the top of the central stairs (second floor above the carriage entrance) because the doors were opened from the inside, and apparently opened by someone who gained access to the internal security controls to open the doors, and not opened by Harrelson.

Therefore, no inference can be drawn from what Harrelson never did.

Regardless of whether we descend into who opened the doors or why, Harrelson is absolutely and unconditionally entitled to evidence ***that it wasn't him.*** He did not "breach" the Capitol.

Harrelson respectfully demands that the Government be ordered to provide, (1) a timeline of when the bronze Columbus doors were closed or open on January 6, 2021, (2) why the Columbus Doors were left open at any time that day if there was a perceived threat, (3) technical

---

[3]     The East Rotunda Doors show double-paned windows cracked in photographs, but no windows broken to the point that one could reach inside to open the doors from the outside.

specifications of the Columbus Doors including brand and models of machinery involved, and technical specifications and details of the controls for operating the doors. He requests to have his expert inspect and test the doors, and have access to information, while he examines and documents the electronics in and around the door, the annex, and the exterior of the door and to inspect the monitoring facility where those signals or communications are received.

### B.     SPECIFIC REQUESTS – Entry to View and Examine Capitol building

Some state-law discovery procedures explicitly allow for entry into land or real estate and inspection. However, here, the centrality of the U.S. Capitol and Capitol grounds to all of the criminal charges in the case and the size and complexity of the 751 foot-long building and the 58.8 acres of grounds,[4] set within 270 acres of the larger Capitol campus[5] makes it unavoidably necessary for Harrelson's counsel and expert witnesses[6] to be able to review the layout and conditions of the scene of the crime. For this purpose, the overly short and tightly limited tour of the building arranged by the prosecution was helpful but entirely insufficient. Neither Harrelson, his counsel, or his expert witnesses are natives to Washington, D.C., and previously familiar with the Capitol campus. Therefore, Harrelson requires the opportunity to view and understand the scene of the crime. Understanding and insight into the evidence and claims around the building and campus may yield exculpatory evidence. Obviously, for a building which routinely allows public tours even by crowds of school children, such a viewing need not involve any disruption. The expert is asking for several days of touring and studying the building and grounds.

---

[4]     **https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/capitol-grounds**

[5]     **https://www.aoc.gov/explore-capitol-campus/buildings-grounds**

[6]     Harrelson's counsel was contacted unexpectedly only recently by world-class expert witnesses with top security clearance and decades of expertise. Their details are disclosed separately in parallel documents.

Also, in violation of *Brady v. Maryland,* the General Counsel of the U.S. Capitol Police aggressively intervened during the tour arranged by the prosecution for defense counsel to prevent questions of exculpatory information. She failed to understand that there can be no government witness or defense witness, only witnesses to the truth. Legitimate questions as to exculpatory information were blocked by the self-identified General Counsel. All of these questions and much more were asked on the tour, but openly withheld in disregard of *Brady*.

C.    <strong>SPECIFIC REQUESTS – Locations of "Restricted Area" Signs at Exact Time of Harrelson's Arrival</strong>

The Government claims that certain areas around the U.S. Capitol were legally restricted on January 6, 2021. But that is a mixed question of law and fact. The U.S. Capitol Police (Governing Board) has chosen by its own decision not to post any permanent signs or notices on the Capitol grounds warning that sometimes the public park of the grounds might be closed. Instead, the Board directed that small, flimsy signs (some seen in photographs torn in two as being merely paper) be affixed to light-weight, movable bike racks, appearing at a very low height at about waist-high-level in most places.[7]

To have a "Restricted Area" there must be an "area" to which the restriction applies. An unidentified, indeterminate area cannot be a restricted area. For a person to knowingly enter a restricted area without authorization, there must be both an identifiable area that is restricted and knowledge by the person of a restriction.

The Government must provide any and all photographs, video recordings, witnesses, discussions in police radio recordings, etc., of exactly where any signs were visible to the crowds

---

[7]    Most people are conditioned to understand that bike racks either route foot traffic, but do not prohibit pedestrian entrance, merely showing where to go, and/or telling pedestrians *when* the doors to an event open. Bike racks do not signal by themselves to the average person any prohibition of entrance, but rather to signal only timing and the preferred pathway for walking.

***at the time that*** the Oath Keepers arrived at the vicinity of the U.S. Capitol building.  Harrelson is entitled to exculpatory evidence as to where signs were ***at that time*** – **not at some other time earlier in the day.**  The Government must identify exactly when and where the Government contends the Oath Keeper Defendants especially Harrelson approached the U.S. Capitol Grounds and the position of any "Restricted Area" signs in that location at that time.  It must identify any and all Government personnel who are witnesses of any "Restricted Area" signs being moved or obscured before any of the Oath Keeper Defendants arrived at the U.S. Capitol.

### D.    SPECIFIC REQUESTS – Who "Led" the "Attack" on the U.S. Capitol?

The Government doggedly claims without evidence that the Proud Boys and Oath Keepers entered into an alliance [8] and the two groups "led" an "attack" upon the U.S. Capitol / U.S. Congress.  Harrelson is entitled to any and all evidence as to (a) ***who*** first approached the U.S. Capitol building on January 6, 2021, (b) exactly ***when*** someone or some persons first approached the U.S. Capitol building, (c) exactly what the Government contends constitutes an "attack" such as precisely defining where or at what distance people approaching the building crossed the Government's line to becoming an "attack" and who the Government contends engaged in such an "attack," and (d) in what way the Oath Keepers Defendants "led" anything on January 6, 2021.  Evidence would be exculpatory identifying those who specifically "led" an "attack" on the U.S. Capitol, because it would show neither Harrelson nor his co-Defendants did so.  Note that this should not be interpreted as seeking an answer to an interrogatory, because Harrelson's counsel is more interested in documents candidly discussing these matters at the time than attorney-generated explanations presented 19 months later.

---

[8]    Using evidence that exclusively concerned a threatened riot purely inside Florida.

### E.    SPECIFIC REQUESTS – Law Enforcement Officers
### Allegedly Jostled or Brushed Past near Columbus Doors

The prosecution offers vague, imprecise, dubious claims that Jason Dolan nearby Kenneth Harrelson brushed past or touched a U.S. Capitol Police officer in order to enter the Columbus / East Rotunda doors on the East side of the Capitol. This error is also wrapped up in the false idea that Harrelson and Dolan entered ***first*** when the doors were opened from the inside. Unfortunately, for this erroneous idea, the video record shows hundreds of demonstrators entering before Harrelson and Dolan, many who share signature characteristics of following a common plan and mission. Thus, law enforcement officers were not guarding those doors by the time Harrelson reached the doors. Nevertheless, the U.S. Capitol Police officers have produced no body cam video because apparently they were not equipped with body worn cameras. Harrelson is entitled to the identity of any and all law enforcement officers whom the prosecution erroneously claims Harrelson ever interfered with much less touched. Harrelson is entitled to call them as witnesses and investigate their stories well in advance of trial.

The Court is reminded that when Kyle Rittenhouse was found not guilty, it was based on the prosecution's witnesses recanting their stories on the witness stand when shown video recordings and photographs exposing the actual truth. That takes preparation and advance work. Harrelson is entitled to exculpatory evidence showing that – as with the Rittenhouse case – there was in fact no brushing past, jostling, or assault on law enforcement officers by Defendants. Harrelson is entitled to evidence that will show the Government confusing the actions of Harrelson at the Columbus Doors and East Rotunda doors with the actions of other, unrelated, unknown, persons having no connection whatsoever to Harrelson or Dolan.

### F.    SPECIFIC REQUESTS – All Evidence that any Oath
### Keeper Injured any Law Enforcement Officer

The Government also doggedly makes claims about injured police officers which are ambiguous about who out of 10,000 (apparently numbering about 75 in total) battled with and injured law enforcement. The Oath Keepers take special offense because many of them are law enforcement, current or retired, and the Oath Keepers were formed to honor and train police and military veterans. The Government must provide any and all evidence of (a) *precisely* which Oath Keeper Defendant the Government contends injured any law enforcement officer, (b) precisely which law enforcement officer (which may be identified by a code number withholding their non-public actual identity), and (c) exactly how in complete description you contend any Defendant injured them. Be careful to distinguish cases where the crowd surged forward and shoved a Defendant like Dolan involuntarily into a police officer beyond his motor control. Such precision is exculpatory because stripping away the fog reveals that Harrelson did not do what others did do, and Harrelson is in fact not guilty.

### G.    SPECIFIC REQUESTS – WITNESSES KNOWN BUT NOT YET UNIDENTIFIED: Suspicious Actors Physically Near to Defendant Harrelson at Key Moments.

The Defendant has identified multiple persons whose existence is known but whose identity (legal name) is not known, who are:

1. Known with 100% certainty to be actual witnesses, that is the video recordings show that these unidentified "Suspicious Actors" are very close to and also looking directly at significant events at key moments and saw those events, heard them, and participated, such as

   a.    Experiencing the crush of the crowd forcing people like Harrelson through the doors that opened suddenly from the inside,

   b.    Witnessing that the crowd outside the Columbus Doors was certainly loud

but also peaceful, singing the National Anthem and mostly just standing around,

 c. Witnessing that the windows attacked by others in certain video footage are nowhere near where Harrelson was standing peacefully, and are not visible from that location.

 d. Witnessing that the doors opened from the inside and neither Harrelson nor other Oath Keepers did anything to breach or break into the Capitol building

 e. Witnessing that no property was damaged in the vicinity where Harrelson was located,

 f. Witnessing that neither Harrelson nor the other Defendants aided and abetted, discussed, referred to, mentioned in any way, encouraged or inspired anyone to damage any property, commit any act of violence, interfere with any police officer, enter the Capitol building, or obstruct anything,

 g. Witnessing that neither Harrelson nor the other Defendants engaged in any altercations with any police officer, and

 h. Witnessing that any claims about tear gas or the like are false and being confused by the prosecutors with events on the other, West, side of the Capitol building.

2. Known with absolute certainty to exist from video evidence,

3. Witnesses of key events and key legal disputes central to this criminal prosecution of Harrelson,

4.  But whose name(s) are not known hindering Harrelson's ability to locate them and call them as witnesses at trial.

    Because the video recordings show them next to, near, or around Harrelson or key occurrences such as the opening of the Columbus / East Rotunda doors or the crush of the crowd pushing Harrelson and Dolan into the Capitol from the force of hundreds of people behind they are witnesses to an absolute certainty.

Given the public pronouncements by the FBI and DoJ of the intensity and thoroughness of the investigation, it defies all doubts that the FBI actually knows the identities of these certain but unidentified witnesses.

But the Government has actively withheld from the Defendants the identity of these witnesses known to exist and known to be actual witnesses.

Of the Suspicious Actors identified by Harrelson, including in the attachment as Exhibit A, many are clearly potential witnesses whose identity the Government has actively, stubbornly, and persistently withheld from the Defendants in this case.

Additionally, based on new information we have discovered since these filings and since the emergence of two expert witnesses that have reported, we require any and all information about the protectees and material witnesses that led Oath Keepers to the angle between where the two columns marched behind police to the East steps at 1:59 p.m. on January 6, 2021. The best information we have on this can be found on this was unearthed by Sedition Hunters and is denoted here. Again, these are witnesses to whose testimony Harrelson is entitled.



Bostic "stack" from Ellipse to Capitol

### H.    SPECIFIC REQUESTS – Actors who actually did what Harrelson is erroneously accused of

The Defendant is not guilty because what he is accused of was in fact done by others, not him. For example, Ray Epps is seen on many recordings and reported by many witnesses organizing and inciting people to go to the U.S. Capitol and "**Go _INTO_ the Capitol!**" Another unknown Suspicious Actor nicknamed "Scaffold Commander" is caught on video using a bull-horn public address device from the top of the scaffolding being constructed for the inauguration to constantly order demonstrators (acting as if he had authority of leadership to order them to move in formations) to go into the Capitol and fill and occupy the U.S. Capitol building.

This is especially true because the Government has nothing to back up their erroneous claims about Harrelson. The Government's case consists purely of **"Post hoc, ergo propter hoc"** -- (a) Harrelson was alive on January 6, 2021, (b) some people ran amok that day, (c) therefore, Harrelson must be responsible. There being no evidence whatsoever that Harrelson actually did anything to organize, incite, or encourage anyone deprives the prosecution of their attempted theory. Harrelson simply being alive on planet Earth does not make him guilty.

Evidence that tends to negate the prosecution's case is exculpatory and must be disclosed well in advance of trial. There was a conspiracy, no matter what we might think about why. But Harrelson and the other Defendants formed no conspiracy other than to do legal acts such as travel to First Amendment rallies in their nation's capitol, protect VIPs, and express their opinions protected by the Constitution. Legally, one cannot conspire to do what is lawful.

Evidence that others actually organized, conspired, urged, or encouraged people to enter and even attack the U.S. Capitol tends to prove that Harrelson did not.

The Court may be allergic to the question of who may have hired or persuaded Ray Epps to run around telling everyone he could find to "**Go _INTO_ the Capitol!**" _Does it matter why?_

Perhaps Ray Epps and his team thought this up for himself. Perhaps he was just being a dumbass as I think Stewart Rhodes wondered aloud. Perhaps Epps was "Demonstrating Under the Influence." But the way he is being treated with immunity tells a different story. Why changes nothing for disclosure. But for purposes of Due Process and Harrelson's rights to a fair trial it is imperative that Harrelson did nothing of the kind, whereas someone else did. The fact that there was a plan – but it wasn't Harrelson's plan and Harrelson had nothing to do with it – tends toward proving Harrelson innocent.

The prosecution theory is that I didn't see who rolled the stone downhill,[9] but the stone rolled downhill, therefore it must have been you who gave it a push. Evidence that someone else actually shoved the stone to roll it down the hill is therefore exculpatory and exoneration. The prosecution theory is on par with arguing that a customer was in a jewelry store when others entered and robbed the store. Therefore, the customer must have been in on it, simply because he was in the vicinity. Knowing who actually did rob the jewelry, and investigating them, would provide proof that the customer had no connection to them.

Harrelson respectfully demands all information about those who actually organized, recruited, motivated, incited, or inspired anyone to go to the Capitol, enter the Capitol, attack police officers, or disrupt the Joint Session of Congress. This would include everyone we referenced and investigated from the public record and from grossly insufficient information contained in Capitol Siege Unit discovery that includes systemic withholding of Brady information. Our current list includes each person referenced in 225-1, 225-2 and 225-3, as well as Ray Epps of Arizona.

Additionally, to finalize an expert 400 page draft report on the causes on January 6 by

---

[9]    Or the Government does know it was not Harrelson, but just won't admit it.

one of our experts, we need any and all information on these two individuals, both of whom

entered through the Columbus Doors as part of an advance team:





It is impossible to suggest that the FBI has not already thoroughly investigated all of

these people.  Harrelson respectfully demands all information about those who actually

organized, recruited, motivated, incited, or inspired anyone to go to the Capitol, enter the

Capitol, attack police officers, or disrupt the Joint Session of Congress, including

I.    **SPECIFIC REQUESTS – All Communications and
      Documents of Threat Assessments Prior to Arrival of
      the Oath Keepers at the U.S. Capitol**

Harrelson and his co-Defendants are erroneously accused of obstructing an official

proceeding, even though they arrived at the Capitol an hour or several hours after security threats

were already occurring.  The discovery of pipe bombs at 12:50 PM and 1:15 PM is ignored like

the Emperor's New Clothes.  Defendants are accused of "leading" crowds to do what those

crowds had already done before the Oath Keepers even arrived in the area.  Defendants are

accused of "aiding and abetting" unknown and unidentified persons in doing what those persons

had already (allegedly) done without the Oath Keepers even being in the area.  Defendants are

accused of obstructing at 2:32 PM to 2:40 PM a Joint Session of Congress that recessed at 2:18

PM.  If the 10 ton Columbus doors had been closed and remained locked (which have no

external door handles -- only ornamental fixtures -- and cannot be opened from the outside) or if

the inner Columbus Doors had not be opened from the inside by individuals who were let in or

were permitted to walk into the Capitol, possibly with official assistance by USCP, , there could

be no threat to the Joint Session of Congress requiring a recess.

Harrelson is entitled to any and all communications, messages, radio traffic,[10] analyses,

conclusions, proposals of action, opinions, recommendations, text messages, email messages, or

---

[10]    The Government has produced police radio recordings which concern such mundane
matters as distributing hot meals to MPD officers and making sure MPD police cruisers are
topped off with fuel.  Certainly those are important to the officers on duty in the field, but for the
purposes of prosecuting the Oath Keepers Defendant the recordings reveal "the dog that didn't
bark" and show a complete absence of anything to support prosecution of Harrelson.  The only
relevance is the occasional chronic misidentification of unaffiliated crowds as being Proud Boys
when they are not, as confirmed by the descriptions of outfits the Proud Boys did not wear.

the like including any threat assessment by the U.S. Capitol Police, the Federal Bureau of Investigation, the Secret Service, Metropolitan Police Department of the District of Columbia or other law enforcement agencies concerning any perceived threats and security arrangements for January 6, 2021. Specifically, he is entitled to records showing when the USCP and other agencies started to decide that there was a threat possibly requiring the Joint Session of Congress to be recessed, the role of the search for more pipe bombs played, when exactly the USCP decided that the Joint Session of Congress should recess, and from what threat exactly. The threat analysis and decision to recess the Joint Session will show that the Oath Keepers played no role in any factor obstructing the official proceeding.

J.    **SPECIFIC REQUESTS – Expert Witness Will Show Oath Keepers had no Plan, Acted Disorganized and Spontaneously on the Fly, but Others Reveal Clear Plan**

Harrelson's expert witness has concluded that:

"That there was a coordinated, relatively sophisticated plot carried out to use bombs at the DNC and RNC as diversions and to storm the Capitol with the tasks being carried out by teams of suspicious actors;"

"That these teams of actors carried out similar sequences of tactics at multiple locations, namely the Northwest Stairs leading to the Senate Entrance, the hallway outside the Senate Chamber, the areas near the Columbus doors to the Capitol, and outside the Main Entrance to the House Chamber;"

"That the main objectives of that plot had been completed by the time the Defendant(s) entered the Capitol;"

"That the remaining objectives carried out by these teams was to open Capitol doors to let everyday Trump supporters in and then to push unwitting crowds through police lines to open up hallways for Trump supporters to travel down."

"That the defendant(s) were unwittingly caught up in such activities after 2:38 p.m. at the Columbus doors and inside the Capitol.

However, to further support this analysis, the expert will require:

➢ Surveillance video to look for suspicious actors at:

o   The Hallways between the Senate entrance (breached at 2:13 p.m.) and the Senate Coach entrance, that Coach entrance from the inside, in the Hallway outside the Senate Chamber between 2:12 and 2:45 p.m.;

o   The Columbus Doors, their foyer, and the Rotunda between 2:15 p.m. and the time that the defendant(s) all leave the Capitol;

o   Statuary Hall between 2:15 p.m. and the time when the defendant(s) all leave the Capitol or 3:00 p.m., whichever comes later; and

o   The room between Statuary Hall and the House Chamber as well as the hallways that connect that room and the Speaker's Lobby.

➢   Discussions with Capitol Police decision makers about key events and their timing, such as:

o   When and what rationale was decided on to evacuate the Senate;

o   When and what rationale was decided on to lock down the House and then to evacuate it;

o   What rationale was involved in decisions to send USCP Civil Disturbance Units to the House Side, to the Rotunda, deployments that occurred at 2:18 p.m., according to the Senate Staff report on January 6

o    and why these units were not sent to the East Front outside or inside the Columbus doors or to the areas near the Senate when that Chamber had still not been entirely evacuated.

o   Whether the Capitol police believed that there was an active shooter event occurring after rioters broke windows set in the House Chamber Entrance inner doorway and what they did as a result of that event, especially whether that was transmitted over the USCP channels.

o   Whether there were any USCP engaged in searching the building as opposed to trying to control rioters before the House Gallery was fully evacuated at 2:17 p.m., according to the Senate Staff Report on January 6.

➢   The opportunity to depose individual USCP officers who may have observed the actions and tactics of these suspicious actors, to include:

o   Their discussions that took place with certain actors at the Middle Stair level of the Northwest Stairs from about 2:00 p.m. when the police line stabilized until the line was broken about 2:09 p.m. (there might be MPD officers too that may have some of this information).

o   Actions by other members of that crowd and whether they match our list of suspicious actors.

o   Similar information for officers who took part near the Senate Coach Entrance and in the Hallway near the Senate Chamber.

o   Similar information for officers that engaged with the rioters outside the Main Entrance to the House, starting about 2:28 p.m. and ending when those officers left.

o   Similar information for a House Sergeant at Arms official who interacted with the same crowd.

o   Information from that same official on what took place after he left that area near the Main Entrance to the House until he was just about to enter the House Speaker's lobby.

➢ Details about the physical security features associated with the Columbus doors and their evolving status from the time that it was recognized that something unexpected was taking place until the defendant(s) left the Capitol.

o   Discussion with the alarm station and personnel who were monitoring from that location events at that door and perhaps controlling door locks to open or lock that door.

o   Ability to visually inspect the installation of security elements immediately outside and inside that doorway and to find out information about the makes and models of the equipment.

**K.    SPECIFIC REQUESTS – Communications Among Secret Service Agents, Department of Homeland Security officials, and Pentagon Officials**

Similarly, Harrelson is entitled to any and all text messages and email messages which are reportedly now missing among Secret Service agents and offices, DHS officials like Chad Wolf and Ken Cuccinelli, and many Pentagon officials from the time period January 5-6, 2021. According to public reports, these communications have been deleted, but Defendant's counsel has high confidence that they can be recovered. The fact that the Biden Administration in or around March 2021 deleted these messages after Donald Trump had left office and the normal rules on spoliation of evidence raises a high probability that the missing communications would be exculpatory of the Defendants individually or as part of the vague crowds by which the

Government wants to charge them for collective punishment. The fact that these messages were deleted at least two months after Trump left office provide a strong inference that their contents would have tended to exonerate these Defendants, if only by "the dog that didn't bark" in those communications. These Defendants are entitled to dismissal of most of the charges against them if the Biden Administration engaged in "spoliation of evidence" beneficial to Defendants.

## V. CONCLUSION

The Defendant requests this Court to grant this Motion and such other relief as may be deemed just. Defendant Kenneth Harrelson, demands to discover the potentially exculpatory information identified above. In support thereof, Defendant attaches his detailed proposed order.

Dated: August 19, 2022          RESPECTFULLY  SUBMITTED
                                KENNETH  HARRELSON,  *By Counsel*

                                /s/ Brad  Geyer
                                Bradford L. Geyer, PHV
                                PA 62998
                                NJ 022751991
                                Suite 141 Route 130 S., Suite 303
                                Cinnaminson, NJ 08077
                                Brad@FormerFedsGroup.Com
                                (856) 607-5708

### CERTIFICATE  OF SERVICE

I hereby certify that on August 19, 2022, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

                                /s/ Brad  Geyer
                                Bradford L. Geyer, PHV
                                PA 62998
                                NJ 022751991
                                Suite 141 Route 130 S., Suite 303
                                Cinnaminson, NJ 08077
                                Brad@FormerFedsGroup.Com
                                (856) 607-5708