# Was the January 6 "Stop the Steal" Riot at the U.S. Capitol an Insurrection?

## A Quantitative Analysis to Address That Question

Mark Snell

January 4, 2022 DRAFT

## Abstract:

The "Stop the Steal" Riot at the U.S. Capitol was labelled an insurrection first by President-Elect Joseph Biden, Jr. on January 6, 2021 and that description has been consistently applied ever since even though no sedition charges have been filed to date, almost one year later. Nevertheless, the label has stuck, largely because of images of what appears to be mindless violence that appears to many Americans to have no other explanation than incitement by former President Donald Trump.  It should be emphasized that this study makes no attempt to justify or whitewash that reprehensible violence that tragically led to multiple deaths; instead, it examines the patterns of charges of physical violence and alleged use of deadly weapons to determine whether those patterns suggest an insurrection was underway even in the face of no sedition charges.  While continued investigation may eventually prove conclusively that January 6 was indeed an attempted insurrection incited by former President Trump, the results of this study suggest that those patterns can be explained as well or better by non-seditious motives more aligned with rioters wanting to have their grievances about the "rigged" election heard by Congress before the Certification of the 2020 Election for President was completed and their increasing anger that law enforcement had prevented some of them from entering the Capitol to make their grievances heard.

*Note:  On August 15, 2022, I added some times that occurred after 4:30 p.m. to the event timeline found in Appendix I; other than that, the information and conclusions were current only as of December 26, 2022 [therefore, most notably not including two separate subsequent sedition charges] and may be significantly in error based either on information I missed at the time or that has been released since that date*

This page is intentionally blank.



# President-elect Biden's January 6, 2021 Remarks about the Still-Ongoing Violence at the U.S. Capitol*

"…All of you have been watching what I've been watching.  At this hour, our democracy is under unprecedented assault unlike anything we've seen in modern times.  An assault on the Citadel of Liberty, the Capitol itself.  An assault on the People's Representatives, the Capitol Hill Police who swore to protect them, and the public servants who work at the heart of our republic.  An assault on the rule of law, like few times we've ever seen it.  An assault on the most sacred of American undertakings, the doing of the People's business.

Let me be very clear:  The scenes of chaos at the Capitol do not reflect a true America, do not represent who we are.  What we're seeing are a small number of extremists dedicated to lawlessness.  This is not dissent; it's disorder, it's chaos, it borders on sedition.  And it must end now.  I call on this mob to pull back and allow the work of democracy to go forward.

You've heard me say before in a different context the words of a President matter, no matter how good or bad that President is.  At their best, the words of a President can inspire; at their worst they can incite.  Therefore, I call on President Trump to go on national television now, to fulfill his oath and defend the Constitution, and demand an end to this siege.  To storm the Capitol, to smash windows, to occupy offices, the floor of the United States Senate rummaging through desks, on the House of Representatives, threatening the safety of duly-elected officials.  It's not protest, it's insurrection.

The world is watching.  Like so many other Americans, I'm generally shocked and saddened that our Nation, so long a beacon of light and hope for democracy, has come to such a dark moment.  Through war and strife, America's endured much and we will endure here; and we will prevail again and we will prevail now.  The work of the moment and the work of the next four years must be the restoration of democracy, of decency, honor, respect, the rule of law. Just plain, simple decency.…

…There's never ever, ever, ever been a thing we tried to do that we've done together that we've not been able to do it.  So, President Trump, step up.…"

*My transcription.



This page is intentionally blank.

## Contents

Preface ................................................................................................................................... 10

Executive Summary............................................................................................................... 14

    Introduction ....................................................................................................................... 14

    Background to this Study .................................................................................................. 14

    Tentative Conclusions ...................................................................................................... 16

    Organization of this Document ........................................................................................ 20

    An Interview by WUSA9 with an "Insurrectionist" Who Saw Ashli Babbitt Die ...................... 21

Chapter 1: Quantitative Analysis .......................................................................................... 22

    Introduction and Overview .............................................................................................. 22

    Basis for Durations used in Rate Calculations.................................................................. 24

    Comparison of Results Between Different Location Categories........................................ 25

    Review of Results for the OTHER Location Category ........................................................ 33

    Graphs Depicting Analysis Statistics................................................................................ 46

Chapter 2: Events near the Senate Chamber ........................................................................ 51

    Summary of Events near the Senate Based on a Statement of Facts for an Indictment ......... 51

    Other Events...................................................................................................................... 55

    Events on the First Floor, Near the Stairs to the Second Floor Where Sargent Goodman Met the Rioters ....................................................................................................................... 59

    Further Police Response to the Senate ............................................................................ 60

    Here are My Notes About What was Said During the Impeachment Trial Concerning Events Near the Senate................................................................................................................. 62

        Description of What Happened When the Senate Wing Entrance Was Breached.............. 62

        Description of What Happened Later When the Senate Was Evacuated ............................ 64

Chapter 3: What You Can Infer from Absence of Video Evidence:  The Senate Side Gallery Violence.................................................................................................................................. 68

Chapter 4: Higher Priority Needs for Security Footage ......................................................... 73

Chapter 5: Events in the Rotunda and Statuary Hall ............................................................. 75

    Events in the Rotunda ...................................................................................................... 75

    Events in Statuary Hall ..................................................................................................... 75

Chapter 6: The House Wing .................................................................................................. 79

Persons Charged with Using Physical Violence or Who Had "Deadly Dangerous Weapon" Appended to One or More of Their Charges Near the House Chamber ................................ 79

Synthesis of House Impeachment Managers' Presentations Regarding What Rioters did Near the House Chamber ................................................................................................................ 81

What Happened inside the House Chamber ........................................................................ 84

Other Actions: The Mob Surges Past a Police Line in the "Crypt" ........................................ 84

Chapter 7: Several Overviews and Summaries Concerning January 6 ........................................ 86

Introduction ........................................................................................................................ 86

Using the New York Times Video "Days of Rage" to Organize the Discussion ........................ 86

Chapter 8: Availability of Police, Tactical Teams, and the D.C. National Guard .......................... 87

Introduction ........................................................................................................................ 87

Additional References ................................................................................................................ 88

Appendix I: Excerpt from Examining the U.S. Capitol Attack: A Review of the Security Planning and Response Failures of January 6 .......................................................................................... 91

Appendix II. Specific Sections of the Impeachment Presentations That Concern Staff, Speaker Pelosi and Her Offices, and Vice President Pence ...................................................................... 98

Some Information Suggesting Why Rioters were Calling for Vice President Pence to be Hung ............................................................................................................................................ 105

Appendix III: Recommendations for Information to be Released to Better Understand Rioters Motives and to Prevent a Similar Riot in the Future .................................................................. 106

Appendix IV: Information on Other Types of Crimes not Addressed in This Document ............ 108

Appendix V: Update: Numbers of Rioters Charged as of December 26 Compared to September 25 ................................................................................................................................................ 112

Appendix VI:  What Might Have Precipitated the Violence on the Lower West Terrace between Approximately 2:25 and 2:30 p.m. .......................................................................................... 114

Appendix VII: Why Rioters May have Engaged in the "This is the People's House" Protest Even After Lawmakers Had Left the Capitol ...................................................................................... 118

# Figures

Figure 1: Hypothetical Intensity of Alleged Acts of Physical Violence under the First Hypothesis ................................................................................................................................. 15

Figure 2:Hypothetical Intensity of Alleged Use of Deadly or Dangerous Weapons Under the Second Hypothesis ................................................................................................ 15

Figure 3: Four Location Categories Labelled on an Image of the Capitol .................................... 16

Figure 4: Hypothetical Intensity of Alleged Acts of Physical Violence under the First Hypothesis ................................................................................................................................. 23

Figure 5:Hypothetical Intensity of Alleged Use of Deadly or Dangerous Weapons Under the Second Hypothesis ................................................................................................ 23

Figure 6: Four Location Categories Labelled on an Image of the Capitol .................................... 24

Figure 7: Excerpt from Audrey Ann Southard-Rumsey Statement of Facts ................................ 42

Figure 8: Details for People Charged with Physical Violence or Deadly or Dangerous Weapon Charges ...................................................................................................................... 48

Figure 9: Details for People Charged with Using Deadly or Dangerous Weapons ...................... 49

Figure 10: Details for People Charged with Committing Physical Violence ................................ 50

This page is intentionally blank.



# Tables

Table 1 Comparison of Counts and Rates for All Location Categories .......................................... 26

Table 2: Comparison of Weapons-Related Charges between the Barricades and West Terrace versus the Lower West Terrace Tunnel .................................................................................... 27

Table 3: Weapons-Related Charge Counts and Rates for Different Time Periods ...................... 29

Table 4: Comparison of Physical Violence Charges between the Barricades and West Terrace versus the Lower West Terrace Tunnel .................................................................................... 30

Table 5: Physical Violence Charge Counts and Rates for Different Time Periods ....................... 31

Table 6: Comparison of Weapons-Related Charges for Three Subcategories of Locations Within or At the Capitol......................................................................................................................... 34

Table 7: Comparison of Physical Violence Charges for Three Subcategories of Locations Within or At the Capitol......................................................................................................................... 36

Table 8: Distribution of Weapons and Physical Violence Charges within the Capitol ................ 37

Table 9: People Whose Charges Involved Use of a Deadly or Dangerous Weapon within the Capitol before the Relevant Location Category was Evacuated................................................... 39

Table 10: People Whose Charges Involved Physical Violence near the House, The Speaker's Lobby, and the Rotunda Before the Congress was Evacuated..................................................... 41

Table 11: Remainder of People Whose Charges Involved Physical Violence within or at the Capitol Before the Relevant Location Category was Evacuated................................................... 44

Table 12: People Whose Charges Involved Use of a Deadly or Dangerous Weapon within the Capitol After the Relevant Location Category was Evacuated .................................................... 45

Table 13:  A Rioter Charged with Physical Violence at the Capitol and the Tunnel, as well as using a Deadly and Dangerous Weapon - a Baseball Bat - at the Tunnel ................................... 46

Table 14: Rioters Whose Charges Involve Threats ................................................................... 108

Table 15: Summary Information about the 20 People Charged Just With Assault* ................. 109

Table 16: 15 People Who Also Had Charges Containing the Keyword: "Injury" ....................... 110

Table 17: 5 People Facing Gun- or Firearms-Related Charges .................................................. 111

Table 18 Counts of Rioters Charged and Corresponding Rates for All Location Categories by December 26 as Compared to as of September 25.................................................................... 112



This page is intentionally blank.

# Preface

There is a widespread belief that the events of January 6 at the Capitol were caused by an angry mob of violent insurrectionists intent on preventing the peaceful transfer of Presidential power on January 20; that there was no excuse whatsoever for them doing what they did; that they were idiots who now need to be locked up to protect public safety; and that they just brought shame to President Trump and his tens of millions of completely non-violent supporters.

That belief has, for the most part, been treated uncritically which is a major concern because if it is not accurate then we risk, as Americans, that we will fail to fully learn the true lessons of January 6 and, as a result, will be less capable of preventing a similar event from happening in the future which is an outcome we all desire.  Unfortunately, both the Federal Bureau of Investigation (FBI) and what is termed the Mainstream Media, traditionally those most capable of and socially chartered with validating such judgements, do not appear to have spent much effort probing behind this narrative.

This document reports on the patterns of violence on January 6 combined with a deep-dive exploration into what lay behind the highest levels of violence in those patterns.  Specifically, I wanted to learn what did that more intense violence consist of and what might have been driving that specific violence?  This is an attempt both at breadth – I have surveyed all the documents in the Department of Justice website[1] as of December 26 for those charged with committing physical violence and the use of a dangerous weapon – but also of depth – I have spent hundreds of hours studying publically-available videos as well as reviewing dozens of statements by the participants, many of them made freely to the media.

If you are like me, you are familiar with a large number of short video segments, all showing the shocking violence that occurred on January 6, but I ultimately found this set of images to actually be a hindrance to me when I tried to think about and make sense of what happened. In that sense, I don't care about whether any of my conclusions in this document survive criticism just as long as it encourages people to start probing deeper beyond those perceptions than trying to find out who Republican lawmakers called on January 6.  It should be seen, then, primarily as a source of questions and secondarily a set of tentative initial answers to those questions.[2]

Before I go any further, I would like to make two disclaimers:

- First, I don't know the best terms for referring to the people who took part in storming the Capitol.  Based on some thought, I will generally refer to them as "rioters" and

---

[1] https://www.justice.gov/usao-dc/capitol-breach-cases

[2] I am fully aware, as someone working alone in New Mexico with access only to those publically available documents I have been able to locate, that I have only personally seen a small fraction of information critical to fully understand January 6.  To be sure, these are major stumbling blocks; in my defense, I want to emphasize: I would not have released this document if the more capable FBI and media had done this work themselves and released their results by now.

groups of them as a "mob."  This should not be interpreted as any judgment or conclusion on my part about any of them individually but merely reflects how American leaders have been consistently describing them[3].

- Secondly, and I want to emphasize, I want to make it clear that everything I am saying in this document about those that took part or what they did is TOTALLY alleged.  In some places I have described acts that I felt were based on charging documents, such as Statements of Facts and Indictments. This being a draft, though, there will be places where I failed to properly add these caveats.  All that I can say is "Mea culpa" and hope to remedy that omission as soon as possible through critical outside review.

Despite these caveats, I think that the conclusions of this document fit in well with the results to date of both charges and offered plea deals to rioters in collectively suggesting that there may be major flaws to the insurrection narrative.  Despite early claims, there have been no charges to date for treason or attempted sedition, which one would expect to be a necessary requirement before something could be termed an insurrection[4].  There been a small number – a handful - charged with threatening lawmakers and injuring non-police.  There also has been no success in determining the sinister motives of the person(s) who created and left the bombs at the DNC and the RNC so this crime currently offers no justification for the label of insurrection.

Most notably, from a counterterrorism perspective, I have found no statements by any rioter that has expressed any remorse with their collaborators that it was a failed insurrection.  After studying terrorist events for years, I have come to the conclusion that extremists that resort to violence are perfectly willing to communicate, if only to their conspirators, their motives and intentions after the event.  Certainly, the rioters had ample opportunity to communicate such remorse, if they had it, over social media in the days immediately following after January 6.

Based on these controversies with the insurrection narrative, I will raise what I believe is a major issue that I argue Americans should soberly and carefully grapple with.  I present it here in the preface to keep it out of the analysis in the rest of this document.  In short, I am very concerned that those charged for crimes at the Capitol will not be provided impartial justice.

As background for this concern, I point first to President-Elect Joseph Biden, Jr., who stated on January 6, with no qualifications, that "It's not protest, it's insurrection" concerning the violent events at the Capitol.  Since that time, there has been a consistent narrative, especially by the Mainstream Media and Democratic leaders, that has continue to allege what happened on January 6 was indeed an insurrection.  This assertion has continued despite the complete lack of sedition charges to date and apparently with roughly 100 plea-deals having been reached thus far with only a low percentage of them requiring the defendant to plead to felony charges.

---

[3] In fact, I'm concerned that if I used more neutral terms I would be accused of being biased.  No offense is meant to anyone by the use of this terminology.
[4] Indeed, one would expect that the alleged seditionists should be convicted before such terminology is used. [*August 15 Note:  this section was written before the first sedition charges were made.*]

I will end this preface with one item that I think is important but I couldn't find a good place to put it in the rest of this document. Just after 2:12 p.m., rioters breached the Senate wing Entrance and flooded into the Capitol.  As this first group raced towards the Senate, we all remember Officer Goodman appearing in front of rioters at a doorway leading to stairs to the second floor.  Somebody yelled, "Where do they count the votes?[5]"  In describing these events, the narrator in a New York Times documentary,[6] tells us: "Behind these rioters [*that is, the ones facing Officer Goodman*], just feet away, is an escape route where lawmakers and staff are now fleeing.  Just one officer stands guard."  I've taken a couple of screen-snaps from that section of the documentary which I present below.  The image on the left shows staffers and possibly even a Senator or two behind that single officer.

 

These images raise a question I frame in the following way. At this point, one or more rioters were provided an opportunity to make a personal decision:  to either push past a single police officer – Officer Goodman – blocking the path to the 'place where they count the votes' or to push past a single officer protecting Senate staff and possibly lawmakers and do something to menace or attack them. The question is: at that point, which choice did the rioters make?  I strongly suspect that if I were a member of an incited, out of control, angry, and violent mob, I would have a sudden impulse to go after those evil collaborators who were knowingly subverting the Constitution by certifying what to me was a fraudulent election (according to what the President had passionately assured me).  We might want to carefully consider that, as far as I know, apparently none of the rioters made the decision to try to push back this single officer and then attack those people behind him or her.  If that is true, we might ask ourselves a further question, "Why *did* they control themselves?"  The reader should be aware that these images record events that were happening less than 2 minutes after the first rioter, Michael

---

[5] From the Impeachment Presentation: "Did you hear the other shouts?  'We're here for you!'  'He's one person, we're thousands!'  And 'Where do they count the votes?' "

[6] Between elapsed times 20:02 and 20:15 in:
https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html

Sparks, entered the broken Capitol window and would have been recording events before the danger was probably apparent to many people inside the Capitol.  There would have been people like the ones you see on the left who were caught, without warning, in offices with their doors open or in the hallways who could have been suddenly attacked by an angry crowd.  It was probably a target-rich environment from that perspective.  And, to my knowledge, the rioters apparently didn't attack anyone other than police inside the Capitol.  Is that true?  I think it is highly relevant to get an answer to that question.



# Executive Summary

## Introduction

Drawing on my experience as a counter-terrorism expert who supported the Department of Energy for 40 years at a National Laboratory, I have done a deep-dive analysis into the pattern of violence on January 6. My conclusions, listed below - which absolutely need critical review! – appear to conflict with the "insurrection" narrative.  I believe these conclusions should be investigated since that largely unquestioned "insurrection" narrative has been the de facto interpretation of January 6 and if that narrative is flawed it will be that much more difficult to determine how to best prevent a future occurrence.  Any misjudgment is in nobody's best interest.

## Background to this Study

The purpose of this study was to analyze where and when on January 6 the rioters committed their most violent acts, including those that involved "deadly and dangerous weapons," to provide some insight into whether this pattern was consistent with the rioters being incited to violence by President Trump's rally speech and whether that pattern was consistent with rioters intending to hurt lawmakers or, still more serious, cause an insurrection.

Under these assumptions, one would expect the most intense violence and use of weapons to occur:

- Hypothesis 1: At the beginning of the riots due to incited anger overwhelming common sense, which one would expect to diminish later on as hot heads regained their composure; and
- Hypothesis 2: Nearer the House and Senate Chambers, as the rioters got closer to their "hated" quarry, Vice President Pence, whom allegedly they wanted to hang, and lawmakers, especially Speaker Pelosi and Leader Schumer.

To test these hypotheses, we searched the Department of Justice website[7] for those charged with crimes on January 6 looking for those whose charges involved either these two keywords[8]

- "weapon" – Which would identify those who allegedly used a "dangerous weapon" or a "deadly and dangerous weapon;"
- "Physical" or "physical"- Which would identify those who were charged with committing "physical violence"

---

[7]  https://www.justice.gov/usao-dc/capitol-breach-cases

[8] Alternative searches could be made for those perpetrators who were charged with having guns or firearms, or whose charges included keywords such as "injury," or involved a "threat" to injure or kill someone. There were too few of these cases to draw any significant conclusions from them so I have not discussed them here, except where the perpetrators were already charged with engaging in physical violence or that they used a dangerous and deadly weapon.

Note that physical violence appears to be a more serious charge than "assault" as in "Assaulting, Resisting, or Impeding Officers" so I focused on the former keyword[9].

Data on these two types of charges would appear to be consistent with these two hypotheses if (see the notional graphs below):

- The intensity of the physical violence would have ebbed as the day wore on, perhaps offset to some degree as rioters got closer to the lawmakers; and
- The use of weapons would increase as rioters got closer to their hated foes, the lawmakers and Vice President Pence, that is, as they moved from the West Terrace into the Capitol and then as they got closer to the House and Senate Chambers and Galleries.



| Figure 1: Hypothetical Intensity of Alleged Acts of Physical Violence under the First Hypothesis | Figure 2: Hypothetical Intensity of Alleged Use of Deadly or Dangerous Weapons Under the Second Hypothesis |
|---|---|

Such a study necessarily must look at which of these charges rioters were charged with (or both), when these alleged offenses occurred, and where they occurred.  Fortunately, enough of that information was available on December 26 for enough people to be listed in the database that out of 624 listed there at that point there were 82 facing "deadly or dangerous weapon" charges and 130 who were charged for physical violence (and 146 for both) that one can arguably begin to reach some tentative conclusions based on data rather than mere opinion.

Besides the number of people charged, another chosen metric of intensity of violence calculated was the number of people charged for their actions in one of three location categories divided by the duration of violence at each category.  As crude as that metric is – number charged per unit time - it is at least a rate that can be used for comparisons.  The locations of the alleged crime were identified and assigned one of the following three location

---

[9] Although I will include a short description of those 20 people (as of December 26) charged with assault in an Appendix.  The details of these charges appears to add very little to this analysis of physical violence and weapons-related charges.

categories (plus a miscellaneous category covering everything else that does not fall within these three categories[10]):

- The Barricades and West Terrace (except the Tunnel);
- The Lower West Terrace Tunnel; and
- OTHER: At entrances to or inside the Capitol.

The general locations of these categories are indicated on the following diagram. Note that the barricades to the Capitol grounds stormed at 12:53 p.m. are not indicated on the figure below but are included in the first location category, the Barricades and West Terrace (except the Tunnel).



Figure 3: Four Location Categories Labelled on an Image of the Capitol

## Tentative Conclusions

Here are some general conclusions reached from both the quantitative analysis and a further deeper dive into the information about physical violence and weapons-related charges summarized by that quantitative analysis.

1. While there was significant violence on the Capitol's West Terrace, especially at the notorious Tunnel Archway, the level of violence on the second (and third) floors inside the Capitol itself appears to have been much more limited. Whatever the mob thought and no matter how incited they were when they entered into the Capitol, it appears that once they had entered those upper floors their level of violence diminished. Perhaps some of this change in behavior occurred because they, self-describing as

---

[10] Specifically there is a "Somewhere else than these other listed places" location category is assigned to crimes allegedly committed elsewhere. This category includes one person charged with using a skateboard against a group of police crossing through the crowd at about 2 p.m., while another person attacked police with a hockey-stick pole just before 6 p.m., while still another was found in possession of a gun as he was leaving the Capitol Grounds at 7:25 p.m., long after the Capitol had been cleared and secured. I did not consider these to be relevant to this discussion.

patriots, were now near the House and Senate Chambers which they viewed as hallowed spaces in the Capitol. **It seems more consistent, though, with the rioters' own statements of what they wanted – to make their voices and grievances heard by the lawmakers – that the rioters' violence diminished on the Second Floor of the Capitol because they were now in a space where they could do exactly that. Whatever the rioters true motives, one must also give credit to the Capitol Police, not so much for fighting off an insurrection (although it seemed, I'm sure, to them that they were engulfed in one), but for de-escalating the boisterous, seething emotions in the mobs around the Senate and House Chamber Entrances before the corresponding chamber was evacuated.** Instead the violence that I did uncover at the entrances to and inside the Capitol seemed entirely consistent with a hypothesis that rioters aimed their violence at getting past police so they could enter through the East Entrance to the Rotunda to get near the Chambers and, once they had entered, they resisted being expelled by the police later in the day, after about 3 p.m. once both chambers had been evacuated, because they felt police had no right to expel them from what they, the rioters, felt was "Our house" not law enforcement's. Specifically:

   a. There were **3** rioters (out of the total of 82) who were charged with having "deadly or dangerous weapons" near the Senate Chamber before it was evacuated, and **none** at the House Chamber or Rotunda before 2:57 p.m., when the Capitol was deemed cleared of lawmakers. Counting 3 others, charged with weapons-related crimes at the Speaker's Lobby entrance and her offices, this totals 6 people. Further, two of those first set of three rioters mentioned above were charged for having knives in their pockets that were not even brandished as far as I can tell.

   b. When it comes to physical violence charges, I could find **no one** that was charged with physical violence in the hallway near the Senate while that chamber was occupied and only **1** rioter who was so charged near the House Chambers. There were 8 additional rioters who were charged with physical violence at either the Speaker's Lobby entrance or inside the Rotunda before 2:57 p.m. This adds up to only 9 rioters charged with physical violence on the Second and Third floors before the Senate was evacuated about 2:40 p.m. and before 2:57 p.m. for the rest, all out of 130 facing such charges.

   c. Given that there were 2 people who had both types of charges, there were only 13 people that had one or the other type of charges due to their actions near the Senate before 2:40 p.m. or before 2:57 p.m. in those other areas. That number works out to 2.1% of the 624 rioters found in the database as of December 26 or 9% of the 146 who faced either one of these two categories of charges.

2. Video, including security footage, released publically to date and statements in indictments appear to cover pretty much all the critical violent events that occurred on these two floors of the Capitol; the public is only lacking a few key time intervals to fully characterize the violence inside. Some of this footage may be available from news media and may not require any subpoenas to access it.

3. Despite paragraph 2, the violence on the first floor, at entrances or especially in the Crypt around 2:25 p.m., was indeed violent and needs to be treated as a riot. Other

than that, the violence on that floor seems consistent with the alternate hypothesis described under paragraph 1 above that people struggled with police to get in and, once in, resisted being expelled.

4. The violence- and weapons-related charges in other locations also ultimately defies the "Trump incited an angry mob intent on harming lawmakers" narrative. If that narrative was true, one would expect the most people charged for the use of "deadly and dangerous weapons" and physical violence to occur immediately after 12:53 p.m. when rioters first breached the outer barricades. But that doesn't fully match the facts in terms of the pattern of use of "weapons": this can be seen most starkly with numbers of and rates of weapon-related charges.  For example, the earliest attacks on the outer barricades did not involve hockey sticks, poles, or bear spray, weapons which were heavily used later on.  More generally, the rate at which people were charged for the use of weapons stayed the same during the day except for the time interval 2:28 to 2:40 p.m. when the rate was much higher. In terms of the other variable, physical violence, the rate of rioter actions leading to charges of physical violence did subside significantly over time, as hypothesized, but several other explanations, besides Presidential incitement, appear equally credible (see the section Comparison of Results Between Different Location Categories). As we saw for weapons, within that overall trend there were also outbursts of physical violence, for example, at the Lower West Terrace between 2:28 and 2:40 p.m. that does not match the predictions of the narrative hypothesis.[11]  Specifically,

   a. As indicated under paragraph 4, the level of violence, measured in terms of the number of people charged for physical violence per hour, on the West Terrace appears to have peaked at 2:28 p.m. compared to the rate for the 90-plus minute period before that which started after the first barricades were brushed aside.  After 2:40 p.m., barely 12 minutes after 2:28, this rate abated again after the police retreated to the Upper Deck, dropping back to a level reduced by 30% from what was seen before 2:28 p.m. and fully 60% from what was seen during that 12 minute period.

   b. This "down-up-then down" pattern of violence makes no sense from the "Trump incited them" perspective.  I have not been able to figure out why there was a burst of violence at 2:28 p.m.

   c. If we look at numbers, rather than rates of weapons-related charges, the trend in the number of people charged with weapons-related offenses appears to peak at the Tunnel, suggesting that these frustrated rioters escalated to using increasingly dangerous weapons against the police who were successfully keeping them out of the Tunnel.  Note that these rioters continued their

---

[11] As a side comment: Based on my own professional experience, review of videos recorded when people approached the Lower West Terrace for the first time appear to suggest that there were "agent-provocateurs" who were already stationed there who intentionally incited the crowd and, from what I could tell, there were people already there prepared to physically attack the police line right away with bear spray; many of these also had brought gas masks and water to wash out their eyes, both signs of some level of preplanning. The latter groups of people clearly were not incited by President Trump's speech. (Note that the evidence for this conclusion is found in videos that are documented elsewhere.)

       egregious violence in defiance of two tweets by President Trump to comply with police, appearing to support the conclusion that he was apparently not influencing their behavior by the time these rioters started their violence at the Tunnel.

    d. Finally, as evidenced by paragraph 2, the use of weapons and level of physical violence on the second floor of the Capitol itself was much less than that found at the West Terrace or the Tunnel, seeming to contradict the second hypothesis concerning the use of weapons that it would increase as rioters got closer and closer to their (hated) "quarry."

5. One important implication of paragraphs 1-4: **There seems to be very little evidence that most rioters - even those that fought at the Tunnel whose violence there, incidentally, was totally unacceptable - would have remained violent if they, somehow, could have forced their way into the Capitol itself. As mentioned earlier, this is a tribute to the Capitol Police who apparently successfully de-escalated the crowd at both Chambers, with the sad exception of the Speaker's Lobby where Ashli Babbitt was tragically killed.** This success suggests that if those at the Tunnel had somehow entered before the House was evacuated, it is not obvious that the Capitol Police would not have been equally capable of handling them. **This is not intended, in any way, to trivialize the traumatic stress and injuries that the police and others experienced inside the Capitol or at the Tunnel. It is meant solely to point out that there appears to be no evidence that the rioters at the Tunnel, if they had entered, would not have been controllable by the Capitol police using minimal or no levels force. And, amid all the political jockeying about January 6, this should be universally recognized as a credit to the skillful use of de-escalation tactics by the Capitol Police near the chambers.**

6. A personal opinion: Once the Capitol was cleared of lawmakers, pretty much all of the responding law enforcement was assigned to clear the Capitol of rioters. From what I've concluded, the law enforcement fear was that there were armed rioters still lurking in the Capitol, continuing to hunt, hurt, or even kill lawmakers or their staff. This priority forced the decision that the police at the Tunnel would not be relieved until the building was cleared. As someone who has worked with law enforcement, I would have done exactly the same thing; but **it is clear that relieving those police at the Tunnel was a secondary priority which would not have been the case if there was a true insurrection underway at the Tunnel (or any other place at the Capitol for that matter).** From careful review of proPublica videos, one knows that an FBI tactical team arrived at the Capitol at about 2:55 p.m. If there had been a "violent insurrection" occurring at the Tunnel at that time, that FBI team could have tasked to respond there to tell rioters in no uncertain terms that they, the mob, better back off or the tactical team would be forced to "kill them all where they stood." That 5-minute intervention would most likely have shut down all the violence at the Tunnel.

I, like all decent Americans, make no excuses for those protestors but I do assert that they have a Constitutional right to have their motives clearly understood instead of being labelled - without any evidence apparently – as insurrectionists intent on sedition who wanted and

expected that they could prevent the peaceful transfer of power a full 14 days later to a new, duly elected, President in defiance of the strongest military in the world.

## Organization of this Document

The quantitative part of this study is reported on in Chapter 1.  The later chapters document results of my deep-dive into the specifics of what happened at the Capitol that is summarized in the statistics of Chapter 1.  For example, Chapters 2, 3, 5, and 6 present details of events at the OTHER location category, at entrances to or inside the Capitol, broken down in to events at the Senate, specific violence at the Senate Gallery after it was evacuated, in the Rotunda and Statuary Hall, and in the House wing itself, respectively.

Chapter 7 includes my compilation of information from several media documentaries, including what they covered and the times these documentaries cover during the afternoon. *[September 1, 2022: The Rest of this description has been redacted to limit the focus of this reduced report.]*

Finally, Chapter 8 describes my analysis of police response to the storming.  *[September 1, 2022: The Rest of this description has been redacted to limit the focus of this reduced report.]*.

Note: Table 18 in Appendix VIII *[September 1, 2022: now Appendix V in this reduced report,]* records how Table 1 changed since September 25 to reflect those rioters listed on the Department of Justice website as of December 26 who are charged with committing physical violence or using/having a "deadly or dangerous weapon."  Notably, the data for the "OTHER: At entrances to or inside the Capitol" location category have not changed since September 25; specifically, the 3 tables describing OTHER data – Table 6, Table 7, and Table 8 – were unchanged.  The other location categories listed collectively gained all of the 7 additional people charged with weapons-related crimes and all of the 9 additional people charged with physical violence since September 25.

*[September 1, 2022 Note:  A reduced version of this document shall be created by redacting certain sections from it, such as Chapters 7 and 8 and an Epilogue as well as Appendices II, IV, and V and around Chapter 1 and a few other related topics.  Thus, Appendix II of the reduced document corresponds to Appendix III of this longer document, while Appendices III through V correspond to Appendices VI through VIII of this longer document, and VI and VII correspond to Appendices X and XI of this longer document).]*

I'd like to close this summary with following interview that I find poignant and I think provides insight into why the riot occurred on January 6.

An Interview by WUSA9 with an "Insurrectionist" Who Saw Ashli Babbitt Die

*Summary from this YouTube video*: "Thomas Baranyi … was interviewed by WUSA9's Ariane Datil immediately following the insurrection, and in the interview, he states his full name and state of residence before sharing details about how he gained access to the building…"

https://www.youtube.com/watch?app=desktop&v=eCuIxBzylyo



When asked by the interviewer about where he entered and exited the building, Mr. Baranyi stated,  "Other side, with the scaffolding.  We tore through the scaffolding through flash bangs and tear gas and blitzed our way in through all the chambers.  Just trying to get in to Congress or wherever we could get into and tell them that we need some kind of investigation into this. And what ends up happening is that someone might have ended up dead.  And that's not the kind of government we could have.  People should do something about it."

"…Just make sure people know because this, this cannot stand anymore, this is wrong, they do not represent anyone, not Republican, Democrat, independent, nobody, and now they'll just, they'll kill people."

The interviewer asked, "Who are you saying will kill people?" to which he responds, "who, I don't … police, congressmen and women they don't care, I mean they think we're a joke, two-thousand-dollar checks was a joke to them.  You know there's people filming us, laughing at us as we marched down the street.  At the Department of Justice there's a man in the window laughing at us, filming us, and here it was a joke to them until we got inside and then all of a sudden, guns came out, but, I mean, now we're at a point now it can't be allowed to stand. We have to do something. People have to do something."

Baranyi then held up his bloody hand again - with Babbitt's blood still on it - and stated, "Because this could be you or your kids."

# Chapter 1: Quantitative Analysis

## Introduction and Overview

The purpose of this study was to analyze where and when on January 6 the rioters committed the their most violent acts, including those that involved "deadly and dangerous weapons," to provide some insight into whether this pattern was consistent with the rioters being incited to violence by President Trump's rally speech and whether that pattern was consistent with rioters intending to hurt lawmakers or, still more serious, cause an insurrection.

Under these assumptions, one would expect the most intense violence and use of weapons to occur:

- Hypothesis 1: At the beginning of the riots due to incited anger overwhelming common sense, which one would expect to diminish later on as hot heads regained their composure; and
- Hypothesis 2: Nearer the House and Senate Chambers, as the rioters got closer to their "hated" quarry, Vice President Pence, whom allegedly they wanted to hang, and lawmakers, especially Speaker Pelosi and Leader Schumer

To test these hypotheses, we searched the Department of Justice website for those charged with crimes on January 6 looking for those whose charges involved either these two keywords[12]

- "weapon" – Which would identify those who allegedly used a "dangerous weapon" or a "deadly and dangerous weapon;" and
- "Physical" or "physical"- Which would identify those who were charged with committing "physical violence."

Note that physical violence appears to be a more serious charge than "assault" as in "Assaulting, Resisting, or Impeding Officers" so I focused on the former keyword[13].

Data on these two types of charges would appear to be consistent with these two hypotheses if (see the notional graphs below):

- The intensity of the physical violence would have ebbed as the day wore on, perhaps offset to some degree as rioters got closer to the lawmakers; and
- The use of weapons would increase as rioters got closer to their hated foes, the lawmakers and Vice President Pence, that is, as they moved from the West Terrace into

---

[12]Alternative searches could be made for those perpetrators who were charged with having guns or firearms, or whose charges included keywords such as "injury," or involved a "threat" to injure or kill someone. There were too few of these cases to draw any significant conclusions from them so I have not discussed them here, except where the perpetrators were already charged with engaging in physical violence or that they used a dangerous and deadly weapon.

[13] Although I will include a short annotated listing in an Appendix of those rioters solely charged with assault, not these other two types of charges.  The details of these charges appears to add very little to this analysis of physical violence and weapons-related charges.

the Capitol and then as they got closer to the House and Senate Chambers and Galleries.



| Figure 4: Hypothetical Intensity of Alleged Acts of Physical Violence under the First Hypothesis | Figure 5:Hypothetical Intensity of Alleged Use of Deadly or Dangerous Weapons Under the Second Hypothesis |
| --- | --- |

Such a study necessarily must look at which of these charges rioters were charged with (or both), when these alleged offenses occurred, and where they occurred. Fortunately, enough of that information was publically available on December 26 for enough people to be listed in the database that out of 624 listed there at that point there were 82 facing "deadly or dangerous weapon" charges and 130 who were charged for physical violence, suggesting that one can arguably begin to reach some tentative conclusions based on data rather than mere opinion.

Note that Appendix VIII summarizes changes in the data between September 25, when the first version of these tables were produced, and December 26, during which time 42 more people were indicted, bringing the total to 624. It turns out that there were no significant changes to the results and conclusions presented here when these later cases are incorporated into the analysis.

The chosen metric of intensity of violence is the number of people charged for their actions in one of three location category divided by the duration of violence at the locations in that categories. As crude as that metric is – number charged per unit time - it is a rate that can be used for comparisons. The locations of the alleged crime are placed in one of the following three location categories (plus a miscellaneous category covering everything else that does not fall within these three categories):

- The Barricades and West Terrace (except the Tunnel);
- The Lower West Terrace Tunnel; and
- OTHER: At entrances to or inside the Capitol.

The general locations of these categories are indicated on the following diagram. Note that the barricades stormed at 12:53 p.m. are not shown on the figure below but are included in that first location category, the Barricades and West Terrace (except the Tunnel).

23



Figure 6: Four Location Categories Labelled on an Image of the Capitol

## Basis for Durations used in Rate Calculations

Timelines for events can be found in Appendices I and IV. These timelines served as a basis for the event durations used in this study to estimate rates for people charged per hour.

While one might easily assume that the storming of the Capitol began at 12:53 p.m., when the first barricades protecting the Capitol were breached, it is difficult to determine precisely when the storming of the Capitol ended. I assumed that the Tunnel was the last location category that was cleared and this was assumed to be 5:10 p.m. (see the discussion below for details). This duration is 4.28 decimal hours.

Times are provide below for each of the three main location categories along with a short explanation of why I chose those times.

Barricades and West Terrace (except the Tunnel)
The duration is based on a 14-second proPublica[14] By 4:23 p.m., police have finally cleared the area near the two doors into the Senate-wing that had been opened first at 2:12 p.m. After this time they started moving to the Northwest corner of the Capitol, pushing the mob northward.

| Barricades and West Terrace (except the Tunnel) | Time Ranges | Total Time Range | Hours (Decimal) |
|---|---|---|---|
| Before 2:28 p.m. | 12:53 - 2:28 p.m. | 12:53 - 4:23 p.m. | 1.583 |
| After 2:28 p.m. | 2:28 - 4:23 p.m. | | 1.917 |

[14] https://projects.propublica.org/parler-capitol-videos/?id=9uZ6QOXOc7Wz

Tunnel

This is based on the Statement of Facts for Jonathon J. Munafo[15].  It states, "At approximately 2:28 PM, in the West Plaza of the Capitol, rioters continued attacking law enforcement and attempting to breach the police line. Not long after the initial surge, rioters broke through the police line and soon the West Plaza was overrun. The mob quickly turned violent. Rioters attacked USCP with fists, fire extinguishers, and 'bike rack' style barricades. At approximately 2:36 PM, USCP fell back into the Capitol via the Arch/Tunnel Entrance. For the next two-and-a-half hours, until approximately 5:10 PM, rioters continued attacking USCP and attempting to force themselves inside. At a certain time during the battle of the Lower West Terrace, just outside of the Tunnel, a video captured an individual … striking a USCP officer…"

|  | Total Time Range | Hours (Decimal) |
|---|---|---|
| Tunnel | 2:40 - 5:10 p.m. | 2.500 |

OTHER: At or Inside the Capitol

This is based on a quote from *Examining the U.S. Capitol Attack: A Review of the Security Planning and Response Failures of January 6*: "USCP secured the Senate and House chambers, along with the basement, subways, first floor, and crypts by 4:28 p.m."  This is a Staff Report developed for the Committee on Homeland Security and Government Affairs as well as the Committee on Rules and Administration.

| OTHER: At Entrances to or Inside the Capitol | Time Ranges | Total Time Range | Hours (Decimal) |
|---|---|---|---|
| Before evacuation | 2:13 - 2:57 p.m. | 2:13 - 4:28 p.m. | 0.733 |
| After evacuation | 2:57 - 4:28 p.m. | | 1.517 |

## Comparison of Results Between Different Location Categories

The table below lists numbers of people charged with weapon-related charges and for committing physical violence, along with the rate of rioters charged per hour, rounded off to whole numbers, for each of the 3 location categories.  The times listed under duration are my estimates of how long violence might have occurred in each area; these were defined and explained in the last section.  The top three rows count the number of rioters whose charges fell entirely within just one of these categories.

---

[15] https://www.justice.gov/usao-dc/case-multi-defendant/file/1389816/download

| Location Category | Duration | People Charged with "Dangerous Weapon" added | | People Charged under Physical Violence Statutes | |
|---|---|---|---|---|---|
| | | Number/% | Rate* | Number/% | Rate* |
| Barricades and West Terrace (except the Tunnel) | 12:53 to 4:23 p.m. | 26/32% | 7 | 47/36% | 13 |
| Lower West Terrace Tunnel | 2:40 to 5:10 p.m. | 33/40% | 13 | 38/29% | 15 |
| OTHER: At Entrances to or inside the Capitol | 2:13 to 4:28 p.m. | 13/17% | 6 | 28/22% | 12 |
| Combinations of Tunnel AND the Other Two Categories | - | 5/6% | - | 7/5% | - |
| Miscellaneous, such as in the crowd on the West side but away from the Terrace | 12:53 to 5:10 p.m. | 5/5% | 1.2 | 10/8% | 2.3 |
| Total | 12:53 to 5:10 p.m. | 82/100% | 19 | 130/100% | 30 |

Table 1 Comparison of Counts and Rates for All Location Categories

*Rate = Number of People Charged for Actions in these Location Categories per Hour

The combination location category, Combinations of Tunnel with the Other Two Categories, includes the people that were charged for actions both at the Tunnel AND either of the Barricades and West Terrace (except the Tunnel) or the OTHER areas at entrances to or inside the Capitol. Seven of them had charges involving "Physical Violence" while 5 of them had charges involving use of "Deadly or Dangerous Weapon.

As mentioned earlier, one metric of intensity of violence is the number of people charged for their actions at places within a location category divided by the duration of violence at those physical locations included in that category. As crude as that metric is – number charged per unit time - it is a rate that can be used for quantitative comparisons. As we can see here, the Tunnel has the highest rates, both for weapons-related charges and charges of physical violence (note that these percentage changes in rates are based on the actual rates determined out to 3 decimal places rather than the rounded off rates found in the tables). Measured over these long time periods, these rates are more than 75% higher for the use of weapons at the Tunnel than for the other locations and are about 10% higher in terms of the alleged commission of physical violence (note that these percentage changes in rates are based on the actual rates determined out to 3 decimal places rather than the rounded off rates found in the tables). Both of these outcomes, especially with respect to use of weapons, are fully consistent with Officer Fanone's characterization that the Tunnel was the "apex" of violence on January 6 (but more on this later).

Table 1 compares charges for rioters committing acts at the Barricades and West Terrace added up across the entire afternoon with charges for those that fought at the Lower West Terrace Tunnel after 2:40 p.m. If we are going to examine how rates vary over time more carefully, we will need to subdivide the Barricades and West Terrace timeline so there is a piece that matches the timeline for the Tunnel as well as other subdivisions that include times before 2:40 p.m. Thus, a better analysis of the use of weapons and physical violence over time between these two location categories might be to divide the Barricades and West Terrace timeline so that one interval covers events after 2:40 p.m., starting at the same time as the Tunnel. Further, there appeared to be a short, 12-minute "burst" of intense violence on the West Terrace that occurred between 2:28 p.m. and 2:40 p.m. so interval might define a second subdivision of the timeline. The remaining segment includes events between 12:53 p.m., when the outer barricades were first stormed, and 2:28 p.m.

These three subdivisions are reflected in the table below which compares numbers and rates of charges involving use of weapons across these three location categories over time.

| Location Category | Metric | 12:53 to 2:28 p.m. | 2:28 to 2:40 p.m. | 2:40 to 4:23 p.m. |
|---|---|---|---|---|
| Barricades and West Terrace (except the Tunnel) | Number | 17 | 5** | 3** |
| | Rate* | 11 | 25 | 2 |
| | Metric | | | 2:40 to 5:10 p.m. |
| Lower West Terrace Tunnel | Number | | | 33 |
| | Rate* | | | 13 |
| | Metric | 2:13 to 2:57 p.m. | | After 2:57 p.m. |
| OTHER: At Entrances to or inside the Capitol | Number | 8 | | 5 |
| | Rate* | 11 | | 3 |

Table 2: Comparison of Weapons-Related Charges between the Barricades and West Terrace versus the Lower West Terrace Tunnel

Legend:

1. *Rate = Number of People Charged for Actions in these (Single) Location Categories per Hour of Duration

2. **These two cells add to 8, which when added to 17 falls one short of the 26 shown in the previous table. The 26th person charged is Mark Ponder who allegedly committed physical violence at the Lower West Terrace at around 2:30 and then allegedly fought with police at the Upper West Terrace at about 2:50 p.m. Thus, he would properly be counted in both of these cells and I didn't want to allow duplicates. Luckily, he was the only duplicate in this table. Note that in the charts in the later section *Graphs Depicting Analysis Statistics* he is included in the 2:28 to 2:40 p.m. bin, just to make sure we could show the details of all 26 counted in Table 1.

As Table 2 and Note 2 show, there were 9 other people whose weapons-related charges are associated with their actions at the Barricades and West Terrace (except the Tunnel) after 2:28 p.m., meaning that there were 17 people charged for Weapons-related charges there before 2:28 p.m. Of those 9, there were 5 people charged for actions resulting in weapons-related crimes on the Lower West Terrace solely between 2:28 to 2:40 p.m. This leaves 3 people charged solely with use of weapons after 2:40 p.m., while a fourth person, Mark Ponder, allegedly committed acts in two subdivisions on the West Terrace some of these occurring before 2:28 p.m. and others between 2:28 p.m. and 2:40 p.m.

Perhaps the most notable result of this subdivision is that the rate of persons charged with weapon-related charges at the Barricades and West Terrace before 2:28 p.m., which in Table 1 only averaged out to merely 7 per hour over the entire time, went up by 40% to 11 per hour, bringing it much closer to the rate at the Tunnel. That latter rate, 13 per hour, is now only 20 percent higher than the former rate rather than the 75% increase that was estimated before the timeline was subdivided.

A better comparison, perhaps, is to add up the number of people charged for actions at the Barricades and West Terrace before 2:40 p.m., which totals 22 people. The computed rate over this time period is 12 people charged per hour, only about 7 percent less than the rate of people charged at the Tunnel. Note that the rate of people charged within the third location category, "OTHER", was about 11 per hour before the Capitol was declared evacuated of lawmakers. These three rates of charges per hour were all roughly 12 which calls into question the second hypothesis that the rates increased as rioters got closer to law makers. This remarkable similarity in rates is in contrast to the raw counts in Table 2 themselves, which are over 25% higher and 250% higher at the Tunnel than the Barricades and West Terrace location category – 33 vs. 26 – and at the Tunnel than the OTHER location category – 33 vs. 13, respectively. Thus, those raw counts are more consistent with Officer Fanone's judgements and, thus, are probably more indicative of the relative use of weapons rather than the rates; however, the pattern in these counts, with the "OTHER" location category closest to the lawmakers having the lowest count, is also strongly inconsistent with the second hypothesis about the use of weapons.

These comparisons are summarized in Table 3 below.

| Time Period/Location | Counts/Rates per Hour Over The Defined Time Period | | |
|---|---|---|---|
| **Total Time on January 6** | Entire Time Violence Occurred at This Location Category | | |
| Tunnel | 33/13 | | |
| Barricades and West Terrace (except the Tunnel) | 26/7 | | |
| **Before/After 2:40 p.m.** | 12:53 to 2:40 p.m. | | 2:40 to End |
| Tunnel | | | 33/13 |
| Barricades and West Terrace (except the Tunnel) | 22*/12 | | 3*/2 |
| OTHER: At Entrances to or inside the Capitol | Before Evacuation: Ended by 2:57 p.m. | | After Evacuation |
| | 8/11 | | 5/3 |
| **By Levels of Violence** | 12:53 to 2:28 p.m. | 2:28 to 2:40 p.m. | 2:40 to 4:23 p.m. |
| Barricades and West Terrace (except the Tunnel) | 17*/11 | 5*/25 | 3*/2 |

Table 3: Weapons-Related Charge Counts and Rates for Different Time Periods

*Note:  For reasons explained in a Table 2 note, Mark Ponder is not included in this count.

A similar analysis looking at the number of rioters charged with physical violence indicates that there were 34 people charged with physical violence of one type or another on the West Terrace (excluding the Tunnel) before 2:28 p.m. while there were 13 charged for crimes after 2:28 p.m.; see Table 4 below.  Of these 13, 8 were charged with committing acts solely between 2:28 p.m. and 2:40 p.m. and 4 were so charged solely for acts committed after 2:40.  As note 2 indicates, there was one additional person charged whose alleged crimes occurred during both of these two latter time intervals.  The rates with which people were charged with physical violence varied from 21 to 40 to 2 per hour over these three time intervals.  These 3 counts result in rates that are, respectively, roughly 40% higher, 160% higher, and 85% lower respectively than the rate of 15 at the Tunnel, based on 38 people charged with physical violence after 2:40 p.m.

Note that if we combine counts for Barricades and West Terrace (except the Tunnel) before 2:28 p.m. with the count between 2:28 p.m. and 2:40 p.m., as we did above for weapons, we get a total count of 42 people so charged *before* 2:40 p.m.  This turns out to produce an average rate of 24 people charged per hour, 55% higher than the rate at the Tunnel.  This compares to an average rate of 26 people charged per hour at entrances to or inside the Capitol before it was evacuated, which is *over* 70% higher than at the Tunnel.

These changes in rates of people charged with physical violence over time strongly suggests a trend that is very much in keeping with the predictions of the first hypothesis, that the crowd was incited early on by something – perhaps by the President - but that their anger subsided over time by the time violence started at the Tunnel.  But when we probe more carefully, by breaking 12:53 to 2:40 p.m. into two further subdivisions, we observe a further complicating detail: as was noted earlier, the rate shot up from 21 per hour to 40 per hour during that brief

12 minutes period. The rate then drops down to almost nothing in that category. While the latter drop might be explained by the violence being transferred to the Tunnel, it is difficult to see how a burst of violence was triggered so late in the day, which implies that something unusual happened there, whether planned or unplanned. I have not come across any good explanation for why that outburst of violence occurred then and not earlier.

| Location Category | Metric | 12:53 to 2:28 p.m. | 2:28 to 2:40 p.m. | 2:40 to 4:23 p.m. |
|---|---|---|---|---|
| Barricades and West Terrace (except the Tunnel) | Number | 34 | 8** | 4** |
| | Rate* | 21 | 40 | 2 |
| | Metric | | | 2:40 to 5:10 p.m. |
| Lower West Terrace Tunnel | Number | | | 38 |
| | Rate* | | | 15 |
| | Metric | 2:13 to 2:57 p.m. | | After 2:57 p.m. |
| OTHER: At Entrances to or inside the Capitol | Number | 19 | | 9 |
| | Rate* | 26 | | 6 |

Table 4: Comparison of Physical Violence Charges between the Barricades and West Terrace versus the Lower West Terrace Tunnel

Legend:
1. *Rate = Number of People Charged for Actions in these (Single) Location Categories per Hour of Duration
2. **These two cells add to 12, which when added to 34 falls one short of the 47 shown in Table 1. The 47th person charged is, again, Mark Ponder who allegedly committed physical violence at the Lower West Terrace at around 2:30 and then allegedly fought with police at the Upper West Terrace at about 2:50 p.m. Thus, he would properly be counted in both of these cells and I didn't want to allow duplicates. In the charts in the later section *Graphs Depicting Analysis Statistics* he is included in the 2:28 to 2:40 p.m. bin, just to make sure we could show the details of all 47 counted in Table 1.

In contrast to the rates, the count of the number of people charged with physical violence is highest at the Barricades and West Terrace before 2:40 at 42, with the next highest at the Tunnel being almost the same, at 38, and with both of these being over 100% or more higher than for the count of 19 for the third category, at entrances to or inside the Capitol, before lawmakers were evacuated, in turn, from each of the respective chambers.

| Time Period/Location | Counts/Rates per Hour Over The Defined Time Period | | |
|---|---|---|---|
| **Total Time on January 6** | Entire Time Violence Occurred at This Location Category | | |
| Tunnel | 38/15 | | |
| Barricades and West Terrace (except the Tunnel) | 47/13 | | |
| **Before/After 2:40 p.m.** | 12:53 to 2:40 p.m. | | 2:40 to End |
| Tunnel | | | 38/15 |
| Barricades and West Terrace (except the Tunnel) | 42*/24 | | 4*/2 |
| OTHER: At Entrances to or inside the Capitol | Before Evacuation: Ended by 2:57 p.m. | | After Evacuation |
| | 19/26 | | 9/6 |
| **By Levels of Violence** | 12:53 to 2:28 p.m. | 2:28 to 2:40 p.m. | 2:40 to 4:23 p.m. |
| Barricades and West Terrace (except the Tunnel) | 34*/21 | 8*/40 | 4*/2 |

Table 5: Physical Violence Charge Counts and Rates for Different Time Periods

*Note:  For reasons explained in a Table 4 note, Mark Ponder is not included in this count.

While the count at the "OTHER" location category is lower than the rest, the rate there before evacuations is over 70% higher than for the Tunnel.  The next section will explore why that rate might have been so high by examining the violence and use of weapons on the First Floor of the Capitol and the East Entrance versus other locations on the Second and Third Floors of the Capitol.  As that time period ended just after the violence at the Tunnel began, a higher "OTHER" category rate before 2:57 p.m. seems to support the first hypothesis, too.

Unfortunately, I feel uncomfortable in trying to subdivide these time periods further than this, partly because there is so little data and partly because of the problem of deciding what single time period to assign a rioter's violence to if their violence falls within multiple time periods, which is increasingly likely if the time granularity to those time periods became too fine, such as 12 minutes, for example.  It is entirely possible that the use of weapons at the Tunnel peaked during a more narrow time period than the 2.5 hours duration used here; in that case, the rates there would then be that much closer to those seen on the West Terrace before 2:28 p.m.  But an equal case might be legitimately made that violence at that West Terrace before 2:28 was clumped, also.

Given this seemingly insurmountable constraint on the granularity of the time periods, the rates suggest that the level of violence went down by about 30 percent as the day progressed, neglecting the period from 2:28 to 2:40 p.m. which appears to strongly support the first hypothesis.  Taken together, though, these data do not seem totally consistent with the assumption that the people fighting on the West Terrace were initially incited to mindless violence by the President.  If that were true, why did these rates peak at the West Terrace about 90 minutes into the storming of the Capitol to 40 per hour and then quickly drop right back down by about 60 percent as rioters attacked the police at the Tunnel?  To summarize,

with the exception of the time period 2:28 -2:40 p.m., the trends in the rate of physical violence charges seem to support the first hypothesis, which suggests that rioters were incited – perhaps by the President – while the trends in the rates of charges for deadly or dangerous weapons use, having remained more or less constant during the afternoon, do not support the second hypothesis that the use of weapons increased as rioters got closer to the Chambers, which argues against the idea that rioters were wanting to commit violence or threats of violence against lawmakers.  Thus, with the exception of that 12 minute time period, **while the rate of physical violence did decrease significantly during the afternoon, the data lends no support for the claim that rioters were intending to commit a violent insurrection against those certifying the Electoral Votes.**

The observed trend in the rate of physical violence also has other possible explanations besides rioters being incited by the President's speech.  One alternative cause was agent-provocateurs – who were clearly present at the Capitol – who attempted to stir up members of an otherwise peaceful group of protestors to anger by demonizing the police and calling for Trump supporters should take "Their House."  Something that clearly antagonized many was the police lofting munitions into parts of the crowd who viewed them as committing police brutality since they were not aware of how police were being attacked at the front of the crowd.  Still another cause that might have been that, once the police line at the bottom of the Lower West Terrace was breached about 2:35, many of those committing violence went and sat in the stands rather than to go fight at the tunnel.  Along those same lines, given the small number of people I counted charged for these crimes committed at both the Lower West Terrace and the Tunnel – 4 for weapons-related charges and 6 for physical violence – it appears that something else was causing rioters to commit violence at the Tunnel besides incitement of any kind that occurred around 1 p.m.  It is also intriguing that the President sent out a tweet at 2:38 p.m., just before the rate of physical violence dropped as compared to before 2:28 p.m.; perhaps that tweet did have an effect. At the same time, the rate of people charged with physical violence may have decreased simply because there was a smaller "edge of battle" at the Tunnel than at the Lower West Terrace.  Finally, I would submit that Office Fanone's characterization of the Tunnel being the "apex" of the violence is consistent with a smaller number of rioters committing violence at the Tunnel but being more likely to use deadly or dangerous weapons to commit that violence.

This may have happened partially because those rioters who fought at the Tunnel became angrier over time that the police were not letting them in through the Tunnel.  Towards the end of the afternoon, one would then suspect most of those still fighting with police were fighting because they had become frustrated at being kept out of the Capitol.  The count of the number of people charged (rather than the rates of charges) for use of weapons seems to bear this alternate explanation out:  namely, it appears that those who were fighting may have resorted more frequently as time went by to the use of weapons because the police had heretofore successfully kept them out.  This latter explanation is also more consistent with the claim echoed by many rioters that the police had no right to keep them out of "Their House."

Despite all of this discussion, it is unclear why there was a spike in violence at around 2:28 that resulted in the breach of the lowest-level police line.  More research is needed to explain this.

There are two other interesting corollaries based on these results:

- It is not clear that those who were fighting furiously at the Tunnel would still have been acting more violently inside the Capitol than those that entered earlier if the former had, somehow, successfully entered the Capitol.  Given that close to 100 rioters have signed plea agreements, this might be a useful topic to get their opinions about after each of their cases have been settled.

- Someone demonstrating their anger motivated by the attitude the police were (unjustly) keeping them out of what they believed was "Our House" would appear to have very little to do with anything President Trump or any other of the speakers had said at the rally earlier.  Clearly, his ONLY concern was with the election that he thought was being stolen by Democrats who, he felt, were lying about what had happened and the only remedy he called for was for the certifications by certain states to be reviewed by their State legislatures and modified, if they thought the evidence justified it, before being certified by Congress.  There was no talk, as far as I can tell, about asserting that his supporters had the constitutional right to get into the Capitol to protest. The closest explanation I have thought of that might establish such a link might flow from the assumption by the rioters themselves, based on their veneration of the President's every word, that the police opposing them knew perfectly well, as much as the rioters did, that the election was "obviously" rigged but, still, did not show solidarity with the rioters by getting out of the way and letting the rioters in.  Even if that were to be the unintended side-effect of the President's speech, it begs the question:  why didn't his supporters, if they slavishly venerated his every word, respond to the President's two tweets that afternoon calling on them to comply with the police and be peaceful?  If rioters were indeed venerating his every word then the violence should have abated when he sent his first tweet to comply at 2:38 p.m., which was roughly when the fighting at the Tunnel broke out; and if that first message didn't have any effect, one would think that they would certainly comply after his later messages, the last one explicitly calling on his supporters to go home.  This analysis clearly shows that while the first tweets might have resulted in a drop in the rate of physical violence, that first tweet appears to have had no effect on the rate of rioters charged with the use of deadly and dangerous weapons.  I was unable to determine whether the later tweets had any effect.

## Review of Results for the OTHER Location Category

These next two tables look at rates for three location subcategories for the single location category OTHER: areas in the proximity of, at, or inside the Capitol.  The Senate counts and rates are being treated differently from the others because the former area was evacuated

before 2:40 p.m. while evacuation of the Capitol, including those latter areas, was completed by 2:57 p.m.

| "OTHER" Location Subcategory | Metric | 2:13 to 2:40 p.m. | 2:40 to 4:28 p.m. |
|---|---|---|---|
| Near the Senate Chamber and Gallery (Chamber Evacuated by 2:40 p.m.) | Number | 3 | 4 |
| | Rate* | 6.7 | 2.2 |
| | Metric | 2:13 to 2:57 p.m. | 2:57 to 4:28 p.m. |
| House Chamber Entrance, House Speaker's Lobby, Rotunda, Speaker's Offices These areas were Evacuated by 2:57 p.m.) | Number | 3 | 0 |
| | Rate | 4.1 | 0 |
| All Entrances and Windows into the Capitol and all Other Areas Inside the Capitol (These areas were Evacuated by 2:57 p.m.) | Number | 2 | 1 |
| | Rate* | 2.7 | .7 |

Table 6: Comparison of Weapons-Related Charges for Three Subcategories of Locations Within or At the Capitol

While the rioter charge rates for the locations near the Senate before it was evacuated were the highest in the table, with 6.7 people charged per hour, note that the time period was also very short, only 27 minutes compared to other areas some of which averaged numbers of weapon charges over an hour and a half duration times. A similar effect can be seen with the second highest rate, 4.1 charges per hour, for the House Chamber Entrance, the House Speaker's Lobby, the Rotunda, and the Speaker's Offices, collectively, due to the short duration of 44 minutes involved. When I looked at the absolute number of charges for those two areas – only 6 – my interest was piqued. I began to explore what level of violence attended those 6 carrying or using weapons on the Second Floor in the areas around the Chambers when lawmakers were still present. Here is what I found:

- Two of them, Douglas Austin Jensen and William Wright Watson, both brought knives which they apparently didn't exhibit in a hostile fashion or use inside while Mr. Watson was also carrying mace but claimed he didn't know how to use it and didn't use it inside;
- A third, Robert Gieswein, brought a spray can and what looked like a baseball bat to that same area near the Senate but apparently stood in the back and did nothing with either of these items. All three of them had gone to a hallway just outside the Senate Chamber while lawmakers were still inside and apparently were quiet enough that the Capitol Police believed they had de-escalated the situation there (see Chapter 2);
- A fourth, Richard Barnett, brought a stun gun into the Capitol, then went into Speaker Pelosi's office and, like the first three, didn't do anything with it apparently and has not been charged with attempting to harm Speaker Pelosi, which was alleged at the Impeachment Trial; and

- The two others, Zachary Jordan Alam and Chad Barrett Jones, appear to have been the only two of these six charged with actually using "deadly and dangerous weapons," in this case a helmet and a pole - to help them smash windows to get into the Speaker's Lobby.  These acts were carried out on the route that the House lawmakers were taking from the House Chamber.

**These last two rioters, especially as they are the only ones to allegedly use those weapons in these areas inside the Capitol before it was evacuated, seems like a pretty weak example of deadly and dangerous weapons in locations nearest the lawmakers, certainly as compared to what was occurring at that very moment at the West Terrace Tunnel.**

In comparison to this 6, there were two people who were charged with using or carrying "deadly or dangerous weapons" near the Senate after it was evacuated:

- Joshua Matthew Black who carried a knife with him and apparently did nothing with it besides carrying it; and
- Bruno Joseph Cua, who had a baton and pushed an officer

I found two other rioters, Lisa Eisenhart and Eric Gavelek, who chased officers guarding the Senate (which I inferred, perhaps incorrectly, as happening after the Senate was evacuated).  Mr. Muchel allegedly carried a Taser in his pocket and was seen in photos inside the empty Senate Chamber carrying zip-ties.

**As with the previous 6 cases, these four cases, especially as they are the only ones to allegedly use those weapons near the evacuated Senate, also seems like a pretty weak use of deadly and dangerous weapons in this area near the Senate, certainly as compared to what was occurring at that very moment at the West Terrace Tunnel.**

But there is another side to this:  actions by this 4 appears to be, by far, the major short-term burst of weapons-related charges covering areas inside the Second Floor of the Capitol.  If these four people were seriously wanting to carry out a violent insurrection, especially using those weapons to target lawmakers, one must answer the question: why did they go to an empty Senate Chamber INSTEAD of going to the House, which continued to see evacuations from the Gallery?  Given the Senate was empty, they would have to go to the House wing to have <u>any</u> chance to succeed.  Instead, they stayed there, near the Senate, and apparently spent their time fighting police.

There are also a number of points that should not be overlooked: the detour of some rioters to the House Lobby was completely spontaneous and could not have been pre-planned.  The violence there at those Lobby doors was apparently not targeted at police officers – one can clearly see Mr. Alam in the video trying to break the glass by hitting it while reaching around an officer standing there. Regrettably, we also learned through Ms. Babbit's shooting that a single bullet stopped the entire mob in its tracks.  If anyone in that mob was attempting to carry out a

violent insurrection there it must have been a half-hearted one and, in any case, would have been quenched immediately by the tactical team standing nearby on the stairs.

The following table lists counts and rates for those charged with physical violence in those same subcategories.

| "OTHER" Location Subcategory | Metric | 2:13 to 2:40 p.m. | 2:40 to 2:57 p.m. | 2:57 to 4:28 p.m. |
|---|---|---|---|---|
| Near the Senate Chamber and Gallery | Number | 0 | 5 | 0 |
| (Chamber Evacuated by 2:40 p.m.) | Rate* | 0 | 18 | 0 |
| | Metric | 2:13 to 2:57 p.m. | | 2:57 to 4:28 p.m. |
| House Chamber Entrance, House Speaker's Lobby, Rotunda, Speaker's Offices | Number | 9 | | 2 |
| | Rate | 12 | | 1.4 |
| All Entrances and Windows into the Capitol and all Other Areas Inside the Capitol (These areas were Evacuated by 2:57 p.m.) | Number | 10 | | 2 |
| | Rate* | 14 | | 1.4 |

Table 7: Comparison of Physical Violence Charges for Three Subcategories of Locations Within or At the Capitol

The cell with the second largest number of people charged with physical violence includes the House Chamber Entrance, the House Speaker's Lobby, the Rotunda, and the Speaker's offices. These are certainly some of the most important locations for this analysis. As we can see from the table, there were 9 people charged for committing physical violence with the following distribution: 1 person faces charges for what they did at the House Chamber Entrance, 4 for the House Speaker's Lobby, and 4 for the Rotunda. The cell with the largest number of people charged for physical violence was physical violence at Entrances, at Windows, and other areas, such as the first floor, inside the Capitol which included 10 rioters. Comparing this with Table 5, we see that there were only 9 people charged with weapons-related charges on the Second and Third Floor, giving a rate of 12 people charged per hour which matches the Tunnel rate fairly closely. This seems to suggest that there were two processes occurring in the Capitol before it had been evacuated: the first involving rioters committing violence accompanied by weapons on the First Floor and at the entrances trying to get past police and the second involving rioters committing violence or bringing weapons onto the Second floor.

If we want to look in more detail at what happened in the Capitol, which should have been the epicenter of any insurrection, we need to look specifically at the charges against each of the 12 people charged with using weapons and 28 rioters charged for committing physical violence (these two lists combined includes 37 people because some people were charged with both types of charges). These charges can be divided by whether the alleged criminal act(s) occurred before or after the Senate Chamber was evacuated (if that is where the acts occurred) or

before or after the rest of the lawmakers had been evacuated in other areas on the Second Floor.  I've color-coded the numbers to help sort out who is who in the following tables.

| Location | Charges: | Before Senate Evacuated (~ 2:40 p.m.) | Senate Evacuated but not House (2:40 – 2:57 p.m.) | House Evacuated |
|---|---|---|---|---|
| Senate (Chamber and Gallery) | Weapon: | 3 (See Note 1) | 4 | - |
| | Physical | | (2 of these 4 have both) | |
| | Violence: | 0 | 5 | - |
| House Chamber Entrance | Weapon: | 0 | - | - |
| | Physical | | | |
| | Violence: | 1 | - | - |
| House Speaker's Lobby | Weapon: | - | 2 | - |
| | Physical | | (these 2 each have 1) | |
| | Violence: | - | 4 -See Note 2. | - |
| Rotunda | Weapon: | 0 | | 0 |
| | Physical | | | |
| | Violence: | 4 (Times are Unclear) | | 2 |
| Speaker Pelosi's Offices | Weapon: | 1 - Richard Barnett was charged for having a weapon: a stun gun | | |
| | Physical | | | |
| | Violence: | 0 | | |
| Other or Unknown Places | Weapon: | 2 | | 1 |
| | Physical | (1 of these 2 has both types of charges) | | |
| | Violence: | 10 - See Note 3 about one other person and Note 4. | | 2 |

Table 8: Distribution of Weapons and Physical Violence Charges within the Capitol

Notes:

1. This includes Robert Gieswein who carried a baseball bat and, apparently, a spray an, when he entered the Senate Wing and went to the hallway outside the Senate.
2. This number includes Uliyahu Hayah who got into a fight with police as he was being ushered by police out of the House East Entrance about 2:55.  Another person, Brian Bingham, also got into a similar fight with police; security footage of his fight was shown at the Impeachment Trial.  He, unlike Mr. Hayah, did not get a physical violence charge.
3. This count does not include Emanuel Jackson, who struck an officer just after the Senate wing Entrance was stormed and entered.  He also used a bat against officers at the tunnel so I counted him as a Tunnel AND "Other" combination included under the Location Category "Combinations of Tunnel with the Other Two Categories."
4. Many of these charges give very imprecise or no times so I have lumped them together.

Let's get back to investigating the information for the people charged with weapons-related crimes inside the Capitol.  There are 8 charges (highlighted in blue) for actions before the Senate was evacuated before 2:40 p.m., or before 2:57 p.m. in the Rotunda, the Speaker's Offices, and near the House on the Second Floor of the Capitol.  There were also 5 such charges

(highlighted in green) after 2:40 p.m. near the Senate Gallery and after 2:57 p.m. for those same locations.

I can only guess how many people will be ultimately charged beyond this 5 for violence after those locations were evacuated but I would tend to suspect that the 8 others listed will probably not undergo much additional change due to the high visibility of activities while lawmakers were still in the building.  The table below focuses on that latter group; it shows a short summary of the information about each of the 8 charged for weapon-related charges before the specific location was evacuated.

The information about these 8 defendants in Table 9 can be summarized as follows:

- Two people were charged with using a helmet and a pole as "deadly and dangerous weapons" to help them smash windows to get into the Speaker's Lobby;
- One person brought a stun gun to Speaker Pelosi's empty office; and
- Regarding other areas of the Capitol, such as the East Entrance to the Rotunda and the First Floor of the Capitol: One person was charged with bringing a wooden club or ax handle through the Senate Wing Entrance on the first floor and using it to prop open a sliding security door that officers were trying to close while a second rioter a second rioter brought a self-defense whip into the first floor where he apparently stayed without going up one floor.  While this second person allegedly attacked officers with the whip outside the Capitol, he was not apparently charged with attacking anyone once he was inside the Capitol.

| Name | Comments regarding weapons, tactics, and threats | Where and when weapon was used OR where and what violence occurred | Location Category |
|---|---|---|---|
| ALAM, Zachary Jordan | **Used a helmet to smash windows** | Smashed windows into the Speaker's Lobby doors | House - Speaker's Lobby |
| JONES, Chad Barrett | **Used a pole to break windows** in the entrance. | Used a pole to break windows about 2:40-2:45 p.m. | House - Speaker's Lobby |
| JENSEN, Douglas Austin | Had **a knife** in his pocket; he never took it out. | First to encounter Police Line outside Senate at about 2:15 | Senate |
| WATSON, William Wright | **Had mace**, claimed he didn't know how to use it, but admitted to waving it towards police. Also cut down fabric from scaffolding **using a knife**. | Waved mace at police at top of the Northwest Steps. Entered at 2:12 p.m. then went to the hallway/atrium near the Senate Chamber where a police line then stopped them. | Senate |
| BARNETT, Richard | Carried **a stun gun** | Went into Speaker Pelosi's office with the stun gun. | **Speaker's Offices** |

**Those Charged with Weapons-Related Charges in Multiple Location Categories**

| Name | Comments regarding weapons, tactics, and threats | Where and when weapon was used OR where and what violence occurred | Location Category |
|---|---|---|---|
| CHRESTMAN, William (*A Proud Boy*) | Had a **wooden club or ax handle; threatened officer** at the Lower West Terrace. Faces conspiracy charges. | At Lower West Terrace before entering the Capitol | West Terrace |
| | | Went to an exit (apparently from the Crypt to the CVC about 2:30 p.m. | Inside - First Floor Door |
| GIESWEIN, Robert (*A III%er*) (*Counted as "OTHER" in graphs rather than OTHER and West Terrace (Not Tunnel)*) | He pushed a Lower West Terrace barrier towards officers. **Had a baseball bat** that didn't appear to be used violently. **Sprayed something at** officers on the Northwest Steps | it is unclear when he pushed the barrier. | West Terrace |
| | | Sprayed officers holding the line on Northwest steps before 2:12 | West Terrace |
| | | Had a baseball bat as he entered the initial Senate breach and *then went and stood in the hallway outside the Senate*. | Senate |
| TAAKE, Andrew Quentin | **Sprayed officers with pepper spray** and **struck officers with a whip** | On Lower West Terrace sprayed officers at 1:16 p.m. and at 2:02 p.m. hit officers with the whip. | West Terrace |
| | At 2:20 entered Senate Wing Entrance **carrying that (self-defense) whip** | Entered Senate Wing Entrance at 2:20 p.m., then went to Crypt Lobby East at 2:35 p.m. | Inside - First Floor Door and Crypt |

Table 9: People Whose Charges Involved Use of a Deadly or Dangerous Weapon within the Capitol before the Relevant Location Category was Evacuated

Table 10 below lists the rioters charged with committing physical violence on January 6 inside the Capitol in three areas on the Second Floor: near the House Chamber Entrance, in the Rotunda, and near the Speaker's lobby before lawmakers and staff had finished evacuating at 2:57 p.m.  Note that the Senate has no entry here: the people charged with committing physical violence nearby allegedly committed it after about 2:40 p.m., after the Senate was evacuated.

This list includes Uliyahu Hayah who got into a fight with police as he was being ushered by police out of the House East Entrance at about 2:55 p.m.  I included him because that fight took place before 2:57 p.m., the "official" time from the Senate Report when the Capitol was said to be evacuated (see Appendix I), even though, technically, the House Gallery had already been completely evacuated a few minutes earlier.

| Name | Comments regarding weapons, tactics, and threats | Where and when weapon was used OR where and when violence occurred | Location Category |
|------|-----|-----|-----|
| SOUTHARD-RUMSEY, Audrey Ann | **She pressed a pole** against the chest of officer V. when the police line outside the House Chamber was breached. | Outside the House Chamber between 2:30 and 2:40 | House |
| ALAM, Zachary Jordan – (also "Weapon") | **Used a helmet to smash windows** | Smashed windows into the Speaker's Lobby doors | House - Speaker's Lobby |
| GRIDER, Christopher Ray | **Tried to breach Speaker's Lobby door; gave helmet** to Alam | Went to main House Chamber Entrance then to the Speaker's lobby | House - Speaker's Lobby |
| JONES, Chad Barrett – (also "Weapon") | **Used a pole to break a window** | Used a pole to break windows in the Speaker's Lobby doors about 2:40-2:45 | House - Speaker's Lobby |
| HAYAH, Uliyahu | **Fought police** when he was exiting at 2:55 p.m. through the House East Entrance. (*Fight was shown during the Impeachment Trial*) | Entered Senate Door 1 2:14; arrived 2:26 near end of Crypt Riot but didn't assault police then; witnessed Babbitt shooting. | House East Entrance After House Evacuated |
| RUBENACKER, Greg | Indictment includes physical violence but no further information. | Entered Capitol Rotunda but it is not clear when. Very little information is available. | Rotunda |
| SANDOVAL JR., Salvador | **Shoved police** and **tried to take shield** inside the East Entrance. | Inside the east Entrance and the Rotunda; his mother entered the Crypt but unclear if he did. Times for events are unknown. | Rotunda |
| SCHWAB, Katherine Staveley | Indictment includes physical violence but no further information. | Entered Rotunda but it is not clear when. | Rotunda |
| WRIGHT, John Douglas | Violence apparently associated with **pushing one barrier and pulling another** on the East side. Made plans to "drag 'em out." Threatened to return to make "HOME VISITS." | Alleged violence was apparently tied to having pushed and pulled barriers on the East Side before rioters went up the steps; probably before 2:26. Was in the Rotunda 2:40 -2:49. | Rotunda |

Table 10: People Whose Charges Involved Physical Violence near the House, The Speaker's Lobby, and the Rotunda Before the Congress was Evacuated



SOUTHARD-RUMSEY holding the flagpole against Sgt. V.



SOUTHARD-RUMSEY pushing Sgt. V. with the flagpole toward the house floor doors.

On January 26, 2021, Sgt. V. was interviewed by the FBI concerning his assignment on the day of the Capitol Building siege. Sgt. V., along with several other USCP officers, had been reassigned from their normal posts to a hallway in the Capitol Building located between Statuary Hall and the Hall of the House of Representatives ("House"). Sgt. V. was given instructions to hold or delay the rioters who arrived at this location. Sgt. V. claimed there were two main agitators in the group who approached his location. After being shown a video clip along with several photos of the location he had been assigned in the Capitol Building, Sgt. V. identified SOUTHARD-RUMSEY as one of the two main agitators in the group of rioters facing him. While standing before him, SOUTHARD-RUMSEY said the following to Sgt. V., in substance, "We're coming, we're coming" and "Let us through. We have the building already."

At some point during Sgt. V.'s interaction with SOUTHARD-RUMSEY, she obtained a flagpole which she held in her hands and pressed against his chest. Once SOUTHARD-RUMSEY had the flagpole on Sgt. V.'s chest, she did not remove it and he felt pressure from it. SOUTHARD-RUMSEY was the only one holding onto the flagpole. When the second agitator of the group yelled "Let's go," SOUTHARD-RUMSEY started pushing Sgt. V. with the flagpole and drove him back into the first set of doors leading onto the House floor. When Sgt. V. hit the doors, the doors flew open and he was pushed into the Lafayette marble statue striking the back left side of his head on the base of the statue. Sgt. V. felt like he was being trampled during the ordeal.

Figure 7: Excerpt from Audrey Ann Southard-Rumsey Statement of Facts

Returning to Table 10, we see that one additional person, Christopher Ray Grider, is charged with committing physical violence at the Speaker's Lobby entrance as part of a mob trying to get through it as Representatives were being evacuated. He also allegedly gave his helmet to Zachary Alam which the latter used to break holes in the windows leading into the Lobby. Finally, there were one more person I identified as being charged with physical violence who was identified as being in the Rotunda before 2:57 p.m., John Douglas Wright. In his case, it was not clear whether that violence was committed outside the Capitol, at the East Entrance to the Rotunda, and/or within the Rotunda itself. I have also included three others who were known to have been in the Rotunda: Greg Rubenacker, Salvador Sandoval, Jr., and Katherine Staveley Schwab, were charged with committing physical violence, but I don't know precisely

why they were so charged (although we *do* have some partial information for Mr. Sandoval), or when their acts leading to those charges were allegedly committed.

Table 11 lists everyone else charged with physical violence inside at or inside the Capitol as of December 26:

- Two were charged with breaking windows;
- Two were apparently charged with fighting police inside the Eastern Door to the Rotunda (while a third, Ryan Scott Zink, apparently did something violent that I haven't been able to get any further details about except a reference to the East Entrance to the Rotunda);
- Three allegedly committed acts against police on the First floor, the first by throwing chair and the other two by pushing or striking police;
- Two of the alleged perpetrators, Brian Gunderson and Jon Ryan Schaffer are charged with committing physical violence but it is hard to determine what they actually did that constituted physical violence and when it occurred.  Note that I've included them here even though I don't know when they committed these acts, just to be on the conservative side of counting them as performing these acts unless I know otherwise.  Unfortunately, I also don't know anything about where they committed these acts.

In spite of this limited list of people charged, we must be honest in admitting that it is clear that what happened in the Crypt, for example, was very violent and, in my opinion, constituted a true riot in spite of only one person on this list being charged for acts allegedly committed.  It is also clear, based on statements by Capitol Police, that it is likely that there was a significant amount of violence that never ended up on the video footage that has been released to date, either by news organizations or the Capitol Police.  Most certainly police were menaced by large crowds of rioters inside the Capitol and may have ended up traumatized even if those rioters never physically assaulted them.

Nevertheless, this list of charges appears to suggest that the violence on this list was largely focused on perpetrators trying to get into or around in the Capitol and, where necessary, the violence was aimed at police who they believed were trying to prevent them from doing so (to include attempting to close internal doors as was the case with Mr. Buteau) or was aimed at breaking windows just to get in.  I have seen no evidence that these alleged perpetrators planned to commit violence against lawmakers or their staff after they got to wherever they were wanting to go.  Needless to say, I haven't heard any evidence (which I might have missed) that suggested they were attempting to prevent the peaceful transfer of power on January 20 by disrupting the certification of the Electoral College votes.

| Name | Comments regarding weapons, tactics, and threats | Where and when weapon was used OR where and when violence occurred | Location Category |
|---|---|---|---|
| FAULKNER, Troy Elbert | **Kicked** in a window. | Kicked in a window on the Capitol Building | At a Window |
| PETERSON, Kurt | Used a **wooden stick** and his fist to break a window. | Broke an exterior Capitol window; also went inside | At a Window |
| PRESLEY, Ronnie Brian | **Grabbed on a** top portion of an officer's **shield** trying to take it. | An east exit at some time, perhaps when it was being breached | Inside - Eastern Door |
| WILLDEN, Ricky C. (*May be a Proud Boy*) | Indictment includes physical violence; but has no details. DoJ press release says he **sprayed police** at the East Entrance. | Entered Capitol; According to a June 30 press release he sprayed police at 2:35 p.m. who were standing at the East door. | Inside - Eastern Door |
| ZINK, Ryan Scott | No description of violence. | Entered Capitol through an eastern door; time unknown | Inside - Eastern Door |
| BUTEAU, Jamie N. | **Threw a chair at officers** under a closing door. | Apparently door between the Crypt and Capitol Visitor Center (CVC) at 2:30 p.m. | Inside - First Floor Door |
| LEFFINGWELL, Mark | **Struck an officer.** | First-Floor hallway in the Senate Wing at 2:30 p.m. | Inside - First Floor |
| PRUITT, Joshua (*Proud Boy*) | Not clear when and how he was violent. Media alleged he **pushed police** in the Crypt. | Media suggested that he pushed police in the Crypt 2:18-2:24 during a what seems to have constituted a "riot" there | Inside - Crypt |
| GUNDERSEN, Brian | Newspaper accounts allege he **pushed officers.** | Entered the Capitol. We don't know when or where violence occurred | Inside - Other |
| SCHAFFER, Jon Ryan | Oath Keeper **used bear spray.** | Spray used inside the Capitol but not clear where and when | Inside - Other |

Table 11: Remainder of People Whose Charges Involved Physical Violence within or at the Capitol Before the Relevant Location Category was Evacuated

| Name | Comments regarding weapons, tactics, and threats | Where and when weapon was used OR where and when violence occurred | Location Category |
|---|---|---|---|
| KRAMER, Philip Edward | Had **a walking stick and a rope** that were apparently not used. | Entered Capitol with a walking stick and rope about 3:10-3:12 p.m.; location unclear | Inside - OTHER After House Evacuated |
| BLACK, Joshua Matthew | Carried **a knife** with him | Went in Senate Side and stood in the Senate Chamber; happened to have a knife on him. | Senate After Evacuated |
| CUA, Bruno Joseph | **Had a baton; also pushed an officer** | At Senate Gallery after 2:45 (as Gallery doors were being locked). | Senate After Evacuated |
| EISENHART, Lisa | Co-charged with Eric Gravelek MUNCHEL for him **having a Taser** in his pocket and for **chasing officers** guarding the Senate | Chased officers outside Senate chamber apparently after it was evacuated. Also stood in Senate Gallery. | Senate After Evacuated |
| MUNCHEL, Eric Gavelek | **Had a Taser** in his pocket; also charged with **chasing officers** guarding the Senate. | Chased officers outside Senate chamber apparently after it was evacuated. Also stood in the Senate Gallery. | Senate After Evacuated |

**Those Charged with Weapons-Related Charges in Multiple Location Categories**

| | | | |
|---|---|---|---|
| MCGREW, James Burton | **Struck officers** in the Rotunda; don't know when the weapon - **a pole** - was allegedly used | At 3:07 struck officers in Rotunda trying to get people to leave; seen inside Capitol at 2:53 on BWC. Not clear if his weapon - a pole - was used here. | Rotunda After House Evacuated |
| | | Involved in actions at the West Terrace Tunnel at a time unknown. Not clear if he committed any crimes there. | Tunnel |

Table 12: People Whose Charges Involved Use of a Deadly or Dangerous Weapon within the Capitol After the Relevant Location Category was Evacuated

There is one other rioter whose charges don't fit neatly in one location category: he is charged with some acts at the Tunnel and others at or near entrances into the capitol, with all of these occurring before the Capitol was evacuated.

| Name | Comments regarding weapons, tactics, and threats | Where and when weapon was used OR where and when violence occurred | Location Category |
|---|---|---|---|
| JACKSON, Emanuel *(Charged for Committing Physical Violence and use of a deadly or dangerous weapon.)* | Allegedly **used a baseball bat to hit officers** | At 4:50 p.m. used a baseball bat against officers at the West Terrace Tunnel. | Tunnel |
| | Violence **such as punching.** The weapon, **a baseball bat,** was only used, apparently, at the tunnel. | As rioters first entered the Senate wing First Floor, he punched an officer. At about 2:48 p.m., he was in a crowd that overpowered officers & gained entry. | Inside - First Floor Door |

Table 13:  A Rioter Charged with Physical Violence at the Capitol and the Tunnel, as well as using a Deadly and Dangerous Weapon - a Baseball Bat - at the Tunnel

### Graphs Depicting Analysis Statistics

The following 3 figures provide graphical views of the data displayed in tables in the previous section.  They also provide some details looking across different location categories.

For example, one set of metrics, shown just under the chart at the top half of the page, is based on the number of people charged for physical violence and/or weapons charges allegedly committed at just the Tunnel OR at the Tunnel and some other locations; or, alternatively, at the Barricades and West Terrace (excluding the Tunnel) OR there and some other locations.  This is helpful because there were 12 people who were charged with such crimes committed at 2 or more of these location categories.

When we examine this metric, we see that there were 5% more people charged with committing physical violence at some point at the Barricades and West Terrace than at the Tunnel; the same is true for physical violence and use of deadly or dangerous weapons but the difference is only 2%.  On the other hand, there were 8% more people facing weapons-related charges who were at the Tunnel at some point than at the Barricades and West Terrace.

Note that these percentages are based on numbers that range from 75 to 138, with the 8% difference corresponding to 6 people.  Thus, the actual differences in numbers charged, as opposed to rates, is somewhere between 2 and 6.

I have added another metric at the bottom of the lower chart found on Figures 8, 9, and 10: the number of people charged with physical violence and/or weapons crimes who were at the Lower West Terrace between 2:28 and 2:40 p.m., as rioters were breaking through the lower deck police line, added to the number of those that fought at the tunnel.  This metric was

chosen because of a perception that, while the violence at the West Terrace before 2:28 was considerable and totally unacceptable, what occurred after 2:28 p.m., first in breaking through the police line and then fighting at the tunnel appeared more violent.  This variable allows us to compare that number with the number of people charged on the West Terrace before 2:28 p.m. giving a clearer picture of how these physical violence or weapon charge rates evolved over time.

Comparing these rates calculated before with those after 2:28 p.m. across these three figures:

- The rate based on those facing either physical violence or weapons-related charges was 20 after 2:28 p.m., which approximately matched the rate at the West Terrace before 2:28 p.m., which was 21;
- The rate based on those facing a weapons-related charge, while ignoring physical violence charges, was 14 per hour after 2:28 p.m., a 35% higher rate compared to 11 per hour at the West Terrace before 2:28 p.m.; and
- The rate based on those facing physical violence charges, while ignoring weapons-related charges, was 17 per hour after 2:28 p.m., which was about 20% less than the rate of 21 per hour at the West Terrace before 2:28 p.m.

To summarize, these results seems to suggest that while the number of people engaged in violence tended to trend down somewhat by about 20% as the afternoon progressed, based on comparing violence on the lower deck of the West Terrace first before 2:28 p.m. with that inflicted thereafter and at the Tunnel, those rioters that continued fighting after 2:28 p.m. were increasingly resorting to using weapons when they saw that police were continuing to prevent them from entering the Capitol through the Tunnel.



Figure 8: Details for People Charged with Physical Violence or Deadly or Dangerous Weapon Charges



Figure 9: Details for People Charged with Using Deadly or Dangerous Weapons



Figure 10: Details for People Charged with Committing Physical Violence

## Chapter 2: Events near the Senate Chamber

### Summary of Events near the Senate Based on a Statement of Facts for an Indictment

This is an excerpt from the Criminal Complaint and Statement of Facts document for Joshua Calvin Hughes and Jerod Wade Hughes.[16] Based on the following section, it appears to suggest that when Capitol police were confronted with an unruly crowd that greatly outnumbered them their level-headed thinking allowed them to defuse the situation in the hallway or atrium at the police line there where Officer Goodman had lured them minutes earlier.  I personally can't find anything particularly violent besides someone slamming a fire extinguisher on the floor so perhaps we can learn more from the Capitol Police or the FBI.  It would be useful to get a more detailed report from the officer referred to, keeping his or her identity anonymous if need be. I've added bolding for emphasis.

> **"The officer reported that, after that event, he and the rest of the officers were able to de-escalate the tension between the rioters and the officers, and the rioters all left the atrium where this confrontation occurred.**
>
> **Upon leaving the atrium, Joshua Calvin Hughes and Jerod Wade Hughes found their way onto the Senate floor – which had since been evacuated while this confrontation took place.**  While on the Senate floor, Joshua Calvin Hughes, Jerod Wade Hughes, and other rioters sat in Senators' chairs, opened Senators' desks, and reviewed sensitive material stored therein."

Thus, if we are to take these two bolded sentences at face value, I interpret them as meaning that these two men remained in the atrium, held back from the Senate by the police line, until after the Senate had been evacuated.  And that there was relative quiet, with reduced tension, during that time.

For everyone's benefit, I am including below more details from that Complaint and Statement of Facts concerning what led up to those statements.

Please be aware that I am organizing the following images in a slightly different manner than the Complaint-Statement of Facts shows them and I have also annotated them in ways that are not found in the Complaint-Statement of Facts.

Regarding these first two images, I have added bolding to indicate emphasis and added large font depictions of the time when each image was captured.  The left-most image was taken about 23 seconds after Michael Sparks was the first rioter to enter and 19 seconds later than

---

[16] https://www.justice.gov/usao-dc/defendants/hughes-jerod-wade

when Robert Gieswein, referred to as the man wearing "tactical body armor[17]" in the Impeachment Trial, was the second person through the broken window to the left of the door.

"Internal surveillance footage shows that Joshua Calvin Hughes and Jerod Wade Hughes entered the United States Capitol building at approximately 2:13 p.m., and were among the first ten rioters to enter this location.

Once inside the Capitol, Jerod Wade Hughes, both on his own and with another rioter, kicked a door until the lock broke so that other rioters could enter the United States Capitol. Joshua Calvin Hughes, upon seeing Jerod Wade Hughes kick the door, walked toward the door to assist in kicking it open, but the door is opened before he could reach it.



Once the door was opened, Joshua Calvin Hughes and Jerod Wade Hughes worked their way back to the front of the mob and advanced toward the Senate floor.

Joshua Calvin Hughes and Jerod Wade Hughes then joined up with Douglas Austin Jensen who was engaged in a confrontation with Capitol Police officer Eugene Goodman. Officer Goodman repeatedly ordered the rioters to back up and leave the Capitol building. Joshua Calvin Hughes, Jerod Wade Hughes, and the other rioters refused those commands. Rather, the rioters kept advancing toward Officer Goodman in a menacing manner – even as Officer Goodman retreated to recover a baton that had been dropped onto the floor. The video shows that Douglas Austin Jensen (circled below in green) was the primary aggressor, followed immediately by Joshua Calvin Hughes and Jerod Wade Hughes.

---

[17] Relevant excerpt: "You can see that the rioter first break the window with the wooden beam you saw previously and a lone police officer inside responds… and begins to spray the first man who enters but is quickly overwhelmed. I want you to pay attention to the first group of assailants as they break into the building. The second man through the window is wearing full tactical body armor and is carrying a baseball bat."



¹ Douglas Austin Jensen is charged in Case Number 21-CR-6 (TJK).

**Officer Goodman, who was facing the rioters on his own, retreated up the stairs and radioed twice for backup to direct other officers to the mob's location.**  Jensen, followed by the mob, chased Officer Goodman up the stairs.  As Douglas Austin Jensen pursued Goodman, he was followed by Joshua Calvin Hughes, Jerod Wade Hughes, and the other rioters.  When Officer Goodman reached the second floor, he positioned himself so that he was between rioters and the Senate floor – which had not yet been evacuated.  Realizing that he could not prevent the mob from storming the Senate floor by himself, Officer Goodman baited the rioters into continuing to follow him – luring them away from the Senate floor and into an adjacent hallway.

Several additional U.S. Capitol Police officers joined Officer Goodman in that hallway and attempted to quell the mob.  **Officers reported that they were too far outnumbered to attempt to arrest the rioters, so instead they used their training to try and de-escalate the situation by talking with individuals in an attempt to calm them down.  Notwithstanding these efforts, offers were met with shouting and aggression.  In reviewing a digital video recording of this altercation, rioters can be heard shouting "this is our house," "this is *our* America," and "we're here for the corrupt government".**



**A Capitol Police Officer reported that, during this altercation, one of the rioters slammed a fire extinguisher on the ground causing it to rupture.  The Officer described that it sounded like an "explosion," and – given both the sound and the white powder in the air – both the rioters and the officers were momentarily shocked and everyone took a step back.**



**The officer reported that, after that event, he and the rest of the officers were able to de-escalate the tension between the rioters and the officers, and the rioters all left the atrium where this confrontation occurred.**

**Upon leaving the atrium, Joshua Calvin Hughes and Jerod Wade Hughes found their way onto the Senate floor – which had since been evacuated while this confrontation took place.**  While on the Senate floor, Joshua Calvin Hughes, Jerod Wade Hughes, and other rioters sat in Senators' chairs, opened Senators' desks, and reviewed sensitive material stored therein."

## Other Events

This Criminal Complaint and Statement of Facts does not really dwell on what happened on the rioters' way from the breach to the Capitol until they reached that hallway; perhaps something incredibly violent happened there. If so, I haven't found it. It turns out that we have a fairly solid understanding of that based on other videos. As we see next, putting two publically-available videos together with security footage we have form a continuous picture of what happened starting at 2:13:06 p.m. when the first rioter, Michael Sparks, entered the Capitol until 2:15:45 p.m., when the police line was in place.

Perhaps one of the best views of Officer Goodman's journey up the stairs towards the police line can be found here: *Lone Capitol Police officer Eugene Goodman diverts Capitol rioters* Washington Post, January 11, 2021 https://www.washingtonpost.com/video/national/lone-capitol-police-officer-eugene-goodman-diverts-capitol-rioters/2021/01/11/ba67a5e8-5f9b-4a9a-a7b7-93549f6a81b3_video.html

The video ends at 2:15:45 p.m. after Officer Goodman has joined the police line seen here; the picture was recorded slightly earlier than that, at roughly 2:15:30 p.m.



I believe that we can see the person who recorded this video here, in an image from a proPublica video[18]. This proPublica video is useful in its own right for recording the earlier events on the Senate side; it shows events starting from the time the Senate wing Entrance was

---

[18]https://projects.propublica.org/parler-capitol-videos/?id=uirfdmQz0pcF

opened by rioters, at about 2:13:30 p.m., until they got close to the top of the stairs.  Thus, these two videos and related security footage provide a continuous view of events from the first rioter, Michael Sparks, entering the broken window at 2:13:06 p.m. until after 2:15:30 p.m.[19]



Concerning those that stood in the atrium outside the Senate Chamber, here is the list of people who were charged with committing "Physical Violence" or who had "Deadly or Dangerous Weapon" appended to one or more of their charges as of December 26.

Note that Eric Gavelek Munchel had a Taser in his pocket and chased officers guarding the Senate; it is unclear when this happened so I have classified it as happening after the Senate was evacuated since the events seem more consistent with that time period (there being entire police lines present when the Senate was first under assault).  This is a key assumption and would need to be verified.  His accomplice was Lisa Eisenhart.[20]

---

[19]Based on that footage, we can determine that Officer Goodman pushed Douglas Jensen at 2:15:10 p.m., which can be seen at elapsed time 0:42 in the Post video.  That video being 1 minute, 17 seconds long, this means that we have a continuous sequence from 2:13:06 until 2:15:45 p.m.  The image shown here was taken at 2:15:35 p.m.
[20] The following 6 people are charged with committing physical violence around the Senate Gallery or in the Senate Chamber after it had been evacuated: BLACK, Joshua Matthew; CLARK, Jacob Travis; CUA, Bruno Joseph; DEGRAVE, Nathaniel J.; MONTGOMERY, Patrick; SANDLIN, Ronald.  I'll have more to say about this in a later section.

| Name | "Deadly or Dangerous Weapon" Involved in Charges? | Status of the Capitol When Act was Committed |
|---|---|---|
| GIESWEIN, Robert | **Yes**: Carried a baseball bat/stick and had spray at one point which he used against an officer outside the Capitol building. He apparently didn't use either inside the Capitol itself. | Both Houses had still been in Session mere minutes before he and the crowd entered the atrium outside the Senate Chambers. Neither had been evacuated. |
| JENSEN, Douglas Austin | **Yes:** He had a knife in his pocket but never brandished it. He did, however, ignore Officer Goodman's orders to leave, forcing the latter to back up the stairs. | Both Houses had still been in Session mere minutes before he and the crowd entered the atrium outside the Senate Chambers. Neither had been evacuated. |
| WATSON, William Wright[21] | **Yes**: Had mace and aimed it at police but apparently didn't spray it. He claimed he didn't know how to use it. Used a knife to cut down fabric on scaffolding. Note: he tried to calm the mob near the Senate Chamber. | Both Houses had still been in Session mere minutes before he and the crowd entered the atrium outside the Senate Chambers. Neither had been evacuated. |

While I understand the charges, I have as yet to see any violence committed by any of them at this location once they had reached the hallway itself (one can view their actions on the way to the hallway from the first floor differently). Otherwise, one would have to presume that there was none, based on the Complaint and Statement of Facts (beyond slamming the fire extinguisher). As Mr. Jensen and Mr. Watson didn't even brandish their "weapons" and Mr. Gieswein apparently stayed near the back of the room and arguably didn't brandish his either, it is hard to understand how these items contributed to violence.

I believe that it is Mr. Watson who shows up in the following video[22], from which I captured this image which I then annotated:

---

[21] https://www.justice.gov/usao-dc/defendants/watson-william-wright
[22] https://amgreatness.com/2021/05/16/video-shows-u-s-capitol-police-gave-protesters-ok-to-enter/



From American Greatness embedded video:

The following three images show, from top to bottom:

1. The first image shows Dominic Pezzola, a Proud Boy and an alleged leader of the "insurrectionists," who was not on this list because he was charged only with assault[23], not with charges involving weapons or physical violence. We see him following Officer Goodman up the stairs with the mob to a hallway where several other officers were waiting. This happened, roughly, at 2:15:45 p.m.



---

[23] His assault-related charge seems to be tied back to his allegedly breaking through a number of police barricades and stealing, allegedly, a police shield. Mr. Pezzola was also alleged to be part of a group that allegedly said they would have killed Speaker Pelosi if they had encountered her as they went through the Capitol. I haven't heard any more about that allegation since February. I would like to know: is that charge still being investigated?

2. In this second image, we see Mr. Pezzola standing with Robert Gieswein whose name is on my list; Mr Gieswein can be seen wearing tactical gear and carrying what looks like a baseball bat.



3. This screen snap, taken at around 2:16 p.m., appears to have captured the dénouement of sorts, of all of the activity on the second floor of the Senate wing that occurred before around 2:40 p.m., when rioters entered the Senate Gallery and the cleared Senate Chamber.  We see the rioter Douglas Jensen in this photograph.



## Events on the First Floor, Near the Stairs to the Second Floor Where Sargent Goodman Met the Rioters

Whether people know it or not, they have seen excerpts from a video created by John Sullivan, with the word "JayDenX" on it, which provided much of the video documentation about violence near the House Chamber included in other videos about January 6 and which was

shown during the Impeachment Trial.  Probably very few have taken the time to look at that entire video and noticed that he proceeded to the Senate side first so his video can provide some limited evidence about what was going on near the Senate Coach Entrance which is located just to the Northeast of the stairs that Officer Goodman retreated up.  John Sullivan never made it to the Second Floor but, even so, his video evidence is relevant:  If we examine his video at elapsed time 7:34, where we see the empty hallway where Officer Goodman stood, this corresponds to 2:17:11 p.m.[24], only 90 seconds after our 1-minute, 17-second Washington Post video of Officer Goodman's retreat ends at 2:15:45 p.m.  By 2:17:34 there are already several police present, some of whom could have been sent upstairs to help the police line on the second floor if need be.  Thus, if the hallway to the stairs to the second floor was empty and there were several police in place near the Coach Entrance by 2:17:11 p.m., just how do we reconcile having a violent "insurrection"/riot being underway, just above this on the second floor, on the one hand with all of these officers in view here when probably half of them could have been told to immediately go upstairs to help control the mob on the other?

## Further Police Response to the Senate

At some point, one or two people from a tactical team apparently arrived near the Senate just about that same time as we see here; the following image is included in the Washington Post video as occurring in a sequence showing activities that occurred at about 2:15 p.m.



One wonders if these are two members of those termed "M4 officers" that had been pulled back into the Capitol minutes earlier.[25]  Note that the M4 carbine, a shortened version of the AR-15 rifle, is in common use in militaries around the world.

---

[24] See Appendix IV

[25] According to the Washington Post documentary, "*D.C. Police requested backup at least 17 times in 78 minutes during Capitol riot*" Visual Forensics;  Washington Post, Apr 15, 2021 at: https://www.youtube.com/watch?v=rsQTY9083r8B between 1:50 and 1:59 p.m., the Dispatcher informed Commander Glover that the Capitol police are pulling back their resources.   These resources include "M4 officers" meaning those armed with M4 military-grade carbines.

This tactical team's precise arrival time is incredibly sensitive and probably classified. But I would point to an entry in the official timeline found in the Senate Report:

> "The House declared a brief recess at 2:18 p.m. All active USCP Civil Disturbance Unit ("CDU") platoons were deployed to either the House side of the Capitol or the Rotunda. "

I personally doubt that the Capitol Police would have pulled ALL of these CDU platoons away from this wing before these M4 officers had arrived. If this team was really in place by 2:18 p.m., and that obviously needs verification, then the Senate would have been judged by Capitol Police to be adequately protected – and possibly Vice President Pence, too – by 2:18 p.m. by heavily-armed teams, bringing the risk to those in the Chamber down to acceptable. **If we assume the extreme case – that the redeployment was ordered at 2:18:59 p.m. - this would mean that we have a narrow time interval missing from our understanding of the risks from protestors standing in this hallway: from 2:15:45 p.m. until 2:18:59 p.m., less than 200 seconds long**[26]. I suspect that the Washington Post, New York Times, or proPublica all have video of the hallway during this time interval.

<u>A comment on risk to the Senate and the Vice President</u>: Given the weak, seemingly impromptu, police line formed at the top of the Northwest Steps, one might argue that the risk to the Senate became acute sometime between 2:08 to 2:10 p.m., when the mid-level police line on the Northwest Steps was breached, and was only reduced when the CDU's were pulled back at 2:18 p.m., indicating that the security risks was then considered acceptable enough that these units could be safely redeployed elsewhere. This was a critical 8-10 minute period and the Capitol Police are to be commended for handling it well. **Unless we get some here-to-fore unavailable images of violence near the Senate during the same time frame, it shows that that the Capitol Police response to the Second Floor of the Senate wing on January 6 was effective and carried out professionally. This response, including everything from use of de-escalation techniques to M4 teams, had compelled this group of rioters to compliantly remain essentially non-violent and had negotiated a way for the latter to have a peaceful protest in place where they felt they could be heard. The implications of this success for analysis of violence at other locations at the Capitol would seem to be of interest to investigators.**

Note that the Washington Post video shows a Capitol Police officer within the Senate chamber (outlined in red below) at 2:15 p.m. helping to lock a door[27]. This locking activity would have been going on when the rioter at the front of the mob, Douglas Jensen, first

---

[26] Even if this is true, the risk during that time period was unacceptable, even in retrospect. Who knows what might have gone wrong that didn't by the grace of God?

[27] Image is from elapsed time 4:14 in *Inside the U.S. Capitol at the height of the siege*, Washington Post, January 16, 2021, See: https://www.youtube.com/watch?v=ibWJO02nNsY

reached the second floor, just behind Officer Goodman.  However, to put that scary fact in some context, it might be presumed that this officer, and perhaps others inside the chamber that we can't see, were armed.



**Relevant Excerpts from the Impeachment Trial**

## Here are My Notes About What was Said During the Impeachment Trial Concerning Events Near the Senate

*This transcript is my own version and I apologize in advance for any errors; such errors were unintentional as were some sections of the Presentation that I judged to be unimportant so I omitted them not believing they were relevant.  I've added bolding for emphasis and put my comments inside tan-colored boxes with red exclamation points to the left of those boxes.  The video I am referencing was recorded by NBC News.  This is the only evidence I could find about what the mob was doing:  The mob was "massing" and some Senators, staff, and perhaps journalists were able to "hear them" yelling.  I talk about the Senate Gallery in the next section. I've found no charges involving "physical violence" on the floor.  There have been weapons charges for such things as carrying knives – for example, Joshua Matthew Black, but those knives were not used for any purposes, as far as I know, within the Senate Chamber.*

## Description of What Happened When the Senate Wing Entrance Was Breached

The relevant section of the Impeachment Trial section begins here:

https://youtu.be/SAnfRjML7WQ?t=19850

"While all of this was going on, Officer Eugene Goodman was responding to the initial breach. You all may have seen footage of Officer Goodman previously but there's more to his heroic story.  In this security footage, you can see Officer Goodman running to respond to the initial breach.  *[Representative Plaskett started narrating over the footage:]*  Officer Goodman passes Senator Mitt Romney and directs him to turn around in order to get to safety.  On the first

floor, just beneath them, the mob had already started to search for the Senate Chamber. Officer Goodman made his way down to the first floor where he encountered the same insurrectionists we just saw breach the Capitol.  In this video, we can see the rioters surge toward Officer Goodman.  Recall that the rioters are in red, Officer Goodman in this model is in blue.

*My note: Just to orient things, we see him running past Senator Romney at 2:13:48 on the second floor.  Officer Goodman then made his way down to the first floor.*

Watch Officer Goodman who backs up the stairs.

> **!** Discussion: As far as timing, we see the door on the first floor opening at elapsed time 5:31:22 in the NBC video, then rioters entering, turning left, then turning right, going down the hall towards the exit and finally encountering Officer Goodman at the doorway to the hall at 5:32:10; the crowd stops there, in a stand-off of sorts until 5:32:37 when he backs up the stairs, reaching the landing about 5:32:50, 88 seconds after the Senate wing Entrance had opened.  A Boston globe short video[28] of this event shows about 9 seconds elapsed from that event to officer Goodman backing off the stairs and onto the second floor, then starting to be in the view of the security camera, In summary, that the door appears to have been opened about 95-100 seconds earlier or 2:13:30-35 p.m., roughly about 5-10 seconds after Mr. Geiswein entered while the end of those events seems to have been about 2:15:11 p.m.
>
> The ones going up the stairs were quoted by her to say "They said they didn't have weapons...."  So, the one who said this clearly didn't know who had weapons.  Some of them asked, "Where they were counting the votes?"  Thus, these folks apparently hadn't been doing any planning.  Note:  Officer Goodman appears to be backing into the room with the other officers at 2:15:15 p.m.  Mr. Gieswein can be seen entering the room at 2:15:33 p.m.  The mob of rioters entering the Senate wing probably included people who had planned events but not this aspect OR they didn't plan at all.

Although they were shouting they did not have any weapons, we know from the earlier video that that's not true.  The second assailant through the breach was the one carrying a metal baseball bat. We know there were other weapons there that day.

Did you hear the other shouts?  "We're here for you!"  "He's one person, we're thousands!" And "Where do they count the votes?"

---

[28] https://apps.bostonglobe.com/nation/graphics/2021/01/us-capitol-riots-timeline/
See the top video under "2:13- Vice President Pence narrowly avoids the mob" The 10-day Electoral Commission proposal can be found under the heading "The House and Senate are evacuated."  It would be good if people listened to it and maybe did something to implement it, even if who is president is moot.

They were coming at the urging of Donald Trump, to keep Congress, a separate branch of government, from certifying the results of a Presidential election.  As the rioters reached the top of the stairs, they were within 100 feet of where the Vice President was sheltering with his family.  And they were just feet away from one of the doors to this chamber, where many of you remained at that time.

I also want to show you a different angle from the security footage of Officer Goodman's acts[29]. This video is on the Second Floor of the Senate wing of the Capitol.  The red dot, you will recall, represents the insurrectionists, the blue dot is Officer Goodman, who led the mob away from the chamber just minutes earlier.

> *She narrates over the video*, "On the left-hand side of the video, just inside the hallway, is the door to Senate chamber.  And watch how Officer Goodman provokes the rioters and the purposefully draws them away from the door to the Senate Chamber and towards the other officers waiting down the hall. The rioter seen carrying a baseball bat in this video is the same one we saw moments ago breaching the window on the first floor."

While all of this was going on, Vice President Pence was still in the room near the Senate Chamber.  It was not until 2:26 that he was evacuated to a secure location.  This next security video shows that evacuation.  His movements are depicted by the orange dot in our model; the red and blue dots represent the location where the mob and officer Goodman were, and where Officer Goodman led the mob away from the Senate Chamber just moments ago.

> *She narrates over the video*: "You can see Vice President Pence and his family quickly move down the stairs.  The Vice President turns around, briefly, as he's headed down."

As Pence was being evacuated, rioters started to spread throughout the Capitol."


## Description of What Happened Later When the Senate Was Evacuated

"And as you know, the threat to the Senate was no less than that of the members of the House. The mob approached the Senate with the same purpose, fulfilling President Trump's goal of stopping the count, delaying the certification of the Electoral College votes of the American people.  As you heard from Manager Plaskett, Vice President Pence was moved away from the area near the Senate chamber around 2:25 p.m.  By that time, rioters had breached several areas close to this chamber and they were flooding the hallways just outside and nearby.  The Senate chamber was not evacuated until 2:30 p.m.   The mob had been in the building more than 15 minutes.

---

[29] The security footage starts at elapsed time 5:34:13 in this NBC News video and ends at elapsed time 5:34:55. Note: security camera footage for Vice President Pence's evacuation, discussed in the next paragraph, shows 2:26:00 p.m.

This new security video of the Senators and staff leaving the chamber will be displayed on the screens. You cannot see it in this footage, but quick thinking Senate Floor staff grabbed and protected the Electoral ballots that the mob was after.

. https://youtu.be/SAnfRjML7WQ?t=22123



> ❗ Discussion: The time shown on this security camera image is 2:30:48 p.m.

https://youtu.be/SAnfRjML7WQ?t=22202

Those of you who were here that day will recall that once you left the Senate floor you moved through a hallway to get to safety.  That hallway was near where Officer Goodman had encountered a mob and led them upstairs away from the Senate chamber.  You know how close you came to the mob. Some of you, I understand, could hear them.  But most of the public does not know how close these rioters came to you.  As you were moving through that hallway, I paced it off, you were just 58 steps away from where the mob was massing and where police were rushing to stop them.  They were yelling.

> ❗ Discussion: Here we hear about "the mob "massing" and some Senators, staff, and perhaps journalists being able to "hear them" yelling.

In this security video, you can see how the Capitol police created a line and blocked the hallway with their bodies to prevent rioters at the end of the Hall from reaching you and your staff.





At the other end of that hallway is where rioters have amassed and where officers are rushing to protect you.

Additional security shows how Leader Schumer and the members of his protective detail had a near miss with the mob; they came within just yards of rioters and had to turn around.

❗ Discussion: this next security camera footage ends at 2:33:22 p.m.

Here in this new video, you see Leader Schumer walking up a ramp.  Going up the ramp with his detail he will soon go out of view.  Seconds later they return and run back down the hallway and the officers immediately shut the door and use their bodies to keep them safe.

https://youtu.be/SAnfRjML7WQ?t=22410

At 2:45 PM, shortly after Senators were ushered to safety from the Senate floor, insurrectionists reached this Senate Gallery.  The following video was filmed by a New Yorker Reporter.[30]

> *Note: We hear the rioters say,* "Knock, knock, we're here.  Is this the Senate?   Where the f*** are they?"

Minutes later the insurrectionists invaded and desecrated the Senate floor.  These vandals shouted and rifled through the desks in this room.  They took pictures of documents and of themselves, celebrating that they had taken over the floor and stopped the counting of Electoral College votes.

> *Note: We hear the rioters say,* " There's gotta be something here we can f*****g use against these scumbags."

Larry Brock, who was arrested for his role in the insurrection was photographed on the Senate floor, wearing a helmet, tactical gear, and carrying flex cuffs.  This man, also in the Senate gallery is Eric Munchell; like Brock he was dressed in what appears to be tactical gear, also holding up flex cuffs.  **If the doors to this chamber had been breached just minutes earlier, imagine what they could have done with those cuffs.**

> **!** Discussion:  Later, we find out that neither wanted to do anything with the flex-cuffs, according to their lawyers; they allegedly just picked them up.  This allegation regarding these flex-cuffs that these two posed a danger appears to be false, based on what is publically available to date.  We learned later, from his charging documents, that he was carrying a Taser.

After insurrectionists occupied the Capitol and stopped the joint Session from counting the votes, the Capitol was in lockdown for 5 hours."

---

[30] https://www.newyorker.com/news/video-dept/a-reporters-footage-from-inside-the-capitol-siege

# Chapter 3: What You Can Infer from Absence of Video Evidence:  The Senate Side Gallery Violence

A security system for a higher-security facility like the Capitol makes extensive use of security cameras.  Security cameras are placed to cover important areas, such as those found around the House and Senate Chambers and Galleries, and their footage is recorded 24/7.  In such cases, *absence of evidence on video footage does strongly imply evidence of absence*.  Therefore, if there was insurrectionary-level of violence occurring around the House and Senate Chambers or Galleries I would presume that we would by now have seen a few images, at least, showing that violence.

There are a few legitimate reasons why we may not have seen such images.  Some have suggested that footage has not been released because of security reasons although Courts have rejected that as a blanket argument and, instead, have ruled that there is justification for releasing parts of such footage to the press.  One would think that releasing images of highly violent, insurrectionary-level footage, if only to show us the most violent of the episode(s), would have such great value for informing national debates about January 6 that this would clearly outweigh the security risks engendered by showing us at least a few well-chosen images.  Thus, a security rationale for holding such images back seems unconvincing.

Another reason might be that the levels of violence inside the Capitol were so insurrectionary and violent that the Capitol Police and the FBI still, more than 11 months after the fact, have not gotten down to reviewing and releasing such less-violent images as the ones I am calling for.  This is a (legitimate) screening argument:  it may be claimed that the images released so far cover more extreme insurrectionary behavior and the FBI and Department of Justice (DoJ) are still working their way down from substantiating charges for sedition and have not had the time to get to the level of examining and using the images I would like to see.  As an analogy, it might be argued that the insurrectionary behavior around the Senate and House was like set of 8-Richter-scale violence "earthquakes" but, unfortunately, there was, according to this argument, so much 9-Richter-scale violence that the FBI and the DoJ haven't just haven't gotten down to that less-horrific level of violence.  The argument would be, "Just be patient."

While this argument certainly has merit, I'd like to turn to a Statement of Fact for Nathaniel DeGrave[31] which <u>does</u> make use of Security footage so what we read about in there clearly exceeds the screening threshold for release.  Thus the "screening level" for resorting to using security footage is at this level of violence <u>or lower</u>.  To see where the screening-level bar is set,

---

[31] https://www.justice.gov/opa/page/file/1362391/download

here are some excerpts[32] from Mr. DeGrave's Statement of Fact (this also provides information about another defendant Ronald Sandlin):

"Following the events of January 6, 2021, your affiant reviewed a copy of surveillance video footage obtained from an internal security camera covering a hallway in the U.S. Capitol Senate Gallery with a date and time stamp reading Wednesday, January 06, 2021, at 2:41:28 PM. This camera provides a view of a hallway and several sets of doors to rooms or areas out of the view of the camera. The beginning of the video clip showed several unidentified subjects in the hallway.

A U.S. Capitol Police (USCP) officer (hereinafter referred to as "USCP1") is seen entering one of these sets of doors and is shortly joined by two other USCP officers ("USCP2" and "USCP3"). As part of their official duties, USCP1, USCP2, and USCP3 were clearing individuals out of rooms and securing the doors.

Approximately 27 seconds into the video clip, an individual who was later identified as RONALD SANDLIN entered the view of the security camera wearing a bright orange sweatshirt, baseball cap, backpack, a second smaller bag over his shoulder, and what appeared to be camera equipment, including a camera and a small tripod. Shortly thereafter, USCP2 and USCP3 moved toward the second set of doors to start to usher people out, while USCP1 finished locking the first set of doors. SANDLIN is seen walking next to USCP1 as he approached the second set of doors, and while USCP2 is attempting to close the second set of doors. SANDLIN is observed cutting in front of USCP1 and attempting to wrestle the door away from USCP2. This wrestling to keep the door open causes PERSON 1, SANDLIN, and several other unidentified subjects to become engaged in a shoving match with the USCP officers. While this shoving match transpires, the three USCPs are without backup in a hallway surrounded by what appeared to be at least 20 individuals. PERSON 1 is observed wearing black tactical gear, including what appears to be body armor, a helmet, and a mask/face shield.

As the three USCPs make their way away from the crowd down the hallway and out of view of the security camera, PERSON 1, SANDLIN, and several others are observed on the video footage acting in an aggressive manner towards the USCPs. PERSON 1 can be seen putting up his fists as if to begin boxing one of retreating USCP officers (see Figure 1). As the USCP officer steps away, PERSON 1 is observed banging his chest. PERSON 1 then removes his mask/face shield (see Figure 2), revealing an individual wearing a red-white-and-blue neck bandanna who resembles NATHAN DEGRAVE, as seen on his driver's license photograph."

---

[32] If you like, you may take a look at what happened; I found a video covering the altercation in an August 30, Buzzfeed article appropriately titled *Eight Months After The Capitol Riots, Thousands Of Hours Of Surveillance Footage Remain Secret: There are 14,000 hours of surveillance footage from the Capitol riots. Most of it isn't public, and the government is fighting to keep it that way*.
https://www.buzzfeednews.com/article/zoetillman/insurrection-capitol-footage-secret



https://www.justice.gov/opa/page/file/1362391/download



Let's turn to Mr. Degrave's indictment[33]; this is the entirety of what he is charged with:

- Assaulting, Resisting, or Impeding Certain Officers;
- Civil Disorder; Obstruction of an Official Proceeding;
- Entering and Remaining in a Restricted Building or Grounds;
- Disorderly and Disruptive Conduct in a Restricted Building or Grounds;
- Disorderly Conduct in a Capitol Building;
- Impeding Passage Through the Capitol Grounds or Buildings;
- Act of Physical Violence in the Capitol Grounds or Buildings; and
- Parading, Demonstrating, or Picketing in a Capitol Building

While I certainly would not want to be one of those officers, apparently faced by more than 20 menacing perpetrators, I think we need to understand why nobody in this group appears to be

---

[33] https://www.justice.gov/usao-dc/case-multi-defendant/file/1365791/download

charged with attacking them with "dangerous and deadly weapons" such as hockey sticks, fire extinguishers, Tasers, stun guns, etc., while these items were being routinely used by rioters on the Lower West Terrace, especially at the tunnel; if they were both enraged and incited by the President why was there this apparent night/day difference in terms of wielding weapons?

The events seen in the Statement's images occurred at 2:41 p.m. after the Senate Gallery and Chamber Floor had both been completely evacuated for several minutes already and the perpetrators would have been aware of that fact.

Mr. Sandlin's charges are identical.[34]

Thus, comparing these crimes we have images for, while they are still extremely serious[35], with claims of insurrectionary behavior, one would presume that security footage of actual insurrectionary behavior near the House or Senate should be of higher importance to use in Statements of Facts or to include in BOLO (Be On the Lookout for) public releases for people who have not been identified yet.  I am not aware of any outstanding BOLO announcements accompanied by images of violent insurrectionary behavior on the Second or Third Floor near the two Chambers or Galleries.

I also recognize that my assumption about camera coverage be wrong.  It might be suggested that some of those places I'd like to see video for just happened to be those rare places that did still not have a security camera covering it or perhaps the camera was unfortunately out of service that day.

Note cases:  two of those on my list are associated with particularly serious charges: those involving Ms. Eisenhart and Mr. Munchel that allege that he was carrying having a Taser and it might be that they both were chasing police; I have highlighted their rows below in yellow.  People may recall Mr. Munchel carrying zip-ties in videos of the 6th; he also allegedly was carrying a Taser.  Whether they actually turn out to have committed these crimes before or after the Senate was evacuated is unimportant in that respect; these are sobering charges.  But, it is important forensically to know precisely when and where this occurred, to include surveillance video images where feasible.  We need to understand these two cases and how they fit into the big picture.

---

[34] https://www.justice.gov/usao-dc/case-multi-defendant/file/1366141/download
[35] The violence seems to pick up as an officer goes to lock the second door, making it appear (to an untrained observer like myself that was not there) that rioters were angered that locking this second door would deny them the opportunity to enter the gallery.

| Name | "Deadly or Dangerous Weapon" Involved in Charges? | Status of the Capitol When Act was Committed |
|------|---------------------------------------------------|----------------------------------------------|
| BLACK, Joshua Matthew | **Yes:** Carried **a knife** with him. No physical violence charges. | Went in and stood in the Senate Chamber after it was evacuated; happened to have a knife on him. |
| CLARK, Jacob Travis | **No: Video shows him "putting up his dukes" to an officer.** | At Senate Gallery about 2:40 p.m. (as Gallery doors were being locked). |
| CUA, Bruno Joseph | **Yes: Had a baton; also pushed an officer.** | At Senate Gallery after 2:45 p.m. (as Gallery doors were being locked). |
| DEGRAVE, Nathaniel J. | **No: Took a stance to suggest he wanted to fight an officer.** | At Senate Gallery at 2:42 p.m. (as Gallery doors were being locked). |
| EISENHART, Lisa | **Yes:** Co-charged with Eric Gravelek MUNCHEL for him **having a Taser** in his pocket; she **chased officers** guarding the Senate. | Chased officers outside Senate chamber apparently after it was evacuated. Also stood in Senate Gallery. |
| MONTGOMERY, Patrick | **No:** Indictment includes physical violence but no further information. | Entered West Side Entrance at 2:35; at 2:45 went to the Senate Gallery. |
| MUNCHEL, Eric Gavelek | **Yes: Had a Taser** in his pocket; he **chased officers** guarding the Senate. | Chased officers outside Senate chamber apparently after it was evacuated. Stood in Senate Gallery. |
| SANDLIN, Ronald L. | **No: Fought police** near gallery with DeGrave; also went to inside of a Capitol doorway and **tried to rip an officer's mask off** from behind. | Fought outside Senate Gallery about 2:42 p.m. and also stood inside some unspecified Capitol doorway when it was opened. |

Except for Eisenhart and Munchel, it appears that most of the rioters did not want to be kept out of the Gallery possibly because they felt that this was "their House!" thus they had a right to be there and they took out their frustrations on law enforcement that was, unjustly to their thinking, trying to expel them. One could argue that the 2:57 p.m. time to start clearing the rest of the Capitol actually began at 2:40 p.m. outside that Gallery since Capitol Police were already locking doors to the (empty) Gallery that time. The same may or may not be true of the area around the Senate; I haven't seen much evidence about what assault against police or physical violence, if any, was occurring in this area between 2:40 and 2:57 p.m.

## Chapter 4: Higher Priority Needs for Security Footage

The following places and time ranges are key for determining where and when violence occurred.  If the USCP don't want to release the complete footage, they should be asked to just provide the footage showing violence, perhaps at least 30 seconds long to provide context.

1. The atrium (or hallway) where Officer Goodman retreated to, for times between 2:15 p.m. and 2:40 p.m.[36]

2. Any other areas, besides the around the Senate Chamber on the Second Floor, for times between 2:13 p.m. and 2:40 p.m.

3. Areas near the Senate Gallery on the Third Floor, for times between 2:14 p.m. and 2:40 p.m. (and not thereafter)

4. The Rotunda itself, excluding the East Entrance area, for times between 2:13 p.m. and 2:57 p.m.

5. Statuary Hall, for times between 2:13 and 2:57 p.m.

6. The room between the House Chamber and Statuary Hall, for times between 2:26 p.m. and 2:57 p.m.

7. The Main Entrance to the House Chamber, for times between 2:25 to 2:57 p.m., from both the outside AND the inside.  It is especially important to establish when someone knocked a hole in the inner door to the Chamber: was it before or after 2:41 p.m. when John Sullivan left who was providing us coverage with his JayDenX documentary video and a time when presumably everyone on the Floor had exited the chamber?

8. The rest of the 2nd Floor of the House wing of the Capitol, for times between 2:13 p.m. to 2:57 p.m., to exclude events where we have extensive footage available, such as what happened in the Speaker's Lobby after 2:45 p.m. I would also leave out Brian Bingham's and Uliyahu Hayah's[37] alleged altercation with officers as they left through the East Entrance of the House wing because these did not occur while they were at the Chambers but while they were being ushered out by officers([38]).

9. The 3rd floor of the House wing of the Capitol, for times between 2:13 and 2:57 p.m.

---

[36] Note that the image above appears to show 2 or 3 journalists recording what was happening at this police line.  Where is their footage?  Would they stop recording the incident in the middle of it occurring?  I would like to know, why they haven't come forward so we can all see the entire videos.

[37] See the WUSA9 *article Silver Spring man accused of fighting with officers moments after Ashli Babbitt was shot at Capitol Riot* August 27, 2021:  https://www.wusa9.com/article/news/national/capitol-riots/silver-spring-man-accused-fighting-officers-ashli-babbitt-capitol-riot/65-f84f6390-7de5-4ecf-b356-1a35c7489fd1

[38] Mr. Bingham's altercation was shown during the Impeachment Trial with the following narration over the silent video: "This security video from 2:56 p.m. shows the mob in the House of Representatives wing, on the second floor of the Capitol.  Insurrectionists who are still inside in the building are fighting with the police who are overwhelmed and trying to get them out."  It might be of some relevance to point out that these two men may have just witnessed Ashli Babbitt's shooting and may have felt some animosity at that point, less than 15 minutes later, towards police for what they, the rioters, felt was an unjustified shooting.  The same comment may hold for Mr. Hayah's state of mind towards officers.

Again, I am only asking for scenes of violence.  More is better but there may be sensitive sections showing exactly when security forces, especially the M4 guards, deployed.  For example, regarding areas near the doors into the House Gallery, we don't want to see any sensitive details about officer deployment during the evacuation; just show us the images showing anything the rioters did who reached this floor, even if this was just trying to approach gallery doors and test the door handles to see if they would open.

Note:  In assembling this list, I am not suggesting that we downplay or overlook the seriousness what was happening on the first floor, say at the Crypt or at the exits, or inside the House Speaker's office area.

It is not just the government that can help inform us.  Given their extensive review of what they claim are thousands of videos, the Washington Post, the New York Times, and proPublica should immediately make available what they have covering these intervals.  Defense lawyers might be able to help out with depositions, especially those who have already been sentenced after accepting plea agreements.

It would also be useful to get a chronology of when different exits had been opened by demonstrators or closed by Security and when certain areas where cleared or closed off, for instance the area inside the Capitol looking towards the Senate Coach Entrance.  Just a time would be sufficient, if images are too sensitive.

It would also be useful to get an analysis done by the Capitol Police and Metropolitan Police about their injuries:  when and where did these occur, what caused them, and were they wearing riot gear at the time?  This is another way to determine the severity of the violence over time and in different places.

# Chapter 5: Events in the Rotunda and Statuary Hall

## Events in the Rotunda

On September 25 (and the number charged had not changed by December 26), I reviewed the Department of Justice database related to January 6 charges and found several people charged with committing physical violence that might have been committed inside the Rotunda:

- There were two people, Daniel Paul Gray and James Burton McGrew, who are alleged to have engaged in very serious physical violence against officers in the Rotunda and those acts appear to have been committed after 3:00 p.m. when officers were trying to clear the Rotunda.  Based on their statements, they appear to have been angry because they felt that police did not have the right to force them out of what they considered to be "their house."  Mr. McGrew is alleged to have used a pole against police but it is unclear when he used it and whether he used it against police while he was in the Rotunda.
- There were four other people with relevant charges: Greg Rubenacker, Salvador Sandoval, Jr., Katherine Staveley Schwab, and John Douglas Wright.  These charges specify physical violence that might have occurred inside the Rotunda before 2:57 p.m., before both houses had been completely evacuated, but the timing is not very clear to me nor is it clear, except for Mr. Sandoval, what that physical violence consisted of (in his case, he allegedly shoved police inside the East Entrance – not the Rotunda itself - and tried to take a shield)[39].  As of December 26, none of these charges involved a "deadly or dangerous weapon."

Unfortunately, I am forced to leave the discussion at this because I could only find details about one person, Mr. Sandoval, who is clearly charged with committing violence before lawmakers had been evacuated.  Nevertheless, it is hard for me to use this limited information about the Rotunda to support the allegation that January 6 was an insurrection.

## Events in Statuary Hall

From what I understand, a U.S. Representative recently got in hot water by saying the rioters in videos of Statuary Hall looked like tourists.  So, I am going to flip that comment on its head: please show us the violence that occurred there between 2:13 p.m. and 2:57 p.m. when officers started clearing and securing the Capitol, so that we can judge for ourselves.

I personally haven't found any charges involving weapons-related charges or charges of people committing acts of physical violence for anything rioters did within this Hall so I'd like to see what charges of that sort involve Statuary Hall.

---

[39] While John Douglas Wright faces violence-related charges, these charges appear to have been associated with his actions on the East Side before rioters went up the steps as opposed to anything he might have committed inside the Rotunda when he was there.

A January 6 CNN video[40] shows several minutes of rioter activities in Statuary Hall interspersed with scenes from other locations (the switching between areas is shown in the following table). This video begins by showing us Statuary Hall, starting at 2:27 p.m. and continuing until 2:30 p.m.  I would like someone to point out the violence that occurs during that time, particularly the insurrectionary violence.  Note that at elapsed time 3:09 into this video we see an officer standing on the left side of the view and no one appears to be hassling or menacing him.  The video then intersperses images of the East Entrance to the Rotunda with those of Statuary Hall:

| View of Statuary Hall | | View of East Entrance | |
|---|---|---|---|
| From Elapsed Time | To Elapsed Time: | From Elapsed Time | To Elapsed Time) |
| 0:00 (2:27 p.m.) | 3:10 (2:30 p.m.) | 3:10 (2:30 p.m.) | 3:32 (2:31 p.m.) |
| 3:32 (2:31 p.m.) | 3:55 (2:31 p.m.) | 3:55 (2:31 p.m.) | 4:20 (2:32 p.m.) |
| 4:20 (2:32 p.m.) | 4:27 (2:32 p.m.) The view then switched to somewhere else until 4:58. | | |
| 4:58 (2:32:38 p.m.) | 5:08 (2:32:48 p.m.) | | |

Notes:
1. The minutes appear to increment whenever elapsed times reach 20-second marks[41]. Thus, 2:30 p.m. should become 2:31 p.m. at 3:20 and 2:31 p.m. becomes 2:32 p.m. just as the scene is changing back to Statuary Hall at elapsed time 4:20.
2. At elapsed time 3:43 you can see two officers off to the side in Statuary Hall just standing there, not being harassed or assaulted as far as I can tell from just observing the scene.

CNN's view of Statuary Hall never returns after elapsed time 5:08, so I end this table at that time, though the video captures feeds until elapsed time 10:14 which is 7 seconds short of 2:38 p.m.  Admittedly, we cannot see Statuary Hall in this video after 2:33 p.m. and we have gaps in coverage before that, but one would think that if there was insurrectionary-level mayhem occurring in Statuary Hall before 2:38 p.m. the CNN camera operator would have been motivated to quickly transfer that camera back for us to see.  Note that 2:38 p.m. is at least two minutes after the evacuation route from the House Floor was secure, as we heard in the Impeachment Presentation[42].  Also, note that at elapsed time 5:08, which is the last time we

---

[40] *See stunning video of rioters inside Capitol*.  See  https://www.youtube.com/watch?v=y9WPuA6EUaw

[41] This means that exactly 4 minutes earlier, at 20 seconds, the time changed from 2:27 to 2:28 p.m., so the video presumably began capturing images at about 2:27:40 p.m.

[42] "At 2:35 PM, Members on the House floor were told an evacuation route was secured.  And it was time to leave. This video shows members of Congress exiting to the side of the podium where we would go through the House Lobby and down stairs."

see Statuary Hall, the exact time is 2:32:48 p.m. which is no more than 3 minutes and 11 seconds – that is, about 200 seconds - before the House Chamber's exit route was secure and it was time to leave.

Here is some additional video from within Statuary Hall found at the proPublica website. ProPublica assigned it a timestamp of 2:50 p.m., about 17 minutes later.  The Hall seems reasonably pacified so any insurrection would have to occur over the time interval from 2:32:49 to 2:50 p.m.  Perhaps CNN or proPublica would be so kind to make that 17-minute gap of what was occurring in Statuary Hall available to us.  In this particular video, people appear to be milling around.  See:

https://projects.propublica.org/parler-capitol-videos/?id=ja8PoJ5Z457H

Note that the fellow in this seems to have been interviewed later at 3:38 p.m.; if so, he is a "Three Percenter" who may have taken part in the occupation of the area near the House Chamber doors. This suggests that his statement at 3:38 p.m. may capture the perspective of some of the rioters as events transpired inside the Capitol near that chamber.



Here is a link to that later 3:38 p.m. interview with him.  Even if the person interviewed is not the same person in that image, the interview probably provides good insight into how a rioter as well as someone from the Three Percenters interpreted that day:

https://projects.propublica.org/parler-capitol-videos/?id=gk0zbAdaB2OS

He says, about elapsed time 2:57 into the video, that "Yeah, we were allowing everybody to leave, staff member, cop, and officer. Nobody was assaulted except for us. So we allowed them to leave, they started pointing live weapons at us."  He doesn't seem particularly angry or trying to rationalize or gloat over violence.

Here is another proPublica video taken inside Statuary Hall, just to the South of the doorway between Statuary Hall and the Rotunda, which is also assigned a timestamp of 2:50 p.m.  Police are clearing the room.  Someone says, "Let them see how violent we are. Let them [presumably the police] walk right through us." As the police go by, he continues, "Yep, see, here he goes, no

fear of us.  Let's see how CNN writes this later on: 'Violent mob!  Violent mob!' right?"
Someone yells, **"We got our point across, let's go!"**  I can't tell who it is but note that the fellow
in the left picture below moves forward.  This appears to be the same person apparently
directing people earlier, as seen in the John Sullivan video image on the right.  **Further, one
might infer that these rioters were most likely unaware that any lawmakers remained in the
House Gallery after those on the Floor had evacuated so they would probably have concluded
that the only ones then present near or inside the House Chamber or Gallery at that time
were police.**

https://projects.propublica.org/parler-capitol-videos/?id=u15B2m0pJPOV



| At 2:50 p.m. | About 2:27:50 p.m. |

As the police get closer and one says, "Get out of the building!" the person they are talking to
gets angry at them, but apparently still leaves.  At the end the person filming leaves Statuary
Hall.  **Note that this is the proPublica last video from Statuary Hall, suggesting this area was
effectively closed off by police from the Rotunda after 2:50 p.m.**  Also, note that at elapsed
time 0:10, one can apparently see the hallway essentially cleared all the way to the House
Chamber doors with Capitol police nearby.  **Again, I want to emphasize: if I have missed any
violence in Statuary Hall, I would like the Capitol Police, proPublica, or the media to make
video of that violence specifically available immediately.**

## Chapter 6: The House Wing

The following video was recorded by John Sullivan:

https://www.youtube.com/watch?app=desktop&v=PfiS8MsfSF4&feature=youtu.be&bpctr=163
1764354&has_verified=1

This is a very important video as it includes just about everything that happened on the House side from when rioters entered into the Rotunda around 2:26 p.m. until 2:41:35 p.m. when Mr. Sullivan and some of the other rioters who were now located in front of the House Chamber Entrance broke off to go to the hallway outside the Speaker's Lobby.

From that 15 minute segment, the Impeachment Trial presentation showed a one-minute-long segment, showing first the boisterous crowd held back by police, and then showing the crowd crashing through the police line, which occurred about 2:36 p.m.

https://youtu.be/SAnfRjML7WQ?t=21508

As of December 26, I had not found any physical violence-related charges made against anyone outside the House Chamber Entrance that occurred after 2:41 p.m.

As we all know, rioters proceeded towards the hallway outside the Speaker's Lobby, where rioters then broke several windows and Ashli Babbitt was shot trying to climb through a broken window.  Mr. Sullivan's video shows most of these events except he arrived about a minute or two after the first rioters arrived at the door.  Note that the violence that occurred before he arrived was shown at the Impeachment Trial:

https://youtu.be/SAnfRjML7WQ?t=21785

A fuller investigation of that gap in rioter activity is presented in Appendix II.  As lamentable as those events were, and Ms. Babbitt's death was, I have not found any other violence that occurred there either.

This leads us to the next section which describes who has been charged for using physical violence near the House or had "weapon-related" charges for their actions near the House.

### Persons Charged with Using Physical Violence or Who Had "Deadly Dangerous Weapon" Appended to One or More of Their Charges Near the House Chamber

The table below lists the names of rioters who were charged with committing "Physical Violence" or who had "Deadly or Dangerous Weapon" appended to one or more of their charges with respect to acts they committed near the House Chamber doors or the Speaker's Hallway doors.

| Name | "Deadly or Dangerous Weapon" Involved in Charges? | Status of the Capitol When Act was Committed |
|---|---|---|
| ALAM, Zachary Jordan[43] | **Yes**: A helmet was used to break Speaker's Lobby windows. | Outside the House Chamber while it was being evacuated |
| GRIDER, Christopher Ray[44] | **No**: Mr. Grider tried to breach Speaker's Lobby doors. He did hand his helmet to Mr. Alam. | Outside the House Chamber while it was being evacuated |
| JONES, Chad Barrett | **Yes**: He used a pole to break Speaker Lobby windows. | Outside the House Chamber while it was being evacuated. |
| SOUTHARD-RUMSEY[45], Audrey Ann | **No**: She pressed a pole against an officer's chest while being **one of two main agitators** who led a mob breaching the last line of officers outside the House Chamber doors. | Outside the House Chamber while it was still in session and then while it was being evacuated. |

Ms. Southard-Rumsey's charging documents suggest that she was one of two main agitators who led the mob breaching that last line of police outside the House doors. If so, that unnamed person plus this 3 works out to 4 people being largely responsible for violence outside the House Chamber entrance and outside the Speaker's Lobby doors.

I wanted to mention two other people, the first Uliyahu Hayah and the second Brian Glen Bingham who was charged just with assault. Just after he left the Speaker's Lobby doorway, Mr. Bingham got into an altercation with an officer who, according to Mr. Bingham, allegedly pushed him to get him to leave. He could be seen in a scene fighting police when he was exiting the Capitol that was shown at the Impeachment trial. This happened at the House wing East Entrance after the Capitol was evacuated, around 2:56 p.m.. Mr. Hayah is accused of committing physical violence in perpetrating a similar crime. Both of them had been in the area just outside the Speaker's Lobby while the House was being evacuated and when Ashli Babbitt was shot.

While violence against people, especially police protecting the Capitol, should always be condemned, we might want to take into account that these two had just seen an unarmed woman shot to death.

There was also at least one man, seen in the annotated screen-snap below, who was kicking doors as he went from the area outside the Main House Chamber door down the hallway to the House Speaker's lobby. I would suspect that there may have been more who acted the same

---

[43] See https://www.justice.gov/usao-dc/defendants/alam-zachary-jordan
[44] See https://www.justice.gov/usao-dc/defendants/grider-christopher-ray
[45] See https://www.justice.gov/usao-dc/defendants/southard-rumsey-audrey-ann

way.  I would also observe that kicking a heavy, locked door typically isn't a successful method for opening it so it is hard to imagine that such an attack was preplanned as part of an insurrection.



People are chanting, "Break it down!"
Elapsed time is 1:09:48 or roughly 2:42 p.m.

This makes 7 people, including this unidentified rioter, still unindicted apparently, who can be seen kicking the door.  *As far as I can tell, that's it for people who were violent in the House wing side of the Rotunda before the lawmakers in the Capitol were finally evacuated at 2:57 p.m.*

## Synthesis of House Impeachment Managers' Presentations Regarding What Rioters did Near the House Chamber

What I have done separately is to analyze the presentations on day 2 of President Trump's second impeachment trial.  It turns out that there are less than 10 pages of transcripts for what happened in close near to the House and Senate chambers on the Second floor of the Capitol. Here is my greatly summarized lists of actions attributed to those who are being called "insurrectionists."  I have put in bold those things that I want to emphasize.

Here is a very rough, non-verbatim description of what is said in the transcripts about the House:

- Starting around 2:28 p.m., **the mob made noise as they approached the House Chamber that those inside could hear** and they came within footsteps of the Chamber Door;
- According to the presentation, "At 2:35 p.m., members on the House floor were told an evacuation route was secured.  And it was time to leave."
- **Sometime between 2:35:49 and 2:36:10 p.m.,** a time derived from security footage being shown in the Impeachment Presentation which starts at 2:35:50 p.m. and ends at

2:36:10 p.m., **the mob surged towards the House door and ended up gathering immediately outside the inner Chamber door, pounded on that door, and broke a hole in it at one point;** [*Note: This part of the Presentation shows Ms. Southhard-Rumsey pushing the officer.]*

- **Some rioters then broke away from the mob at the Chamber door and proceeded to:**
  - o Spread out in different directions to effectively surround the Chamber
  - o **Flood the halls and kick doors** as they passed them; [*Note: We can see this happening in the screen snap above.*]
  - o Turn the corner towards the House Lobby doors where member were leaving;
  - o Spot Chairman McGovern leaving; and
  - o **At the House Lobby door, try to break a hole through a window to get in.** [*Note: A video clip of this happening was shown during the Presentation.*]
- At 2:44 p.m., **Ashli Babbitt, who was unarmed, was shot as she tried to climb through one of the shattered windows into the Lobby.** A tactical team was already present.
- As members were being evacuated from the gallery, **at about 2:50 p.m.,** they walked a few feet from where Capitol police were holding **an insurrectionist** at gun point who **had, a few minutes earlier, tried to open a locked Gallery door.** A tactical team was already there along their route. [*A video clip of this happening was also shown during the Presentation.*]

Everything itemized here, in particular the bolded items, is accurate. **However, I'm wondering, did I miss anything from the Impeachment Presentation?** What I see here is the following: We have a mob:

- Making "noise as they approached the House Chamber that those inside could hear;"
- Surging towards the inner House Chamber door, pounding on it, and breaking a hole in it;
- Splitting into two groups, with the second group flooding the halls and containing protestors who futilely kicked doors, apparently trying to open them;
- Breaking windows into the House Lobby as the Chamber was being evacuated and then an unarmed woman tried to climb through a shattered window; and
- Additionally, someone either left the mob or avoided the mob and then traveled on their own to the Third Floor and tried to open a locked Gallery door.

Note: As we find out from other sources, such as this New York Times film itself, starting at 29:04, there were another set of 5 to 6 rioters caught somewhere else on the House Gallery evacuation route; they had been stopped by a tactical team armed with what appear to be military-style carbines.



*[September 1, 2022: The following section of this chapter has been redacted to limit the focus of this reduced report.]*

Finally, I believe we can demonstrate visually that any additional violence that occurred next to the House Chamber Entrance occurred after 2:42:07 p.m. which was when the last lawmakers were exiting through the Speaker's Lobby. At elapsed time 31:55 in Mr. Sullivan's video, discussed earlier, the chant "Break it down!" ends outside the House Chamber doors; this time is 2:41:32 p.m., just a few seconds before he leaves that area at 2:41:35 p.m. to go to the hallway outside the Speaker's Lobby. Picking up about that time, this next 39-second video, recorded by someone else, shows the area outside the Entrance to the House Chamber and appears to begin just before the time John Sullivan left since the "Break it down!" chanting subsides at elapsed time 0:04 in that video:

https://projects.propublica.org/parler-capitol-videos/?id=T4PbZy883GjM

Given that the video lasts 39 seconds, then this second video would seem to cover everything up to 35 seconds later, that is, up to 2:42:07 p.m.

I suspect that the rest of this second video, which probably extends beyond the 39 seconds seen here, if released might show us what else happened between 2:41:35 and 2:50 p.m. In particular, I find it incredible to believe that if some insurrectionary violence had indeed occurred at this location between 2:41 and 2:50 p.m. it would not have been captured by the person recording this and then shown by ProPublica with notable public fanfare. Needless to say, if such footage exists, even if it just shows people looking through the window into the Chamber, I'd sure love to see it.

In summary, I would expect truly incited insurrectionists to want to carry out more serious violence than what I have documented here so **I want to emphasize:  we all could benefit from**

knowing what other violence occurred near the House, or was planned to occur but could not be carried out for some reason.

### What Happened inside the House Chamber

Note: This excerpt is from a 5-minute, 21-second video with a focus on what was happening inside the Senate and House Chambers: *Capitol under siege: What we saw inside the chambers*

> https://www.youtube.com/watch?v=J1PS31qRi28

> The summary: *CQ Roll Call's Tom Williams, Katherine Tully-McManus and Chris Cioffi were inside the House and Senate chambers when the violent pro-Trump mob descended on the Capitol on Wednesday. From witnessing lawmakers take care of each other to being shuffled to shelter, here are their stories from the tragic, historic day.*

Note: An important section can be found at 90 seconds into the video (the transcription is my own.):

https://youtu.be/J1PS31qRi28?t=90

> Tom Williams narrates this section: "I ran over to the House steps on the second floor. First I saw, a House cop tried to grab me and pulled me into a side door to the House chamber.  I thought that was really weird because ... I've never been invited to go in there before so they're obviously trying to shelter people.  So, I'm like now 'I'm going to my office' and he let me go, and so I was basically [inaudible] while I could find a vantage point.  Ok, it's a little more serious but; I thought, there's no way they can get through these doors.  Then, another cop sees us, he says, 'You guys come with me,' pulls us into the House Gallery, on the third floor.  'Get down under your chairs if necessary, so we have folks entering the rotunda and coming down this way.  So, we'll update you as soon as we can. But just be prepared. Stay calm.'  And another cop is like, '… get your gas masks out.' … Protestors are banging on the door of the House chamber so you're hearing all this loud banging. …. About 8 minutes later[46] ["after" measuring the time after what?] we were evacuated through some back stairways.  We eventually got to the Longworth Building."

### Other Actions: The Mob Surges Past a Police Line in the "Crypt"

---

[46] "After" measuring the time after what?  Estimates of when Ms. Babbitt was shot range from 2:43 to just before 2:45 (technically still 2:44 p.m.).  The gunshot is heard at elapsed time 2:19 in the video referenced above and at 2:21 we can see the House Chamber Floor cleared, with several officers that can be seen indistinctly protecting the chamber doorway with drawn guns.

**N.6!** | I would flag this as a violent action by the mob against police in the Capitol.  It would be useful to learn if police were injured during this interaction.

One event inside the Capitol that appeared to be violent occurred when a crowd of rioters pushed through a line of police on the first floor trying to hold them back.  One rioter, Gabriel Garcia, was allegedly in this crowd trying to crash through a police line at 2:19 p.m.   The melee lasted for about 5 minutes until about 2:24-25 p.m. which seems to match the following screen snap from the Washington Post video.  One of the officers deployed an asp, which is an extendable baton manufactured by a company called ASP.  This altercation would probably be considered by the police involved as a violent breach of the police lines, possibly earning those in this mob the label of rioter (if, as alleged, they committed assault, etc.) as opposed to "mostly peaceful" protestor.  The link for this Washington Post video is repeated here.[47]



Inside the U.S. Capitol at the height of the siege | Visual Forensics

One can see rioters push through the police line.

---

[47]  Image is from the Washington Post video "Inside the U.S. Capitol at the height of the siege, January 16, 2021". https://www.youtube.com/watch?v=ibWJO02nNsY

# Chapter 7: Several Overviews and Summaries Concerning January 6

## Introduction

*[September 1, 2022: This introduction has been redacted to limit the focus of this reduced report.]*

.

## Using the New York Times Video "Days of Rage" to Organize the Discussion

**https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html**

From what I have seen, this is the best video describing the activities of a group of rioters that apparently stormed first the barricades, then assaulted officers at the Lower West Terrace, and finally attacked the Eastern side of the Capitol.

*[September 1, 2022: The Rest of this chapter has been redacted to limit the focus of this reduced report.]*

# Chapter 8: Availability of Police, Tactical Teams, and the D.C. National Guard

## Introduction

*[September 1, 2022: The Rest of this chapter has been redacted to limit the focus of this reduced report.]*



## Additional References

Here are some links to referenced videos that I strongly suggest viewers watch but didn't include in the main body of this document.  One of them, recorded by "Millie Millennial" shows how Trump supporters at their hotel that evening go from "normal" to "incited" in minutes, showing that it doesn't take much to cause angry reactions to police who, from the crowd's perspective, are behaving badly.

- An earlier chapter discussed the Washington Post video *Inside the U.S. Capitol at the height of the siege*, January 16, 2021 can be found at:
  https://www.youtube.com/watch?v=ibWJO02nNsY
  There is a notable section in this video regarding the person stating "Occupy, do not destroy":
  https://www.youtube.com/watch?v=ibWJO02nNsY&t=391s

- Here is an extremely helpful video since it is a full hour and a half (1:28:30) and, as a result, covers a lot of the action on the Lower West Terrace

  https://banned.video/watch?id=5ff73a601669d333f2b27315

- Here is another that shows what happened at a hotel that evening when the police came to enforce the curfew against some Trump supporters who were outside the hotel smoking cigarettes.  This video was recorded by "Millie Millenial" who, apparently, at the time worked for Alex Jones' InfoWars.  Notice how the people go from "Normal" to adrenaline-fueled "Angry" in almost no time.  Also, notice that they use the same slogans and terms here that protestors did at the Capitol, including calling the police 'Gestapo.'  I'm including it to show that a crowd can very easily 'self-incite' if they feel the police are wrong.  Think of it as "All Police [at the Capitol on January 6] Are Gestapo." Or "APAG."

    The interaction begins here at 23:25:

    https://youtu.be/ObVMGPGHRe8?t=1405

    Some choice comments about the police can be found starting here:

    https://youtu.be/ObVMGPGHRe8?t=2067

    For another interesting segment, see what else protestors have to say about the police here:

    https://youtu.be/ObVMGPGHRe8?t=3197

One woman: "We are the ones that back the Blue. And you guys should be absolutely ashamed of yourselves for not standing up for our patriots!"

Another: "…Just standing up for the constitution and our civil rights!"

- Here is another interesting article regarding alleged right-wing symbols:

Insider News: *We Decoded The Symbols From The Storming Of The Capitol* | Jan 16, 2021

https://www.youtube.com/watch?v=blxT61F-Ris

- Regarding allegations that President Trump incited the mob, I have combined below some screen shots from the Instagram video of the 12:53 p.m. assault on the outer two barricades to illustrate how those rushing the barricades were behaving towards the police in that line.  However much I disagree with their motives and particularly their methods, it's hard for me to accept that these people leading the charge were angry, incited people intent on carrying out a murderous insurrection; my question would be: If that were the case, where were the hockey sticks and bear spray during this earliest incident?  One would tend to think that angry, incited crowds would "cool down" after a while and they would be "hottest" at 12:53 p.m.; if that is the case, why did so much of the egregious violence occur at the tunnel entrance nearly 2-4 hours later as opposed to earlier, and, in particular, why not here?

*[September 1, 2022:  It should be noted that the officer who was knocked down suffered a serious concussion and perhaps other physical or emotional effects; these were mentioned at the House Select Committee hearings.  A statement about how I am interpreting the mob's behavior is a quite different subject than how that behavior tragically affected law enforcement officers.]*

First line of barricades on the Pennsyvlania Ave. Walkway



Notice that none of the rioters seen trying to break through the line appear to be punching police. Here is an example of what is happening instead.



See https://www.instagram.com/p/CJugaFfnFD7

Starting at 51 seconds, two rioters are shown pushing a barricade so hard that their pushing threw an officer (identified as O-1) to the ground, causing her to have a concussion. Their response can be seen during 1:02-1:11.

After seeing this, they help her up and transfer her off to two other officers.

Ryan Samsel, with red cap, is quoted as saying to O-1: "We don't want to hurt you, why are you standing in our way?"

**slightlyoffensive.tv** IMPORTANT

this is exact moment the siege of the Capitol building began as the two men in front ripped down a preliminary barrier & rushed officers who were behind a 2nd barrier

They then encouraged others to follow their lead. Officers appeared to be taken completely off guard

## Appendix I: Excerpt from Examining the U.S. Capitol Attack: A Review of the Security Planning and Response Failures of January 6

(This section is based on a Staff Report developed for the Committee on Homeland Security and Government Affairs as well as the Committee on Rules and Administration. The PDF for this report was created June 7, 2021.)

Note:  I have listed events by times wherever possible.  Editorial additions for clarity are in brackets [ ].  The entries in the Staff Report timeline are in black type.  Times from other sources are in red type.  Events involving the Metropolitan Police Department (MPD) at the Capitol use red, bold type font and blue shading[48].

| | |
|---|---|
| 12:53 p.m. | Rioters break through the outer police barricades on the Northwest side of the Capitol, at the Pennsylvania Avenue Walkway.  They then proceed towards the West Side of the Capitol. |
| 12:55 p.m. | Capitol Police Chief Sund begins calling the MPD to request their support. |
| 1:10 and 1:23 | From Day 2 of the Impeachment Trial: "At about 1:10 and 1:23, respectively, Capitol police sent out the first evacuation alerts of the day, telling people to evacuate the Madison Building and the Camden Building, respectively." |
| 1:12 p.m. | MPD officers arrive to reinforce the police line about this time; MPD Commander Robert Glover is in charge.  He calls for DSO teams (who have chemical munitions) and CDU's, referred to as 'hard' platoons, where the officers wear riot gear. |
| 1:18 p.m. | Commander Glover reports, "Multiple Capitol Injuries!" |
| 1:38 p.m. | Commander Glover states, "I need two other 'hard' platoons up here now!"  An officer replies that one is coming. |

[1:49 p.m.]

- By 1:49 p.m., rioters had breached the Upper West Terrace. *[Note: this refers to the breach of the lower police line at the Northwest Steps under the scaffolding.]*
- At 1:49 p.m., Mr. Sund called William Walker, DCNG (the Department of Columbia National Guard) Commanding General, to request immediate assistance.
- At the same time, MPD (the Metropolitan Police Department) declared a riot at the Capitol.

[At 1:51 p.m.] "Two minutes later, at 1:51 p.m., Mr. Sund activated USCP's mutual aid

---

[48] Most of these MPD times comes from the Washington Post documentary, "D.C. Police requested backup at least 17 times in 78 minutes during Capitol riot" Visual Forensics;  Washington Post, Apr 15, 2021: https://www.youtube.com/watch?v=rsQTY9083r8

agreement with National Capital Region law enforcement entities."

| 1:50 to 1:59 p.m. | Between 1:50 and 1:59, the Dispatcher informs Commander Glover that the Capitol police are pulling back their resources.  These resources include "M4 officers" meaning those armed with M4 military-grade carbines (shortened AR-15's apparently). |
|---|---|

| 1:57 to 1:59 p.m. | According to the proPublica authors who edited the stolen Parler videos, this is when rioters first broke through the police line and its associated barricades on the Northeast side of the Capitol.  The police barricades nearer the House did not yet appear to be breached. |
|---|---|

"At 2:00 p.m., then-Assistant Chief Pittman also ordered a lockdown of the Capitol Building."

| 2:00 p.m. | A MPD official advises Commander Glover, "... you need to pull back our resources.  If you need to go inside or pull back if they're getting behind you; you don't have enough resources." Glover replies, "If I give this up they're going to have direct access.  At least the scaffold we can defend.  We gotta hold what we have." |
|---|---|
| | According to the Washington Post, Unit 42, the MPD 'hard' platoon that was responding to Commander Glover's 1:38 p.m. request, are still making their way past the base of the NW Steps.  There are at least 22 officers in Unit 42. |
| 2:04 p.m. | This information comes from a proPublica video downloaded from their site: https://projects.propublica.org/parler-capitol-videos/?id=8dLyJxfRn3cI The video begins with police in riot gear passing in front of the crowd on their way to the Lower Terrace Area.  They walk past the opening to the North Steps under the scaffolding but don't stop despite people being on the steps.  Note that this might be Unit 42 finally arriving at the police line. Then we hear a police announcement to the people on the west side to comply:  Starting at about 1:13 into this video the police use a loudspeaker to tell the crowd to comply, saying … *"leave the area pursuant to D.C. official code 22-1307B, all people must leave the area.  If you don't comply with this order, you will be subjected to riot control agent or impact weapon."* Starting at 1:52 into the video, the police more or less repeat the message: *"This area is a restricted access area.  Pursuant to D.C. official code 22-1307B, all people must leave the area immediately.  Failure to comply with this order will subject you to arrest and may subject you to the use of riot control agent or impact weapon."*  The ones in front apparently can hear both announcements clearly because they are audible in this video. |

"At 2:06 p.m. Rioters continued to push toward the Capitol building, reaching the Rotunda steps…"

[At 2:08 p.m.]
- "Rioters continued to push toward the Capitol building, reaching … the House Plaza by 2:08 p.m.
- Ms. Pittman then expanded the lockdown to cover the entire Capitol Complex."

"At 2:10 p.m.
- rioters breached the final barricade on the West Front and northwest side of the Capitol, quickly approaching an entrance near the Senate chamber.
- Also … House SAA Irving and Senate SAA Stenger issued an emergency declaration on behalf of the Capitol Police Board and formally approved requesting National Guard assistance."

[At:2:11 p.m.] "A minute later, rioters smashed through first-floor windows on the Capitol's south [*sic, either my or their error*] side, making a hole big enough to climb through; a stream of protesters entered, with two individuals kicking open a nearby door to let others into the Capitol.  According to reports, officers attempted to disperse the group with pepper balls and smoke bombs."

| | |
|---|---|
| 2:11 p.m. | Regarding conditions at the Lower West Terrace[49]: "By approximately 2:11 p.m., on January 6, 2021, the crowd had calmed somewhat and a line of police officers still stood at the top of the steps on the west side of the Capitol building." |
| 2:12 p.m. | Over the next 12 minutes Commander Glover asks for guidance on where to pull back to from Capitol Police but he gets no response. |
| 2:13 p.m. | A rioter breaks a window north of and near the East Entrance to the Rotunda; police stop him and handcuff him. |
| 2:13:10 p.m. | Based on security footage, this is when Robert Gieswein enters the window into the Senate wing of the Capitol.  He is the second rioter through and, further, unlike the first person who entered at 2:13:06 p.m., he has tactical body armor and a bat so his entry is probably as good as any to be the "official" time when the mob began entering the Senate wing from outside. |

"At 2:13 p.m., two minutes after rioters breached the building, the Senate went into recess."

"At 2:14 p.m., USCP Officer Eugene Goodman redirected rioters away from the Senate chamber.[99] Vice President Pence and congressional leaders were evacuated to secure locations."

---

[49] See *Pollack, et al, Complaint and Affidavit* paragraph 35. a. at:
https://www.justice.gov/usao-dc/case-multi-defendant/file/1410336/download

| 2:15:10 p.m. | Based on security footage, this is when Douglas Jensen, one of the rioters following Officer Goodman, first reaches the Second Floor of the Capitol near the Senate.  One might treat 2:15:10 p.m. as the "official" time when rioters reach the Second Floor of the Capitol, which now would allow them to then commit malicious acts on that floor. |
|---|---|

[2:15 p.m.] "An order to lock down the House and Senate chambers was issued at 2:15 p.m."

[At 2:18 p.m.]
- "The House declared a brief recess at 2:18 p.m.
- All active USCP Civil Disturbance Unit ("CDU") platoons were deployed to either the House side of the Capitol or the Rotunda."

[At 2:18 p.m. at the earliest and 2:30 p.m. at the latest] "After receiving the Board's 2:10 p.m. authorization, Mr. Sund urgently requested National Guard support."

| 2:19 | The U.S. Capitol Police issued a security alert for the Capitol informing people what to do.  See elapsed time 6:33 in the following video: *Inside the U.S. Capitol at the height of the siege*, Washington Post, January 16, 2021, https://www.youtube.com/watch?app=desktop&v=ibWJO02nNsY |
|---|---|
| 2:18 – 2:24 p.m. | The rioters encounter a police line blocking passage through the Crypt; following an altercation with these officers, rioters finally breach the line at 2:24 p.m.  I refer to this as the "Crypt Riot." |
| 2:26:00 p.m. | Based on security footage, the East Entrance Door to the Rotunda is opened at this time by rioters.  Rioters proceed towards the House Chamber.  Based on a CNN video, which shows people at the South End of Statuary Hall at 2:27 p.m., the rioters finally, at just about that time, encounter and stop at a police line standing between them and the Chamber itself. |
| 2:26 p.m. | According to the Washington Post, the Public Safety Secretary of Virginia, Brian Moran, dispatched the Virginia State Police to the Capitol under a mutual aid agreement with D.C.[50]  They were described as "rolling into the District by 3:15 p.m." |
| 2:29 p.m. | After a sudden surge by the mob on the Lower West Terrace at 2:28 p.m. weakens the police line, Glover reports that they had been flanked and lost the line; he then called an emergency (a "10-33").  He also orders MPD to pull back to the Upper Deck. |

---

[50] "U.S. Capitol Police Chief Steven Sund to resign later this month; new Capitol fence in place for 30 days."  There is a section for 2:46 p.m. titled, "Northam recounts call for help from Speaker Pelosi during Capitol siege".  Washington Post. January 7, 2021.  Even though the section is assigned 2:46 p.m., it describes this event as happening at about 2:26 p.m.

["Around" 2:30 p.m.] During a teleconference around 2:30 p.m. with Pentagon officials and D.C. government officials, including Mayor Bowser, Director of the D.C. Homeland Security and Emergency Management Agency Dr. Christopher Rodriguez, and Acting MPD Chief Contee, Mr. Sund pleaded for immediate backup.   According to the testimony of Mr. Sund, Acting MPD Chief Contee, and Commanding General Walker, officials from the Department of the Army at DOD headquarters— particularly Lieutenant Generals Walter Piatt and Charles Flynn—responded that it was not their best military advice to support the request because they did not 'like the optics of the National Guard standing a line at the Capitol.'"

| | |
|---|---|
| 2:35:50 p.m. | The Impeachment Managers displayed a short clip of security footage starting at this time, to accompany their narration that rioters outside the House Chamber finally broke through the last police line that had kept them away from that chamber.  This was 8-9 minutes after the rioters first encountered that line. |
| 2:38 p.m. | President Trump tweets, "Please support our Capitol Police and Law Enforcement. They are truly on the side of our Country.  Stay peaceful!" |
| 2:39 - 2:40 p.m. | After being closed for an unknown time, the East Entrance Door to the Rotunda is forcefully reopened at this time by rioters (see below). |
| 2:40 p.m. | MPD officers were forced off the Upper deck by this time and retreated into the Tunnel. |

[Around 2:40 p.m.] [David] "Moerschel and others from the stack[51] were captured on surveillance video inside the Capitol shortly after the Capitol's east Rotunda doors were breached around 2:40 p.m." *[A more precise time may be 2:39 p.m.][52]*

| | |
|---|---|
| **2:41 p.m.** | Based on security footage showing Ashli Babbitt rounding a corner in a House hallway at 2:41:12 p.m., this is an estimate of when some rioters, including her, leave the House Chamber doorway and head towards the Speaker's Lobby. |

"At 2:43 p.m., rioters broke the glass of a door to the Speaker's Lobby, a hallway that would have  given the rioters direct access to the House chamber.  When the rioters tried

---

[51] The FBI news release describes him and the others as being members of the Oath Keepers.

[52] Tuesday, July 6, 2021 "Oath Keepers Member Arrested on Conspiracy Charges Related to Jan. 6 Capitol Breach" https://www.justice.gov/usao-dc/pr/oath-keepers-member-arrested-conspiracy-charges-related-jan-6-capitol-breach   A proPublica video with a time-stamp of 2:39 p.m. shows people streaming through an exit which looks like the same one: https://projects.propublica.org/parler-capitol-videos/?id=tXIzFNM5yp9f  If that is so then the East Entrance into the Rotunda would have been opened at 2:39 p.m.

to lift Ashli Babbitt through the opening[53], a USCP officer fatally shot her."

| | |
|---|---|
| 2:47 p.m. | After being closed for an unknown time, the First Floor Senate Wing Entrance door is forcefully reopened at this time by rioters.  A door in the Senate wing just northwest of this entrance had been breached about 5 minutes earlier by somebody with a crowbar; that event was described in the video in the first section as one constituting of the breaches. |

[Before 2:52 p.m.]

- "Less than ten minutes later rioters breached the Senate chamber.
- In the House chamber, USCP officers barricaded the door with furniture and drew their weapons to hold off rioters."

[2:57 p.m.] "The last Members were evacuated from the House chamber by 2:57 p.m."

"After 3:00 p.m., additional reinforcements from federal agencies began to arrive, and USCP turned to extracting and securing congressional staff.  A number of agencies and entities provided assistance, including DHS (Department of Homeland Security); the FBI (Federal Bureau of Investigation); the Bureau of Alcohol, Tobacco, Firearms and Explosives; the Montgomery County Police Department; the Arlington County Police Department; the Fairfax Police Department; and Virginia State Troopers."

| | |
|---|---|
| 3:13 p.m. | President Trump Tweets, "I am asking for everyone at the U.S. Capitol to remain peaceful. No violence! Remember, WE are the Party of Law & Order – respect the Law and our great men and women in Blue. Thank you!" |

[By 4:28 p.m.] "With this help, USCP secured the Senate and House chambers, along with the basement, subways, first floor, and crypts by 4:28 p.m."

### Timeline for January 6 Events Occurring after 4:30 p.m. Based on Other Sources

Wikipedia Timeline starting at 6:14 p.m./18:14.

https://en.wikipedia.org/wiki/Timeline_of_the_January_6_United_States_Capitol_attack#cite_note-WaPo_ugliest-113

- 6:14 p.m.: U.S. Capitol Police, D.C. Metropolitan Police, and DCNG successfully establish a perimeter on the west side of the U.S. Capitol.
- 6:30 p.m.: Chief Sund briefs Pence, Pelosi, Schumer and other members of congressional leadership on the security situation, advising that both chambers could reopen by 7:30 p.m.

---

[53] Some place this time at 2:44 p.m. while my estimates fall between roughly 2:44:30 and 2:45:00 p.m.

- 8:00 p.m.: U.S. Capitol Police declare the Capitol building to be secure.
- 8:06 p.m.: The Senate reconvenes, with Vice President Pence presiding, to continue debating the objection to the Arizona electoral count.
- 9:00 p.m.: Speaker Pelosi reopens the House debate.

Note:  I believe that the House evacuation was in place by about 2:30 p.m.-2:35 p.m., while the building was declared secure at 8:00 p.m. based on these timelines, meaning that there was a delay of about 5 and one half hours from when the evacuation of the Congress had started (and couldn't be stopped) until the Capitol was considered secure and Senate official proceedings were restarted.

https://media.defense.gov/2021/Jan/08/2002562063/-1/-1/0/PLA

https://media.defense.gov/2021/Jan/11/2002563151/-1/-1/0/PLANNING-AND-EXECUTION-TIMELINE-FOR-THE-NATIONAL-GUARDS-INVOLVEMENT-IN-THE-JANUARY-6-2021-VIOLENT-ATTACK-AT-THE-US-CAPITOL.PDF

My comment:  The introductory line for this document is: *This timeline is intended to memorialize the planning and execution efforts of the Department of Defense to address the Violent Attack at the U.S. Capitol on January 6, 2021.*

1632: A/SD provides verbal authorization to re-mission DCNG to conduct perimeter and clearance operations in support of USCP. SECARMY to provide public notification of support.

1640: SECARMY phone call with Governor of Maryland. Governor to send Maryland NG troops to D.C., expected to arrive on January 7, 2021.

1702: Departure of 154 DCNG from D.C. Armory in support of USCP. Arrive at Capitol at 1740, swear in with USCP, and begin support operations.

1745: A/SD signs formal authorization for out-of-State NG to muster and gives voice approval for deployment in support of USCP.

1814: USCP, MPD, and DCNG successfully establish perimeter on the west side of the U.S. Capitol.

1936: A/SD provides vocal approval to lease fences in support of the USCP for security of the Capitol building.

2000: USCP declares Capitol building secure.

## Appendix II. Specific Sections of the Impeachment Presentations That Concern Staff, Speaker Pelosi and Her Offices, and Vice President Pence

*The following is my transcript of a section of the Impeachment Presentation; I'm sorry for any errors I might have introduced.  The relevant sections of the Presentation can be found in this NBC video at*

https://youtu.be/SAnfRjML7WQ?t=20147

*I have put my own shorter notes in italics and have included longer ones in tan boxes with a red exclamation mark to the left of them.  I have also bolded certain sections for emphasis.  I have left out some sections with the belief that they are not relevant to this discussion; again, my apologies if I have removed something valuable in the presentation.*

As Pence was being evacuated, rioters started to spread throughout  the Capitol.  Those inside helped other rioters break in through doors in several locations around this entire building. **And the mob was looking for Vice President Pence because of his patriotism.  Because the Vice President had refused to do what the President demanded and overturn the election results.**  During the assault on the Capitol, extremists were reportedly coordinated online and discussed how they could hunt down the Vice President.  Journalists in the Capitol reported they heard rioters say they were looking for Pence in order to execute him.  Trump supporters had erected a gallows on the lawn in front of the Capitol building.  Another group of rioters chanted, "Hang Mike Pence!" as they stood in the open door of the Capitol Building... You can hear the mob calling for the death of the Vice President of the United States.



This was not an isolated area or incident where that was being said.  It was going on everywhere.  Here's another example of a crowd outside yelling, "Bring out Pence! Bring him out!"

> **!** Here you see a guy whipping up the crowd on the West Terrace (see below).  If you watch the video, the mob starts out more quietly and starts getting riled up,

probably by people yelling that the police are "traitors" who don't care about the Constitution.



After President Trump had primed his followers for months and inflamed the rally goers that morning, it is no wonder that the Vice President of the United States was the target of their wrath after Pence refused to overturn the election results.  Listen to this man explain, "Well Congress, the cowards, hid inside and were emergency escorted away, because of fear of the people.  Of course, they're cowards, can't face the people, can't do the right thing.  Pence lied to us, he's a total treasonous pig and his name will be mud forever.  Now the real battle begins and it looks like the American people are very pissed.  Peace out."

Hmm.  Peace out.

Several insurrectionists described what they had planned to do if they had encountered the Vice President or other lawmakers.  One of them, Dominic Pezzola, also known as "Spaz," is a member of the Proud Boys as we discussed.  Pezzola came to the Capitol on January 6 with deadly intentions.  He commandeered a Capitol Police shield, used this to smash a glass window, entered the Capitol, and paved the way for dozens of insurrectionists.  As you recall from an earlier video, Pezzola was one of the first wave of rioters to breach the building.  On the left you can see a screen shot from the video of the break-in that we showed earlier.  On the right you can see Pezzola in the mob chase Capitol Police Officer Eugene Goodman through the building.  Pezzola is the man in the center of the photo with the gray beard.  Pezzola has since been charged with 8 federal crimes related to January 6.  According to an FBI agent's affidavit submitted to the Court, the group that was with him during the sack of the Capitol confirmed that they were out to murder "anyone they got their hands on." Here's what the FBI said: "other members of the group…*[see below]*.*"

> those photographs.  W-1 stated that other members of the group talked about things they had done during the day, and they said that anyone they got their hands on they would have killed, including Nancy Pelosi. W-1 further stated that members of this group, which included "Spaz," said that they would have killed [Vice President] Mike Pence if given the chance. According to W-1, the group said it would be returning

They were talking about assassinating the Vice President of the United States.  During the course of the attack, the Vice President never left the Capitol, remained locked down with his family, with his family inside the building.  … The Vice President, our second in command, was always at the center of it.  Vice President Pence was threatened with death by the President's supporters because he rejected President Trump's demand that he overturn the election.

The mob also went after the Speaker of the House who alongside the Vice President who was presiding over the joint session of the Certification in the House chamber. On January 6, armed and organized insurrectionists trained their sights on Speaker Pelosi.  They sought out the Speaker on the floor and in her office, publicly declared their intent to harm or kill her, ransacked her office, and terrorized her staff.  And they did it because Donald Trump sent them on this mission.

As the insurrectionists got closer, Capitol Police rushed the Speaker from the House floor at 2:15 p.m. mere minutes after the Capitol was first breached.  They recognized immediately that she was in danger.  The Speaker was not just rushed from the Floor, the Capitol Police deemed the threat so dangerous that they evacuated her entirely from the Capitol complex, rushing her to a secure offsite location.

The insurrectionist's intent to murder the Speaker of the House is well documented in charging documents that are now available.

We know from the rioters themselves that if they had found Speaker Pelosi, they would have killed her.  I have already discussed Proud Boys' member Dominic Pezolla, who has since been charged with 8 federal crimes for his conduct on January 6.  As you will recall, according to the FBI agent's affidavit submitted to the court, the group he attacked the Capitol with confirmed that "anyone they got their hands on they would have killed" including Nancy Pelosi.

William Calhoun, a lawyer from Georgia, also participated in the insurrection that day and he, too, has been charged for his actions.  This insurrectionist detailed his criminal activity at the Capitol online.  Calhoun wrote about his involvement on his own Facebook page.  Here's the post.  Calhoun stated:

"And get this – the first of us that got upstairs kicked in Nancy Pelosi's office door and pushed down the hall towards her inner sanctum, the mob howling with rage – Crazy Nancy probably would have been torn into little pieces, but she was nowhere to be seen."

'Crazy Nancy' – that's Trump's nickname for the Speaker of the House.

> **!** Appendix VII lists the people charged, as of December 26, with making threats serious enough to constitute crimes.  None of the people described here are on that list nor have they been charged with attempted murder.  Charges against Cleveland Grover Meredith, Jr., suggest that he may have wanted to assassinate Speaker Pelosi but he arrived a day late.

Then he explains that he and his group only abandoned a claim to the Speaker's office when a SWAT team shows up.  He writes, "Then a SWAT team showed and we retreated back to the Rotunda and continued our hostile takeover of the Capitol Building."

"Retreated."  "Hostile takeover."  He's using military terms for this attack.

The mob continued to look for Speaker Pelosi throughout the time they occupied the Capitol, including invading her offices.  Watch now how the mob searches for Speaker Pelosi's offices, which is marked in red and the House chamber itself.

[*See* https://youtu.be/SAnfRjML7WQ?t=20679 ]



During the siege, the Speaker's staff took cover in her office, hiding in fear for their lives for hours, as rioters broke in and ransacked her office. As the rioters were breaking into the Capitol, her staff retreated into an interior room. 8 of them gathered into a conference room.

About the same time Capitol Police announced the Capitol had been breached, Speaker Pelosi's staff heeded the call to shelter in place. On the model, you can see the rioters in the rotunda in red and the Speaker's office, again in orange. So, this is a security video so there is no sound.

*Manager Plaskett narrates*: "As you can see here, the staff moves from their offices through the hall and then enters a door on the right-hand side. That's the outer door of a conference room which also has an inner door that they barricaded with furniture. The staff then hid under a conference room table in that inner room. …This is the last staffer going in and then barricading themselves inside of the inner office."[54]

After just 7 minutes of them barricading themselves and the last staffer entering the door on the right, a group of rioters entered the hallway outside. And once inside, the rioters have free reign in the Speaker of the House's offices.

> **!** The time on the security footage initially shows 2:15:54 p.m. but people continued to enter the room until 2:16:33 p.m., which was the last time shown on the security footage. 7 minutes later would have been 2:23 -2:24 p.m. John Sullivan, who recorded a very long video inside the Capitol, appears to have come this way about 3-4 minutes later.

In this security video, pay attention to the door that we saw the staffers leading into and going into: https://youtu.be/SAnfRjML7WQ?t=20829

*She narrates over the video*: "One of the rioters you can see is throwing his body against the door three times until he breaks open that outer door. Luckily, when faced with the inner door, he moves on."

Another rioter later tried, unsuccessfully, to break through that inner door. At this point, the mob had already broken into the Speaker's formal conference room that is in the back of the hall at the top of the video. I want to play some audio we have of the Speaker's staff with the rioters at the door that day.

You can hear the terror in their voice as they describe what's happening to them as they are barricaded in that conference room. Please listen carefully because the staffer is whispering into a phone as he hides from the rioters that are outside the door:

2:28: "They're with… we need Capitol Police come into the hallway.

They're pounding on the doors trying to find her."

---

[54] The last staffer enters at elapsed time 5:46:43.

You could hear the pounding in the background as that staffer is speaking.

**!** For some reason, I can't, even on maximum volume but this can be heard in a section of the New York Times video in the main body of this report covering these same events at Speaker Pelosi's offices, which begins at elapsed time 24:39 and ends at 25:29, lasting just 50 seconds, much shorter than this presentation: https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html

The latter video also shows the last staffer entering the conference room and narrates "just 12 minutes later rioters outside head straight for her office." That would make that time roughly 2:28 or 2:29, which seems more believable than 2:23 to 2:24 p.m., as we heard in the Impeachment Trial; the former time seems more consistent with the time I calculated that John Sullivan, one of the first rioters that came by that area, came this way.

One of those staffers explained later that they could hear the mob going through her offices breaking down the door and yelling, "Where are you, Nancy?" The mob also pillaged and vandalized the Speaker's office and documented their crimes on social media. They stole objects, desecrated the office of the Speaker of the House of Representatives of the United States. As you can see in these photos, rioters broke down a door; they also shattered a mirror.

**!** The characterization here: "pillaged and vandalized the Speaker's office" was precisely correct. Regarding Mr. Barnett, it is quite true that he did have a dangerous weapon – a stun gun - but it is still unclear to me that he wanted to use it on Speaker Pelosi's staff if he had encountered them that day.

At 2:50 p.m., several rioters, including Richard Biggle Barnett, entered Speaker Pelosi's office. The world is all now, too familiar with the images from these slides. If you look closely, however, now at the now infamous pictures of Barnett, with his feet on the desk, you might see something that you didn't notice previously. Here's a better look.



Richard Barnett bragged about his actions.  He was proud of the way he desecrated the Speaker of the House's office.  He left a note "We will not back down."  Here's Barnett in his own words,

> Someone asks, "How'd you get it?"

> He replies, "I didn't steal it.  I bled on it and they were f*g Macing me and I couldn't f*g see… and so I figured, well, I'm in her office, I've got blood in her office, I'll put a quarter on her desk even though she aint f*g worth it, and I left her a note on her desk and it says, "Nancy, Biggle was here you b*h."

Trump's mob ransacked the Speaker of the House's office. They terrorized her staff.  Again, that is a mob that was sent by the President of the United States to stop the certification of an election.  The Vice President, the Speaker of the house, the first and second in line to the Presidency, were performing their constitutional duties, presiding over the election certification.  And they were put in danger.  Because President Trump put his own desires, his own need for power, over his duty to the Constitution, and our democratic process.  President Trump put a target on their backs and his mob broke into the Capitol to hunt them down."

### Some Information Suggesting Why Rioters were Calling for Vice President Pence to be Hung

To see what I am referring to, here is a Propublica video with a timestamp of 3:20 p.m. that shows someone calling out, "Bring out Pence!"

https://projects.propublica.org/parler-capitol-videos/?id=dYnlOJ08BQT1



"He says he's a Christian, he says his only loyalty is to God.  He knows this is a Chicom takeover of our country and yet he's validated electoral votes he knew were completely and utterly fraudulent.  He's handing over this country to the Chicoms.  I hope he goes under the gallows, I hope he's put under the firing squad and found guilty of treason.  Because men like him are the reason this country's falling apart."

Subsequent Chant:  "Where is Pence? Bring him out!  Bring out Pence!  Bring him out!"

These further comments about Vice President Pence by Damon Michael Beckley might provide another reason why some rioters were angry with the Vice President after 3:00 p.m.: to their way of thinking if he had returned the votes to the States then Ashli Babbitt would not be dead. https://youtu.be/b76KfHB0QO8?t=583

You will also notice another section regarding a protestor with a bull horn who says "Hey, [I couldn't make out the words] all of the Senators and House Representatives.  We have done our job.  Now, they're closing the exits and they're going to arrest everybody who's inside. Okay?  So, we've done our job, let's step outside with these people and let's go see [I couldn't figure out the rest but that might be useful to understand]" https://youtu.be/b76KfHB0QO8?t=303

Unfortunately, from subsequent video this exhortation did not seem to have much effect.

## Appendix III: Recommendations for Information to be Released to Better Understand Rioters Motives and to Prevent a Similar Riot in the Future

Based on my studies to date, here are some categories of information that might provide better insight into what really happened on January 6, why it happened, and, most crucially, how to prevent a similar tragic event from happening in the future.  This information, if released, may turn out to be more helpful than a Congressional Committee looking into communications by Trump Administration officials:

- **The Department of Justice should immediately make available to the American people all the evidence it was planning to use to prosecute people who have signed plea agreements that have been accepted by courts.**  This does two positive things:  it gives the American people, who arguably have been starved of information about what motives rioters had, more insight into what people did and why; it also addresses the concern that defendants are being railroaded into pleading guilty to lesser charges in the face of the alternative of decades-long incarceration for some of the other charges even though the Department of Justice may still have insufficient information to convince a jury to convict them of those latter charges.
- **The Capitol Police should release the security footage of the most serious rioter violence associated with 8 locations within the Capitol.**  Rather than provide hundreds of hours of security camera footage, I recommend that they make available to the public 30 seconds of security footage surrounding each of the 5 five most violent events that occurred in each of the following 8 locations, to show events that we have not seen before during either the Impeachment Trial or in media documentaries (note that this is only asking for a total of, at most, <u>20</u> minutes of video):
    1. The atrium (or hallway) where Officer Goodman retreated to between 2:15 p.m. and 2:40 p.m.
    2. Any other areas around the Senate Chamber on the Second Floor between 2:13 p.m. and 2:40 p.m.
    3. The Rotunda itself, but excluding the East Entrance area, between 2:13 and 2:57 p.m.
    4. Statuary Hall between 2:13 and 2:57 p.m.
    5. The room between the House Chamber and Statuary Hall between 2:35 and 2:57 p.m.
    6. The Main Entrance to the House Chamber from 2:40 to 2:57 p.m., from both the outside AND the inside.  It is especially important to understand at what time someone knocked a hole in the inner door to the Chamber; was it after 2:41 p.m. when presumably everyone on the Floor had exited the chamber?
    7. The rest of the 2nd Floor of the House wing of the Capitol from 2:13 p.m. to 2:57 p.m., to exclude events that happened in the Speaker's Lobby and Brian

Bingham's altercation with officers as he left through the East Entrance of the House wing (both of which had been shown extensively during the Impeachment Trial).

8. The 3rd floor of the House wing of the Capitol, from 2:13 to 2:57 p.m.

- **Organizations such as proPublica and media organizations, such as CNN, Washington Post, the New Yorker, and the New York Times, should immediately release the videos they possess for these same 8 categories of locations along with the metadata associated with those videos.**
  - It would be helpful if they also released all footage of what was happening on the Northwest Steps and around the Senate Courtyard on the West Terrace between 1:49 p.m. and 2:57 p.m.

- **Any information that release of which does not compromise further investigations suggesting that rioters were plotting to commit sedition or to prevent the peaceful transfer of Presidential power to Joseph Biden on January 20, 2021.** As noted above, this information should be available for those that have made plea agreements accepted by the courts. As it is, this information is not released during plea deals down to lesser charges but it should be for the public good.

- **Information suggesting that protesters turned to violence primarily because of their white supremacist or white nationalist beliefs.** This evidence should be distinguished from information merely demonstrating conclusively that some of those present at the Capitol held white supremacist or nationalist beliefs when the latter might, arguably, have been motivated to take part solely because of their separate beliefs that the 2020 Presidential election was "rigged" or "stolen").[55]

---

[55] https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/

## Appendix IV: Information on Other Types of Crimes not Addressed in This Document

| Name | Specifics |
|---|---|
| MEREDITH Jr., Cleveland Grover<br>MEREDITH Jr., Cleveland Grover | Threatened Speaker Pelosi.  Did not arrive in Washington until January 7. |
| MILLER, Garret<br>MILLER, Garret | Threatened to Kidnap or Assassinate Representative Alexandria Ocasio-Cortez and an Officer. |
| REFFITT, Guy Wesley<br><br>REFFITT, Guy Wesley | Threatened his family. **He is also charged with taking a semi-automatic handgun onto the Capitol Grounds. He was apparently sprayed by officers before retreating to the middle of the Northwest Steps; his actions at the Capitol are otherwise unknown.** |
| SMOCKS, Troy Anthony<br>SMOCKS, Troy Anthony | Threatened to come back armed to hunt lawmakers and on January 19. Apparently targeted "DEMS, RHINOS, and Tech Execs" |
| STOLL, Justin<br>STOLL, Justin | Note allegedly put a post on Clapper app threatening a witness with death which was posted for those planning a "coup" and "insurrection" |

Table 14: Rioters Whose Charges Involve Threats

| Name | Locations Named In Their Documents | Link to Their Documents |
|---|---|---|
| ADAMS, Daniel Page | Senate Courtyard and Northwest Steps Under Scaffolding | ADAMS, Daniel Page |
| ALVARADO, Wilmar Jeovanny Montano | Tunnel | ALVARADO, Wilmar Jeovanny Montano |
| ANDERSON, John Steven | Tunnel | ANDERSON, John Steven |
| **BINGHAM, Brian Glenn** | **OTHER (House Entrance and Speaker's Lobby)** | BINGHAM, Brian Glenn |
| CONNELL, Cody Page Carter | Senate Courtyard and Northwest Steps Under Scaffolding | CONNELL, Cody Page Carter |
| COPELAND, Landon Kenneth | Lower West Terrace away from the Tunnel | COPELAND, Landon Kenneth |
| **COUNCIL, Matthew** | **OTHER (First Floor Exit Senate Wing After House Evacuation)** | COUNCIL, Matthew |
| DOOLIN, Joshua Christopher | Lower West Terrace away from the Tunnel | DOOLIN, Joshua Christopher |
| **ECKERMAN, Michael\*\*** | OTHER: Pushed Officer in the Crypt; went to House Chamber 2:30 | ECKERMAN, Michael |
| FISCHER, Joseph W. | **OTHER (Rotunda After House Evacuation Apparently)** | FISCHER, Joseph W. |
| GEORGE Jr., Edward | OTHER (included as OTHER since locations are unknown) | GEORGE Jr., Edward |
| HARRIS, Richard L. | OTHER (included as OTHER since locations are unknown) | HARRIS, Richard L. |
| **LOLLAR, Joshua R.** | **OTHER (Rotunda After House Evacuation Apparently)** | LOLLAR, Joshua R. |
| **MILLER, Garret** | **OTHER (East Entrance and Rotunda)** | MILLER, Garret |
| MOSTOFSKY, Aaron | OTHER (Not Clear Where in the Capitol he was) | MOSTOFSKY, Aaron |
| **PEZZOLA, Dominic (aka Spaz, aka Spazzo, Aka Spazzolini)** | **OTHER (Senate Wing Entrance and East Entrance)** | PEZZOLA, Dominic (aka Spaz, aka Spazzo, Aka Spazzolini) |
| **SECOR, Christian** | **OTHER (East Entrance, Senate Floor, other places)** | SECOR, Christian |
| SHALVEY, Dale Jeremiah\*\* | OTHER: On Senate Floor once Evacuated; not clear when assaulted someone | SHALVEY, Dale Jeremiah |
| YOUNG, Philip S.\*\* | West Terrace (Not Tunnel): Upper West Terrace (at 2:46) | YOUNG, Philip S. |
| **WARNAGIRIS, Christopher** | **OTHER (East Entrance)** | WARNAGIRIS, Christopher |

Table 15: Summary Information about the 20 People Charged Just With Assault\*

\*That is, charges don't include keywords 'physical' nor 'weapons'   \*\*New Assault-ONLY cases as of December 26
The following people were co-indicted with someone else as part of a multi-person indictment that included assault charges but the assault charges apply only for that other person or persons: PEPE, William Joseph, RAE, Paul, and SANDOVAL, Deborah

109

| Name | Case | Specifics |
|---|---|---|
| BROWN, Jeffrey Scott<br>BROWN, Jeffrey Scott | 1: 21-mj-565 | Took part in crowd inside the tunnel that crushed an officer, injuring him |
| FITZSIMONS, Kyle<br>FITZSIMONS, Kyle | 1:21-cr-158 | Apparently charged at officers at the Tunnel; he also pushed, grabbed, and swung at officers |
| GRANT, James Tate<br>GRANT, James Tate | 1:21-cr-537 | Pushed Barricade and Knocked an Officer down, hurting her; (this was the Dangerous and Deady Weapon) |
| GRAY, Daniel Paul<br>GRAY, Daniel Paul | 21-mj-429 | Pushed an officer down the stairs at the west entrance to the Rotunda,injuring her at 3:02 |
| JOHNSON, Paul Russell<br>JOHNSON, Paul Russell | 21-cr-332 | Injury occurred at the second barricade about 12:50: He took part in hitting Officer C.E. with a fence barrier |
| KHATER, Julian Elie<br>KHATER, Julian Elie | 1:21-cr-222 | Involved in spraying Sicknick with some agent and pulled on a barrier at the WT at 2:23 |
| Mattice, Cody<br>MATTICE, Cody | 1:21-mj-622 | Mattice's and Mault's charges include the phrase: "Using a Dangerous Weapon or Inflicting Bodily Injury."  It appears that the issue is the weapon since I could not find any evidence of an injury. |
| Mault, James Phillip<br>MAULT, James Phillip | 1:21-mj-622 | Mattice's and Mault's charges include the phrase: "Using a Dangerous Weapon or Inflicting Bodily Injury."  It appears that the issue is the weapon since I could not find any evidence of an injury. |
| MCABEE, Ronald Colton<br>MCABEE, Ronald Colton | 1:21-cr-35 | For details, see charge 3 of the Sabol et al multi-defendant indictment charges him with injuring Officer A.W. of the MPD, along with Clayton Ray Mullins |
| MCKELLOP, Jeffrey<br>MCKELLOP, Jeffrey | 1:21-cr-268 | Fought with police at the WT around 2:26-2:28.  He jabbed one near their eye with a flagpole |
| MULLINS, Clayton Ray<br>MULLINS, Clayton Ray | 1:21-cr-35 | Charge 3 of the Sabol et al multi-defendant indictment charges him with injuring Officer A.W. of the MPD, along with Ronald Colton McAbee |
| OWENS, Grady Douglas<br>OWENS, Grady Douglas | 21-cr-286 | Used a skateboard to attack an officer in group of 33 MPD moving towards the WT at roughly 2 p.m., causing a concussion and injuring a finger |
| QUAGLIN, Christopher Joseph<br>QUAGLIN, Christopher Joseph | 1:21-cr-40 | Bodily injury charge is found in Geoffrey William Sill's indictment |
| RANDOLPH, Stephen Chase<br>RANDOLPH, Stephen Chase | 21-cr-332 | Injury occurred at the second barricade about 12:50: He took part in hitting Officer C.E with a fence barrier |
| TANIOS, George<br>TANIOS, George | 1:21-cr-222 | Involved in spraying Sicknick with some agent at the WT at 2:23 p.m. |

Note that Dale Jeremiah SHALVEY's indictment includes an injury charge but his Statement of Facts does not seem consistent with that.  See SHALVEY, Dale Jeremiah

Table 16: 15 People Who Also Had Charges Containing the Keyword: "Injury"

This reference includes a good discussion about this topic:

https://www.statesman.com/story/news/politics/politifact/2021/07/14/some-jan-6-capitol-rioters-were-armed-guns-documents-show/7963993002/

**This reference makes a good point**: The total number of people who carried firearms with them that day may not ever be fully accounted for because the majority of those involved in the siege were not arrested on-site but were tracked down by law enforcement days, weeks, and months later.  It's also worth noting that the DoJ's definition of "armed" is not legally limited to guns or knives — it refers to any weapon used for defense or offense and used as a means of protection. Other items used as weapons Jan. 6 included bats, crutches, flagpoles, skateboards, fire extinguishers, and chemical sprays.

**Those charged include Christopher Michael Alberts, Lonnie Coffman, Mark Sami Ibrahim, Cleveland Meridith, and Guy Wesley Reffitt.**
**Christopher Michael Alberts** is already flagged as having a weapon in my single charge "Physical" and "Weapons" database on the *Physical and Weapons (Single)* sheet.

**Lonnie Leroy Coffman**, from Alabama, who brought a truck full of guns, Molotov cocktails and hundreds of rounds of ammunition to Washington DC. is also facing charges

**Mark Sami Ibrahim**, a DEA agent, is accused of bringing a gun onto the Capitol Grounds while trespassing and displaying it.  No malevolent intent was implied in his indictment nor is he accused of assault, etc., or entering the Capitol building.

**Cleveland Meredith**, did not attend the rally at the Capitol January 6, but was arrested in D.C. the day after the attack with an assault-style rifle equipped with a telescopic sight, a Glock firearm with several high capacity magazines and over 2,500 rounds of ammunition — including at least 320 "armor-piercing" rounds.  He said he'd arrived too late to attend the rally, but the following day, authorities said he sent a text threatening to shoot House Speaker Nancy Pelosi in the head.

From Statement of Facts: https://www.justice.gov/opa/page/file/1353311/download
Later on January 7, 2021, the other participant wrote, "That comment you made about Pelosi, what the fuck are you thinking. Get real nephew." MEREDITH replied, "Psychological warfare. I've been on the radar for a while now, they now [sic] I'm harmless." MEREDITH was utilizing a cellular phone in Washington, DC to send these text messages on January 7.

**Guy Reffitt** is already flagged as having a weapon in my single charge "Physical" and "Weapons" database on the *Physical and Weapons (Combined)* sheet, the *Physical and Weapons (Single)* sheet, and the *Search on Weapons* sheet.  For more about him, see:
https://www.cbsnews.com/news/january-6-capitol-riot-firearm-guy-reffitt/

Table 17: 5 People Facing Gun- or Firearms-Related Charges

# Appendix V: Update: Numbers of Rioters Charged as of December 26 Compared to September 25

Table 18 provides an update of Table 1, reflecting those people charged with weapons-related charges and with physical violence before September 25 and December 26. The numbers in bold red font inside brackets indicate the increases in the number of rioters charged between those two dates (for example, the two inside the brackets for physical violence at the Lower West Terrace Tunnel indicates that 2 additional rioters were charged between September 25 and December 26).

| Location Category | Duration | People Charged with "Dangerous Weapon" added | | People Charged under Physical Violence Statutes | |
|---|---|---|---|---|---|
| | | Number/% | Rate* | Number/% | Rate* |
| Barricades and West Terrace (except the Tunnel) | 12:53 to 4:23 p.m. | 26[+3]/30% | 7 | 47[+4]/36% | 13 |
| Lower West Terrace Tunnel | 2:40 to 5:10 p.m. | 33[+2]/40% | 13 | 38[+2]/29% | 15 |
| OTHER: At Entrances to or inside the Capitol | 2:13 to 4:28 p.m. | 13/16% | 6 | 28/22% | 12 |
| Combinations of Tunnel AND the Other Two Categories | - | 5/6% | - | 7[+1]/5% | - |
| Miscellaneous, such as in the crowd on the West side but away from the Terrace | 12:53 to 5:10 p.m. | 5[+2]/6% | 1.2 | 10[+2]/8% | 2.3 |
| Total: | 12:53 to 5:10 p.m. | 82[+7]/100% | 19 | 130[+9]/100% | 30 |

Table 18 Counts of Rioters Charged and Corresponding Rates for All Location Categories by December 26 as Compared to as of September 25

Before I discuss these data I want to inject this important caution: All of the changes must be treated with some skepticism because of factors associated how the Department of Justice maintains that database, factors that I would personally describe as flaws in their maintenance procedures. First, other rioters might have been charged with such crimes in the meantime but their charges may have only been reflected within revised indictments for other people; in such cases, their new names would then not appear as part of my searches on the list of all people charged. Secondly, when a person is first indicted their names, PDF's of their Statement of Facts and Indictments, and a text list of charges are entered into the database but if additional charges, such as the two categories described here, are subsequently brought, I discovered that the list of charges displayed for that person is not consistently updated even if the attached document PDFs were. This means that if I searched for "physical" or "weapons" keywords in

the database I would then miss those people who had these charges added later.  Finally, conceivably these two factors could combine so that an additional rioter was charged but their names only appeared on a multi-person indictment stored under someone who is now charged with such crimes but whose searchable text list of charges doesn't indicate it, resulting in me missing both of these rioters altogether during a keyword search.

Another indication that indicted rioters have not shown up in my searches is that the number of people whose names are listed on the Department of Justice website appears to be lower than the total announced on the same date by news media, implying strongly that there are people charged that, for some reason, do not have their names explicitly on the website at all.  I can't account for that discrepancy.

With these warnings in mind, the only location category showing no increase across either of the two types of charges during that 3-month time period was the "OTHER: At entrances to or inside the Capitol" location category while the Combination category had no additional weapons-related charges but did have one additional rioter charged with physical violence. Specifically, this means that the 3 tables describing "OTHER" data - Table 6, Table 7, and Table 8 – are unchanged.  Regarding Table 2 through Table 5, and Figure 8 through Figure 10, the additions to the Barricades and Lower West Terrace location category counts for both types of charges all occurred before 2:28 p.m.

## Appendix VI:  What Might Have Precipitated the Violence on the Lower West Terrace between Approximately 2:25 and 2:30 p.m.

During the time window 2:25 to 2:30 p.m., video shows several people being arrested after what appears to be police throwing them to the ground and handcuffing them.  Whatever the intentions and standard, legitimate police tactics, I believe some protestors saw those acts as excessive use of force, that is, police brutality.  I am especially concerned that agent provocateurs may have intentionally caused these acts to happen so that the crowd's resulting anger could be focused on a new level of violence against police all meant to break through the police line which indeed then happened over the next 15 minutes.  If that is true, the incitement was caused at 2:25 p.m. rather than 90 minutes earlier.

I would like to know: what happened and who were the people who were arrested so we can interview them?  Part of the concern would be to see if their actions were part of a plan; the other interest would be to verify that police did not use excessive force, with the understanding that further inquiry might be needed if, in fact, it appears that it might have.

I base those conclusions on the video of those actions I found at[56]

https://www.youtube.com/watch?v=esvuSWXncc8

Luckily for me, I had taken screen snaps from it on April 18.  It appears to show police punching a protestor that had broken through the line.  Other members of the crowd that break through are then tackled and handcuffed.  This seemed to have made people mad in the crowd.

---

[56] It is interesting to note that I had another link for a video but that video has been removed for some reason since I first accessed it on April 18 to create the first draft of this document: https://www.youtube.com/watch?v=0zyjCvDN4Ig&t=2940s



25 sec. into the video:  As the camera turns towards the crowd, a woman shouts, "Stop hitting him, you stupid a**e!"

Shortly thereafter, rioters standing next to the police line attack the officers violently, especially those police standing below the person filming the events, as we see here.



At about 40 seconds into the video, the crowd at the very northernmost crowd at the West Terrace start pushing hard at the police line, perhaps in rage about how that one guy is apparently being hit by the police. What you see now, at 43 seconds, is a fight going on.

The characterization of the line as "disintegrating" in note with the next image may be overdoing it.  The police lines in the other areas seem to still be in place.





By 1:03 into the video the police line has completely disintegrated on the North side of the West Terrace



At 1:07 someone yells, "You better run, f*g cops!"

Here is a match between two videos tied to the event of somebody throwing a fire extinguisher at police, first, in a ProPublica video from their website on the left-hand side (which suggests time is about 2:29 p.m.) with an image of the same event shown on the right-hand side from the short video used for the images above. This suggests that the short video, starting with someone being hit by police, started at about **2:27 p.m**. if there were no gaps in filming in the latter video.



It is remarkable to note that this violence, as well as the treatment of the protestor (which may have looked violent when it was just standard police practice) took place just after President Trump's 2:24 tweet disparaging Vice President Pence:

> "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!"

| ! | The Impeachment Managers suggested that the violence we see here was caused by President Trump's tweet by juxtaposing the images with the tweet.  These images suggest that the crowd may have been incited instead at this point primarily by what appeared to be unnecessary police brutality (after experiencing chemical agents apparently lobbed at random dozens of yards into parts of the crowd that didn't even realize violence was going on at the police line) rather than President Trump's tweet, especially since his two later tweets about complying with the police seemed to have had absolutely no effect on the crowd behavior. |
|---|---|

Note:  Here is an extremely helpful video since it is a full hour and a half (1:28:30) long and, as a result, covers a lot of the violence committed during what I am calling the Battle of the Lower West Terrace:

https://banned.video/watch?id=5ff73a601669d333f2b27315

## Appendix VII: Why Rioters May have Engaged in the "This is the People's House" Protest Even After Lawmakers Had Left the Capitol

A proPublica video, with a timestamp of 4:55 P.M. and 1 minute, 54 seconds long, provides some insight into why many took part in what I would call the "This is the People's House" protest that took place largely at the West Terrace Tunnel, even after lawmakers had left.  You, like me, may disagree with the sentiment, but recognizing his beliefs is perhaps better moving forward than pretending he and people like him are just "incited" angry, white supremacists.  Again it must be emphasized that President Trump never suggested this "right" to his supporters: they would have had to invent it completely on their own with no basis beyond their own beliefs, so I would infer that they alone are responsible for ALL the violence against police that ensued based on this excuse after his tweet at 2:38 p.m. to stay peaceful.  I have **bolded** certain parts for emphasis.

https://projects.propublica.org/parler-capitol-videos/?id=aFO87IEKv43J

"So, I was at the Capitol … And I just see right now, Joe Biden finally came out of his basement to say .oh,..,. he demands Trump to say something to his extremist supporters. Like, let me tell you something because they're going to lie on MSM like they always do.  **Trump supporters, American citizens, we have the right to walk into the Capitol because that's our Capitol, not the politicians' Capitol, it's ours! And, you know what happened?  You know what happened? The police, their Gestapo, came and stopped people from going into the building that is theirs.  That's what happened. So, as they twist what happened into this crazy extremist stuff – No!  We have the right to go in there!  We do!  If you don't understand that American citizens have a right to go in there, and you think that its' okay for them to act like this, you need to go to another country, you need to a Communist country, a Socialist country, because that's how they do it there.  That's not how they do it here.**  And most people are willing to fight tooth and nail, put everything on the line, to make sure this country never becomes that, so because if it does, you know, it does, but [shakes his head in exasperation, apparently] I've seen it firsthand, I've seen it firsthand and now you're going to tell me now that Edison [???] said or any in DC [???] said, because they're waiting to do this but people need to go to jail and **they're going to need to lock people up for … inciting this fraud.**  It's fraud against the people, we see it.  They did it last night [*presumably talking about the Georgia elections on January 5*].  'Nah, nothing to see here.'  It's crazy, man.  But, you know what? Don't worry about that… We'll just sit here and continue to watch how in the city – the nation's Capital - we've got homeless tents out here like, 'Oh, it's just another way of life' [*see figure below to the right*].  Yeah, look how screwed our priorities are."

