**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 22-cr-00015** |
| | ) | |
| **ROBERTO MINUTA** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

## **DEFENDANT'S SENTENCING STATEMENT**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
Attorney for Defendant

I.      **Introduction**

Comes now Defendant Roberto Minuta, by and through his undersigned counsel of record, William L. Shipley, and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on June 1, 2023. Defendant Minuta appears for sentencing before this Court having been convicted on the following offenses:

Count One – Seditious Conspiracy in violation of 18 U.S.C. Sec. 2384;

Count Two – Conspiracy to Obstruct an Official Proceeding in violation of 18 U.S.C. Sec. 1512(k);

Count Three – Obstruction of an Official Proceeding in violation of 18 U.S.C. Sec. 1512(c)(2); and

Count Four – Conspiracy to Prevent Any Officer from Discharging Any Duties in violation of 18 U.S.C. Sec. 372.

II.     **Objections to the Presentence Report.**

Part A:  The Offense -- Charges and Convictions

Defendant Minuta objects to the inclusion of the entirety of paragraphs 1 through 31 of the Presentence Report.  The existence of, or allegations contained in versions of the indictment in this case that were superseded by later indictments is irrelevant for purposes of sentencing.  Whatever the motivation, the fact is that the Government chose to return to the Grand Jury with each superseding indictment thereby voiding and abandoning the prior versions of the indictment for all purposes.  The only relevant charging document was the indictment which the jury's verdict was rendered upon.

Paragraphs 1 through 31 stretch from pages 5 through 18 of the PSR, and the contents are irrelevant to the trial, verdict, or sentence in this case.

<u>Part A:  The Offense – Offense Conduct</u>

The offense conduct reflected in a Presentence Report is defined by U.S.S.G. Sec. 1B1.3(a)(1)(A-B) to include:

> all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
> (B)      in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i)      within the scope of the jointly undertaken criminal activity,
>
> (ii)       in furtherance of that criminal activity, and
>
> (iii)       reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

The "offense conduct" does not consist of "The information … obtained from the various Indictments filed in this case, the government's Opposition to Defendants' Motions for Judgments of Acquittal, and additional information provided by the government."

The determination by the Probation Office to use allegations returned by a grand jury from proceedings that included no adversarial testing of the evidence, the Government's written advocacy of it's case-in-chief, or comments/information supplied by the Government *ex parte* without the

involvement of the defense, renders nearly the entirety of the "Offense Conduct" section of the PSR of little or no value.

The Offense Conduct is to be based on the evidence presented during the trial as is made clear by Section 1B1.3.

The use of allegations from the indictment as a source of the "offense conduct" is particularly galling given that the Government objected to the trial jury having the indictment during deliberations.  Had that been available, the jury would have seen the numerous and significant failures of proof with respect to the very allegations used by the Probation Officer when it was considering the evidence in the case.  Yet now the defendants are saddled with "offense conduct" consisting of allegations the Government could not – and did not prove at trial.

With respect to the individual paragraphs of the "Offense Conduct" section, Mr. Minuta makes the following objections and/or corrections based on the evidence in the record:

Par. 43:    Mr. Minuta did not lead "a group of Oath Keepers" on January 6. Mr. Minuta joined a group of four Oath Keepers on the morning of January 6 at the Mayflower Hotel as part of a personal security detail for Roger Stone.  That group consisted of James, Brian Ulrich, Mark Grods, and Rick Jackson.

Ulrich testified that Mr. Minuta was not with the group on January 5 after they arrived from Georgia/Alabama.  Ulrich testified that James and Minuta seemed to know each other, but no one else in the group knew Minuta or where he had come from to join them. Ulrich testified that it was James who was the "leader" of the second group at all times – including during the planning on Signal and elsewhere leading up to their departure from Georgia/Alabama.

The only manner in which the <u>evidence</u> showed Minuta to be a "leader" of the second group was that at times he was first in line

as the group walked across the Capitol grounds after leaving the golf carts behind.

Par. 49:     The evidence at trial – including testimony from FBI witnesses – was that Mr. Minuta was not a participant in the November 9, 2020, GoToMeeting conference call.

Par. 51:     There was no evidence presented at trial that Mr. Minuta "agreed" with Rhodes' "calls for action."

Mr. Minuta was not a participant in the Florida Oathkeeper Signal chats.

Rhodes' description of Mr. Minuta as one of his "most trusted men" was a gratuitous and unsolicited Signal message that was unrelated to any aspect to the alleged conspiracies.
The evidence, including testimony from FBI witnesses, confirmed there was no that Mr. Minuta was not a member of any state chapter of the Oath Keepers, and that Mr. Minuta was, in effect, a "chapter" consisting of only himself.

The only <u>evidence</u> presented at trial of communications between Rhodes and Mr. Minuta were the records of cellular phone calls made during the morning and afternoon of January 6.
The suggestion that Mr. Minuta was a conduit for communication with members of the Proud Boys based upon a single text message from Mr. Minuta to Dominic Pezzola. The Court precluded the Government from introducing evidence concerning Mr. Pezzola to suggest a link between the two groups by virtue of this single text message as there was no other evidence to support that claim.

Par. 59     The second group of Oath Keepers did not enter "into the Capitol … in the same formation with their hands on each other's shoulders or backs" as had been the case with the first group. The six members of the second group climbed the East Front stairs and paused outside on the Plaza for approximately 3 minutes. Video evidence showed the group going up the stairs directly behind a line of USCP Officers led by Lt. Tarik Johnson. Video from inside the Capitol of the Columbus Doors showed James, Minuta, and Walden entering through the doors directly behind the same group of Officers. Grods and Ulrich had been separated from the first three outside on the Plaza, and did not enter the Capitol until 7 minutes later. Jackson paused outside the Columbus Doors and never entered the Capitol.

Mr. Minuta did not assault any USCP Officer inside the Capitol. After approximately one minute of verbal exchanges with Officers

Jackson and Mendoza – which Officer Jackson testified to included James asking if Officer Jackson wanted help getting out of the Capitol – Officer Mendoza struck James with his left hand on the left side of James' face. Whether justified or not, Officer Jackson testified that it was Officer Mendoza who struck the first blow, and it was in response to that blow that James retaliated by grabbing Officer Mendoza and attempting to drag him away from the police line.

Mr. Minuta was not involved in this altercation. He was standing several feet behind James and the line of officers, recording the events with his cellular telephone. When the scuffle intensified, the crowd behind Mr. Minuta surged forward, trapping Mr. Minuta in the middle.

The riot shield in question was taken from a USCP Officer by a rioter with no connection to Mr. Minuta or the Oath Keepers. That rioter had both hands – without gloves – on each handle of the shield and used it to push back against the police line that was attempting to push the rioters out of the Rotunda. Mr. Minuta did not attempt to use the riot shield for any purpose.

As he left the building, the full statement made by Minuta was "If you take away the First Amendment, all that is left if the Second Amendment." The Probation Officer's editorializing regarding prior statements by Mr. Minuta regarding the Second Amendment is inaccurate and should be stricken.

Mr. Minuta was not charged with assault, there was no jury verdict on the charge of assault, and the claim in Par. 59 should be stricken.

Par. 64    The evidence showed that Mr. Minuta sent a Signal message stating that he deleted a single Signal chat message with a video attached – not that he deleted the video from his phone. The message stated that he did so at the request of James because James was shown in the video.

The reference to Minuta "discarding" his phone as evidence of obstructive behavior should be deleted since FBI witnesses testified they could not say Mr. Minuta had discarded his phone. All they could say was that the phone was not found during searches of locations connected to Mr. Minuta, and one phone they did locate showed that service on that phone had only begun in mid-February, 2021. The jury acquitted Mr. Minuta on the charge alleging specifically that he "discarded" his cellular telephone to obstruct a grand jury proceeding. Because the cellular telephone was never found, and Mr. Minuta was never asked about its

whereabouts by the Government, there is no evidence from which to conclude he "discarded" the phone, much less what his purpose was in that regard.

With regard to all the "Offense Conduct" as set forth in the PSR with regard to the second group, all suppositions and/or conclusions which are set forth therein based upon information provided by the Government – either in the form of the allegations of various charging documents or information supplied directly to the Probation Officer by Department of Justice Officials – must be considered against the backdrop of Mr. Ulrich's testimony in the second trial, and Mr. Jackson's testimony in the first trial.  They both testified – and their testimony was not contradicted by any other evidence – concerning the events and motivations of the members of the second group on January 6.

Further, the "Offense Conduct" with regard to the second group as advocated by the Government should be considered in light of the fact that the Government chose to not call co-Defendant Josh James as a witness in any of the three trial even though he has pled guilty and is obligated by the terms of his plea agreement to testify truthfully if called upon to do so.  The unwillingness of the Government to risk putting James on the witness stand to explain his conduct as well as his interactions with Rhodes, Green, and the other members of the second group is as powerful as any of the highly suspect testimony extracted by intimidation from Caleb Berry, Brian Ulrich, or Jason Dolan.

Part A: The Offense – Role Assessment

Par. 105    There is no evidence that Mr. Minuta was a "manager" under co-Defendant James or otherwise.  As testified showed, Mr. Minuta flew from Texas to New Jersey on January 5, and drove from New Jersey to Washington D.C. later that night.  The first time he met

the other members of the Stone security detail was on the morning of January 6.  There was no testimony of "leadership" by Mr. Minuta at any point during the day – in fact, Ulrich and Michael Green testified exactly the opposite, that James was at all times the leader of the second group.  Greene testified to this very point extensively in the third trial – he was on continual contact with James throughout the morning of January 6 about the activities of the second group.

The single gratuitous description by Rhodes of Minuta in a Signal message, and the one text message communication between Minuta and a Proud Boy member he met at his hotel are woefully inadequate to support the claim the Government has fed to the Probation Officer on this issue.

Equating the evidence of Mr. James "leadership" activities with the evidence of Mr. Minuta's "leadership" activities is duplicitous and defies credulity.

Par. 118     Mr. Minuta was acquitted by the jury of obstruction with regard to the allegation that he discarded his cellular telephone.  The only other issue in the evidence as his single message that he had deleted from Signal – not from his cellular telephone – a single video showing James, because James requested that he do so.  Without evidence that Mr. Minuta intended to obstruct a grand jury proceeding, there is insufficient evidence that this was an obstructive act warranting the two-level adjustment.

## III.     <u>Sentencing Guidelines Calculation</u>

Mr. Minuta agrees that pursuant to U.S.S.G. Sec. 2X6.1, the Guideline applicable to Count 1 is Sec. 2J1.2 as it reflects the most analogous offense conduct to the charged count.  Mr. Minuta agrees with the PSR recommendation that that same Guideline is applicable to all four counts of conviction.

### A. <u>Applicability of the Guideline Enhancements</u>

As noted above, Mr. Minuta agrees that the applicable Sentencing Guideline with respect to all the counts of conviction is Sec. 2J1.2.  The base

offense level is 14.  Mr. Minuta objects to each of the enhancements recommended by the PSR.

    1.  Threatening Injury to Obstruct The Administration of Justice:  Sec. <u>2J1.2(b)(1)(B)</u>.

Mr. Minuta objects to the + 8 level enhancement recommended in Paragraph 132.

The factual basis is that the offense conduct involved causing or threatening physical injury to a person, or property damage, <u>in order to obstruct "the administration of justice"</u> pursuant to Sec. 2J1.2(b)(1)(B).  The phrase "administration of justice" is described in Application Note 1 as involving "a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources."

The conspiratorial objectives charged with respect to Count 1 were to oppose by force the authority of the United States, or by force to prevent, hinder, or delay the execution of any law of the United States, specifically Congressional proceedings as required by the 12th Amendment and the Electoral Count Act ("ECA").  The conspiratorial objectives of Counts 2 and 4 were substantially the same – to prevent Congress from certifying the vote of the Electoral College.

For the +8 level enhancement to apply, the offense conduct must fall within the ambit of "administration of justice" as that term is used and defined in Section 2J1.2(b)(1)(B).

Interference with the administration of justice "includes a premature or improper termination of a felony investigation; an indictment, verdict, or any

judicial determination based upon perjury, false testimony, or other false evidence[.]" U.S.S.G. Sec. 2J1.2, n.1. This portion of the definition fits a textual interpretation of the "administration of justice" as referencing a judicial or quasi-judicial tribunal that applies the force of the state to determine legal rights.  The list in Sec. 2J1.2 n.1 refers to investigations, verdicts, and judicial determinations—all of which involve the coercive force of the state and the actual or potential determination of legal rights in judicial or enforcement proceedings.

The congressional certification – the obstruction of which is the conspiratorial objectives as set forth in the indictment -- does not share the characteristics of these definitions.

In other cases where this issue has been disputed, the Government has relied upon the final phrase involving the "unnecessary expenditure of substantial Governmental . . . resources" as bringing this enhancement into play with regard to January 6 sentence guideline determinations.  But omitting from this final clause the phrase "or court" avoids the implications of the rules of statutory construction that apply with words "associated in context" are used together in a sentence.  If the word "government" was interpreted broadly to include both Executive and Legislative branches, such a broad construction must also by implication be considered to include the Judicial branch.  But doing so makes the reference to "or court" in the sentence superfluous.

Thus, "government resources" is most accurately read to be the expenditure of resources of the executive branch in its function as the prosecutorial entity in judicial or quasi-judicial proceedings.  As such,

"government resources" does not bring "congressional proceedings" within the definition of "administration of justice" for purposes of Se. 2J1.2(b)(1)(B).

2.  <u>Substantial Interference With Justice (U.S.S.G. § 2J1.2(b)(2))</u>

Mr. Minuta objects to the +3 level enhancement under Sec. 2J1.2(b)(2) on the same basis as his objection above, i.e., the offense conduct does not involve interference with the "administration of justice."

3.  <u>Extensive Scope, Planning, or Preparation (U.S.S.G. § 2J1.2(b)(3)(C))</u>

Mr. Minuta objects to the +2 level enhancement for "extensive scope, planning, and preparation.  The factual justification for imposing this enhancement on Mr. Minuta is stated in the PSR as follows:

> The offense was otherwise extensive in scope, planning, or preparation (to wit: the conspirators began planning in November 2020 and continued through January 2021. More than 20 members of the conspiracy communicated with each other using sophisticated, encrypted messages, and coordinated with one another to travel across the country from Arizona, Texas, Alabama, Georgia, Florida, North Carolina, Virginia, and elsewhere into the Washington, DC area. Conspirators staged an armed Quick Reaction Force a short distance from the Capitol building at a hotel in Virginia, where they stored firearms and other weapons collected from numerous conspirators); therefore, two levels are added. USSG §2J1.2(b)(3).

Nearly the entirety of this passage, while possibly applicable to one or more co-defendants based on evidence in the case, is entirely inapplicable to Mr. Minuta.  The Government was unable to establish with any certainty when the conspiratorial agreements were formed.  In closing argument it resorted to a rationalization under the law that the agreements could have been formed on the steps on the East Side of the Capitol leading to the Columbus Doors.

In fact, the Government offered the testimony of Caleb Berry that it was

just prior to going up the stairs that Kelly Meggs was claimed to have told the first group they needed to go inside the Capitol to stop the Congressional certification process.  If that was the moment the conspiratorial agreements were formed, then the conspiracies were not "extensive in scope, planning, or preparation" and the +2 level enhancement would not apply.

Further, it is now a fallacy to say that use of third-party messaging applications for cellular phones such as Signal – or WhatsApp, Telegram, Threema, Wire, Viber, Dust, etc., -- or email service providers outside the United States such as Proton Mail, are "sophisticated."  Such services are widely available and utilized by tens of millions of people – if not more – around the world.

But even if it were true, as to Mr. Minuta this particular factual basis as supporting the +2 level enhancement doesn't apply because he was not a regular user of such means of communication.  As the testimony showed, he was added to only two Signal chats by Rhodes.  Even in those chat groups he made almost no use of the Signal application to communicate with other Oath Keeper members.

There was no evidence at trial that Mr. Minuta coordinated his travel with anyone else.  He was in Texas with his family looking for a new place to live and work the first week of January, flying home to New Jersey on January 5.  He then drove to Washington D.C. late at night on January 5, meeting Mr. James and staying in his hotel room.  There was no evidence that he was in communication with any other Oath Keeper member for days leading up to January 6.  He went with Mr. James to meet the other members of the second

group on the morning of January 6, none of whom he had ever met or had contact with prior to that.

He had no involvement in or knowledge of the storage of firearms at the Comfort Inn in Balston as he was not in any of the Signal chat groups where those details were discussed.  There was no testimony or other evidence offered that trial that he knew of the storage of firearms in Virginia.  Although he owned nearly 30 firearms prior to January 6, he did not bring a firearm with him to Washington D.C. for the Roger Stone personal security detail.  Thus, none of the factual bases serving as support in the PSR for a +2 level enhancement for extensive planning are applicable to Mr. Minuta or the offense conduct as it applies to him.

    4.   Role in the Offense – Manager or Supervisor (U.S.S.G Sec. 3B1.1(b)):

Mr. Minuta objects to the +3 level enhancement for being a "leader or supervisor."  [P]ersons receiving an enhancement under § 3B1.1 must exercise some control over others." United States v. Flores, 995 F.3d 214, 221 (D.C.Cir. 2021)(Quoting United States v. Wilson , 605 F.3d 985, 1037 (D.C. Cir. 2010) (per curiam)).

The was no evidence offered at trial that Mr. Minuta exercised control over any other individual in connection with the events of January 6 or at any other time.  In fact, cooperating defendant Brian Ulrich testified that Josh James was at all times the leader of the second group in which both Ulrich and Minuta were members.  This fact was confirmed by the testimony of Michael Greene in both the first and third trials when he testified that he was in regular

communication with James regarding the actions of the second group on both
January 5 and 6, and that he and Rhodes made James the leader of the Roger
Stone security detail.

    5.   <u>Obstruction – Destruction of Evidence (U.S.S.G. § 3C1.1)</u>

Mr. Minuta objects to the +2 level enhancement for "obstruction."

Mr. Minuta does not dispute that evidence of acquitted conduct can
provide evidentiary support sufficient for the application of a sentencing
enhancement due to the differing standards of proof required.  But with respect
to the allegation that he "discarded" his cellular telephone as a basis for an
obstruction enhancement, the testimony at trial established that the
Government simply did not find his cellular phone in the places it searched for
evidence connected to Mr. Minuta.  The failure of the Government to recover a
particular item of evidence does not establish any obstructive conduct by Mr.
Minuta with respect to that item of evidence.  It only establishes that the
Government agents conducting the searches didn't find one of the items they
were looking for.

With regard to the claim that Mr. Minuta deleted "videos", the single
Signal message in question concerned a video Mr. Minuta deleted from Signal –
not from his cellular telephone – and that the reason for doing so was that
James asked him to delete the video he posted as a message on Signal.
Application Note 1 to Section 3C1.1 states:

        "Obstructive conduct that occurred prior to the start of the
investigation of the instant offense of conviction may be covered by this

guideline <u>if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction</u>."

No evidence supports the conclusion that Mr. Minuta was anticipating an investigation at the time he deleted the Signal message with the video, nor that his deletion was "purposely calculated to thwart" any such investigation. In fact, Mr. Minuta posted a Signal message explaining that he had deleted the video and that he had done so at the request of Mr. James. This message is clear evidence that he made no "purposeful calculation" to "thwart the investigation."

## IV.   <u>Sentencing Factors Under Sec. 3553(a)</u>

Pursuant to 18 U.S.C. § 3553(a), numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to Mr. Minuta's background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

1.   Nature and circumstances of the offense and the history and <u>personal characteristics of the defendant</u>.

a.   <u>The Nature and Circumstances of the Offense</u>.

Having presided over three trials involving almost entirely the same operative facts with regard to the events of January 6, and Mr. Minuta's involvement with the Oath Keepers before, during and after that date, Mr. Minuta will rely on the Court's view of the evidence as it was presented.

b.   <u>History and Personal Characteristics of Mr. Minuta</u>.

The PSR includes a lengthy and accurate passage concerning the personal history and characteristics of Mr. Minuta.  For purposes of this Sentencing Statement, Mr. Minuta supplements the PSR with the following additional information.

Roberto was not raised in a household where strong political beliefs were part of his upbringing.  He could not distinguish between the defining characteristics of Democrats and Republicans until his late teens. Through high school, he watched scenes of the Iraq War in some of his classrooms and was disturbed by the visuals and realization of large-scale death and destruction that resulted from war.  Roberto developed an unfavorable view of the Republican Party at that time as the push for the war was associated with Pres. Bush and the Republican Party.

Roberto was in his 20's when President Obama ran for his first term, and many of his campaign promises resonated with Roberto in the same way they resonated with many voters his age.  At the time Roberto was an advocate for avoiding future wars and protecting the environment.  He felt that Pres. Obama was the candidate who represented generational change and offered views for the future most in line with Roberto's views.

Still knowing little about national politics, Roberto discussed his evolving belief with his parents.  They told him that his deceased maternal grandfather, who Roberto grew up greatly admiring, had been a life-long Republican.  This fact led Roberto to register for the first time as a Republican and cast his first vote for the Republican nominee for President.  Roberto felt then it was a largely uninformed decision over which he later had some regret, and it

spurred him to taking more interest in politics and world events from that point forward.

This newfound interest led him to deeper research into the foundations and inner workings of the American political system.  What he learned greatly disillusioned him as he came to realize how much campaigning, lobbying, and seeking/receiving political donations were tied up in running for political office and policy decisions after getting elected.  He began to "follow the money" in politics, looking at ultimate sources of the capital and wealth – finally identifying the Federal Reserve, multi-national corporations, and international banking institutions as the centers of political power.

In both his personal and business relationships, and in online activities, Roberto became a strong advocate for "sound money," which was originally Gold and Silver as per the Constitution. He felt that a return to a currency backed by tangible assets would prevent the massive expansion of the currency supply through issuance of new debt, and limit the ability of banks and corporations to amass the enormous wealth that gives them such immense political power.  Roberto ultimately took the stance that he was against the Federal Reserve because they were not federal, and they have no reserves. In his view, they are a privately owned, for-profit institution that should not have the ability to steer America's economy, issue debt, and steal from future generations by placing the debt on their backs.

After years of research, Roberto ultimately made the decision that he was a political atheist and did not have much faith in the willingness or ability of either political party to be truthful and honest. He felt that most politicians on

both ends of the spectrum were beholden to their largest donors, and while they may appease the people at face value, their decisions on policy were influenced by money in one way or another. In Roberto's view, the money was contributions from large corporations, and their subsidiary "Charities" that had special interest in swaying politicians to favorable policy positions that would ultimately be mutually beneficial in making the corporations, and the politicians more rich and powerful. This was deeply disturbing to Roberto, as he associated this system to the origin of his family in Sicily under the dictatorship of Benito Mussolini, the father of fascism. Mussolini defined fascism as the merger of government and corporation, and Roberto later would see the massive corporate influence over the American political system first-hand.

Roberto's paternal grandfather, Giuseppe Minuta, was forced to fight for Mussolini in his deranged conquest campaigns in Africa. Roberto heard the horrific war stories and was told the graphic details of what it looks like when an army wielding modern weapons meets a technologically inferior country. It was genocide and those effects of war carried through several generations. The physical abuse visited upon Roberto's father by his grandfather – a byproduct of his war experiences -- turned to verbal abuse to Roberto and his siblings by his father.  Roberto has learned from his father's mistakes and believes each generation of his family must make strides in eradicating the effects that originated from their forced military service for a fascist dictatorship. The Minuta family left Sicily after World War II because they had nothing left. They

were starving and their war-torn country had collapsed as a result of a Fascist dictators psychotic direction.

Towards the end of President Obama's 2nd term, Roberto had his first child, Antonio Minuta.  Roberto and his wife Gissela – born and raised in Peru -- just wanted the best for their son and had strong religious as well as philosophical beliefs that deterred them from administering vaccinations to their child from birth. As a couple, Roberto and Gissela became more politically active because of their desire to give their son (and later their daughter Lucia as well) the best future possible. Both children had a religious exemption from vaccination in NY state, that allowed them to attend school.

But in the summer of 2019, Antonio and Lucia were kicked out of summer camp for not having up to date immunizations, and days later a bill was introduced in the New York Legislature to end all religious exemptions in New York entirely.

Roberto and his wife attended the vote on the bill at the NY Capitol in Albany.  They were permitted to sit in the room with the health committee while they debated and cast their votes. The bill failed by one vote, but the representative most aggressively promoting the bill was frantic after the loss and went around the room whispering into the ears of other officials. One of the members who had voted in opposition then stood up and said that while he still did not agree with the bill and had many concerns, he changed his vote to "Please his majority". A young female African American Democrat on the committee stood up and started shouting that there was money involved, and that money and corruption was the sole influence behind the passing of the

bill.  She believed that what was being done was a direct violation to the religious freedom outlined in the 1st Amendment, and a gross display of big Pharma influence.  Roberto and his wife agreed with her views.

Roberto and Gissela left the Capitol.  On the drive home they decided they would leave New York and move to New Jersey.  This was their first time witnessing first had how money and lobbying corruptly influencing lawmaking. This confirmed their lack of faith in politics, political parties, and politicians. When immunizations became mandatory to attend any school in New York, Roberto and Gissela moved their family to New Jersey where their religious exemption was still allowed. One month after moving, the same bill was introduced in the New Jersey legislature. Thousands of parents, many with their children, showed up at the NJ Capitol to protest the bill. The large-scale peaceful protest was enough to cause the bill to fail. That made Roberto understand and appreciate the importance if the First Amendment, and that all appropriate First Amendment activity should be respected and protected regardless of the content of the advocacy.

These events took place while former Pres. Trump was in office. Roberto was skeptical of Trump as he was all politicians but found hope initially in what he thought was Trump's willingness to take on establishment centers of power.  But Roberto quickly realized that Pres. Trump was lying on many fronts throughout his Presidency.  Trump's divisive campaign rhetoric about Hispanic immigrants was particularly offensive because Roberto's wife was a Peruvian citizen. Roberto helped his wife obtain American citizenship by studying with her for citizenship exam.  Doing so led them both to learn more

history behind the Constitution, the Bill of Rights, and structure of government institutions.  He watched his wife take her oath to the Constitution and swear her allegiance to America. It was a turning point for Roberto as he felt as if he was born into the oath he watched his wife take, having always taken his birthright citizenship for granted.

Roberto continued to learn about the Constitution, inspired by his wife oath, and became a strong advocate – almost an "absolutist" -- on the Bill of Rights regardless of political affiliation.

Pres. Trump was on track to out-spend every other president before him, political policy that was the antithesis of what Roberto believed.  Roberto began to distrust and eventually despised Pres. Trump.  COVID was the breaking point for Roberto. He felt that Pres. Trump was inadequate in his handling the virus from the very beginning. Then economic shutdowns followed by corporate bail outs only made worse all the economic problems in Roberto's view.

Roberto saw a dictatorial streak in what Trump was doing in the first few months of the pandemic and brought back memories of the fascism in Italy that was described to him by his family when he was growing up.  The corporations gained enormous wealth while the mom-and-pop businesses were destroyed.  Roberto voluntarily closed his tattoo business for 2 weeks during the "Flatten the curve" phase.  Having had some education and experience in emergency medicine, he thought that was a reasonable and wanted to do his part, especially since he was hospitals being overwhelmed by COVID patients. After the two weeks, New York state labeled Roberto's business as non-essential and he had no projected date on which he could expect to reopen.

Robert's view was that the authority for the New York Governor to mandate the close of his business was handed down through the political advocacy of Pres. Trump, and firmly believed that it was Pres. Trump who was orchestrating the greatest Government overreach he had ever seen.

Following their move to New Jersey, Roberto had a 1.5 hour commute each way to his tattoo shop in New York which he opened in defiance of the shut-down mandate.  Roberto began making Facebook videos during the drives where he voiced his frustrations and boredom. He adopted a mannerism of an older Italian New Yorker he was familiar with, a gentleman who passionately yell and go a little "off the rails" in his car while recording himself.  Roberto saw the videos of that gentleman to be comical and entertaining, and adopted his style in making his own videos during his commute. The audience for Roberto's videos posted on his Facebook page were his friends, family, and regular customers. They would generally react positively to his videos, telling Roberto they were informative and entertaining -- especially when Roberto would go crazy and rant to the camera.  The positive feedback encouraged Roberto to take his aggressive contrarian behavior further and further to the extreme, and he made them almost daily during his drives.

Eventually, Roberto's brutal honesty about Pres. Trump aggravated many people, and his political views attacking about every politician on the political spectrum led to some "flack" from those watching – he had gone too far in his hyperbole. But because he had grown to dislike Pres. Trump so much over the course of his time in Office, Roberto leaned into his criticism of Trump

criticism even further in making videos – as was reflected in the disparaging terms he used about Pres. Trump in videos shown during the trial.

But he found that some in his audience were very complacent and almost worshiped Trump on a level of idolatry, believing that Trump would fix literally everything that was wrong after winning reelection. They would not exercise their First Amendment rights to protest government misconduct, nor would they criticize Trump in any way.  Roberto's theatrics – initially for effect and amusement – began to be a reflection of genuine frustration, and he was lashing out at all political sides equally. Local Antifa groups threatened Roberto for the views he expressed and would enter his business and threaten violence. Roberto would often address these individuals publicly through his Facebook videos, adding to the already high emotional charge of Roberto's demeanor in some of his videos. Ultimately, Roberto's business was vandalized and destroyed by Antifa who left their stickers behind, marking their destruction.

Roberto's First Amendment absolutism is reflected in his experiences in the immediate aftermath of the death of George Floyd and the protests that followed -- before they became destructive.

Roberto had attended many protest events as an advocate of the First Amendment.  This was the feature of the Oath Keepers that he was drawn to – their involvement in securing spaces for speakers at political rallies and protests.  That is what inspired him to go to Washington DC with the Oath Keepers on three occasions.  He believed people had the right to express their views even if he did not agree with what they were saying. He visited BLM Plaza and engaged in conversation with BLM\Antifa protesters on the issues that

motivated their actions.  Roberto volunteered to protect speakers that would be considered Trump allies not because he agreed with their views, but because Roberto believed they had a right to express those views without the threat of violence. Roberto was openly supportive of BLM and Antifa protests, but only if they remained within the boundaries of First Amendment advocacy, and did not promote violence, looting, and property destruction.

Just before the election, Roberto and his wife received five mail-in ballots from different organizations at their residence, with three different versions of their names for the two of them. Roberto posted a video on Facebook showing the five ballots and expressing his concern for election integrity. He was a registered Republican that received 5 ballots for 2 people.  He was not concerned about a stolen election or the prospects of Pres. Trump's electoral prospects. His frustration and concern was about irresponsible government oversight that allowed such a sacred right as casting a ballot for the leader of the country to be handled in such a slapdash fashion that 10 different ballots could arrive for him and his wife in their mailbox.

Roberto did not have a political side in the 2020 election – he said as much in one of the videos played at trial.  He has not felt an affinity towards either major political party for many years. He is a First Amendment absolutist, and a Second Amendment advocate and practitioner. Roberto was not a Trump supporter leading up to the 2020 election, and did not care about who won the election because he had no faith that either would pursue sound economic policies. Roberto expressed frustration with the process and government actors in his Facebook videos, as well as on video and in-person on January 6.

He should not have yelled at police – his diatribe directed in their direction wasn't even related to matters concerning the election. The misplaced frustration that manifested as verbal belligerence was inappropriate, especially on a day that police had been under such high levels of stress for more than 2 hours before he arrived.

Roberto had good intensions when entering the right behind the line of USCP led by Lt. Tarik Johnson who had gone inside to attempt to escort out USCP Officers he thought were trapped inside by the rioters.   After the events inside the Capitol involving Josh James – which shocked Mr. Minuta -- his emotions got the best of him as he tried to leave, and both his words and his manner of expressing them made things worse, not better.

It is easy in hindsight to recognize the sheer level of folly and foolishness involved in the decision to go inside the Capitol under the circumstances that were obvious for anyone to see.  The decision to do that reflected an inflated sense of self-worth in the moment and was an impulsive and counter-productive exercise reflecting an idiotic view that he could somehow assist the situation and make it better.

Roberto has stated several times that he does not condone what happened on Jan 6th. He spent weeks reviewing footage from all around the Capitol that day in preparation for trial, and became increasingly disturbed by the acts and level of violence he repeatedly viewed. Having gone in on the East side, and not having seen anything that had taken place on the West Side other than brief reports on the television at the Mayflower Hotel, he was unaware of the extent and frequency of the violent behavior on the West Side until

reviewing dozens of hours of video obtained through discovery.  Roberto is apologetic and remorseful for his inappropriate words that day, especially towards the distressed police. He is also remorseful for his foul and belligerent Facebook videos, that may have been offensive to many people.

> 2.   The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other <u>correctional treatment in the most effective manner</u>.

As several Judges in this District have recognized after studying the events of January 6 in detail, the crowd at the Capitol that day can generally be categorized as having three primary constituent parts:

1) a relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence with the goal of disrupting the Congressional proceedings;

2) a larger number of protesters who intended to protest loudly and wanted to be heard, but came with no intention of engaging in violence -- although some were drawn into committing acts of violence for a variety of reasons; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.

Mr. Minuta came to Washington D.C. to participate in the Oath Keeper personal security detail for Roger Stone.  He did the same thing on November 14, 2020, during the "Million MAGA March" for Alex Jones, and on December 12, 2020, during the Jericho Rally for Ret. Gen. Michael Flynn.

When Roger Stone elected to not attend the STS Rally on the Ellipse during the morning on January 6, and decided to not march to the Capitol for a scheduled protest speech on the afternoon of January 6, Mr. Minuta and the other members of the Stone security detail returned to the Mayflower Hotel and went into one of the three rooms in which Ulrich, Grods, and Jackson had stayed the previous night.  Ulrich testified that the members of the second group removed the protective gear and settled into the room without any plans to go anywhere else that afternoon.  They were watching events of the afternoon unfold in real time on television and James was on the telephone talking to someone he believed to be Rhodes.  On the television they watched scenes of violence between protesters and police at the Capitol building.  At some point in time, James told the others that they were going to the Capitol. Ulrich testified that no further information was provided, the group put back on their protective gear, and they walked back to the hotel where they had left the golf carts.

What followed is reflected in the video evidence that the Court is familiar with.

Mr. Minuta has been convicted – for the most part – because he made the decision to follow Josh James up the stairs on the East Side of the Capitol and through the Columbus Doors into the Great Rotunda.  Ricky Jackson did all the same things as Roberto Minuta, but opted to not go inside. He was never charged by the Government.  In all other respects, Mr. Jackson – uncharged and not convicted – and Mr. Minuta acted in almost identical fashion.  Mr. Minuta did express himself towards U.S.C.P. Officers in a

belligerent and vulgar manner – but that conduct by him was protected by the First Amendment.

Mr. Minuta did not assault or otherwise make contact with any law enforcement officer.  He was not charged with assault or any other crime of violence.  He took no firearm to Washington D.C. even though he lawfully owned many.

Based on the almost unique set of factual circumstances related to Mr. Minuta – and the only very slight difference between his conduct and the conduct of Ricky Jackson – a relatively minor custodial sentence is all that is necessary to accomplish the purposes outlined in Sec. 3553(a)(2).

3.  <u>The Kinds of Sentences Available.</u>

Because the guideline range is in Zone D of the Sentencing Table, the minimum term of imprisonment must be satisfied by a term of imprisonment.

4.  <u>Any pertinent policy statement</u>.

Defendant Minuta is not aware of any pertinent policy statement that applies to his case.

DEFENDANT'S SENTENCING RECOMMENDATION

Roberto Minuta came to Washington D.C. late on the evening of January 5, 2021, for the purpose of serving in the personal security detail of Roger Stone arranged through the Oath Keeper organization.  He had no intention or plan to engage in any other activity.

The events of the day and the instructions of Josh James led him to the Capitol not long after 2:30 pm.  At 3:14 pm, approximately one hour after the Congressional proceedings inside had been suspended, Roberto followed Josh

James inside the Capitol building through the Columbus Doors. He remained inside for less than 15 minutes before exiting out the same doors.  He did not assault any officer while inside, nor after exiting the building.

The applicable offense level is 14, and the recommended guideline range is 15-21 months.  Mr. Minuta requests a 3 level downward variance to level 11, placing him in Zone B of the Sentencing Table, with a guideline range of 8-14 months.  In a Zone B, the minimum term of imprisonment can be satisfied by a term of community confinement, including home incarceration.

Mr. Minuta requests that the Court impose a sentence no greater than 12 months home incarceration, with credit for the time he has served under that condition since the date of his conviction.

Date: May 6, 2023

Respectfully Submitted,

/s/ William L. Shipley
William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*