UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 22-cr-00015-APM |
| ) | |
| STEWART RHODES, et. al., ) | |
| ) | |
| **Defendants** ) | |

**Defendant Roberto Minuta's Reply to the
Government's Sentencing Statement**

"In his videos and messages leading up to January 6, Minuta stated he was prepared to die and that others should be too…. His actions on January 6 are consistent with these sentiments…"

From such hyperbolic nonsense a sentencing recommendation grounded in delusion is spawned. The Government's Sentencing Statement is a farce. It ignores trial testimony of witnesses called by the Government across three trials involving the same universe of operative facts. First the Defendants were made to deal with "Offense Conduct" in the Presentence Report that was not anchored to the evidence in the case, but rather drawn from allegations from 15 or more different variations of two different indictments, enhanced by misleading information provided *ex parte* by the Government. Now, in the final act of this melodrama of its invention, the Government has returned to the where it started -- a fantastical narrative that once again ignores inconvenient testimony and failures of proof on many claims it now wants included as as "offense conduct" for purposes of sentencing.[1]

---

[1] Ultimately, the evidence at the trials was so far off the allegations set for the indictments in each trial that the Government opposed jurors having the indictments during deliberations as that would have allowed them to understand how distant the evidence was from the allegations made by the grand jury.

As Judge Cooper wrote recently in United States v. Khatallah, 314 F.Supp 3d 179 (D.D.C 2018):

> The D.C. Circuit's "strict procedural mandate" requires the Court to "make explicit findings as to the scope of [Abu Khatallah's] conspiratorial agreement before holding him responsible for a co-conspirator's reasonably foreseeable acts." See United States v. Tabron, 437 F.3d 63, 66 (D.C. Cir. 2006). Evidence of the scope of an agreement is often circumstantial … but the Court nonetheless must carefully and explicitly "determine what kind of agreement or understanding existed as to each defendant." Id. (quoting United States v. Borelli, 336 F.2d 376, 384 (2d Cir. 1964) (Friendly, J.)).

Repeated references to "they" and "the defendants" in the Government Sentencing Statement and the PSR leave the heavy lifting to the Court when it comes to accurately setting for the scope of the conspiratorial agreement as it applies to Mr. Minuta.

A.   Claims Regarding "Offense Conduct" Not Supported by the Evidence:

   1.   Assault on Law Enforcement: The Government repeatedly claims that Mr. Minuta "assaulted" law enforcement officers by "pushing past" them and/or using a stolen shield to push against them.  No evidence supports such a claim.  Minuta was not charged with "assault" because "assault" requires an intentional attempt to inflict bodily injury.   The Government knows the video evidence shows Josh James – and only Josh James – grabbed Officer Mendoza and pulled him away from the police line.  Mr. Minuta was not involved.  The only other allegation of "assault" involves the stolen shield.  Mr. Minuta plans to play that particular video at sentencing.  It does NOT show Mr. Minuta using the shield in any fashion.

   The Government claims Officer Jackson encountered "both waves" of Oath Keepers. The second "wave" was James – Mr. Minuta never went so far as to reach Officer Jackson, and Walden, Grods, and Ulrich never left the area next to the Columbus Doors.

   2.   References to Minuta and Use of "Force" to Oppose Transfer of Power:  At Page 5, the Government claims Minuta "explicitly discussed" the need to use any means necessary,

including force, to oppose the transfer of power. The Government never identifies any individual with whom he supposedly had such "explicit" discussions. Mr. Minuta posted FB videos of himself talking to his camera where he expressed quasi-apocalyptic views about the state of our democracy. Nowhere in those videos does he mention "opposing the transfer of power" as a reason for doing so. The timing and commentary in those videos was completely unrelated to the Oath Keeper organization or any "plan" the Government attributes to members of that organization. Mr. Minuta was involved in no discussions about a QRF or bringing firearms to Washington D.C. on January 6 -- or any other date. He didn't bring a firearm although he owned more than two dozen.

      3. <u>The +8/+3 Enhancements Relating to "Administration of Justice" Do Not Apply</u>.

Several decisions in this District in the context of whether Sec. 1512(c)'s prohibition on obstruction have determined that "official proceedings" is a phrase encompassing a range of activities broader than judicial or quasi-adjudicative activities that traditionally encompass the "administration of justice." <u>United States v. Fischer</u> confirms that to be the law, i.e., that that scope of the *actus res* under Section 1512(c)(2) is broader that the traditional definition of "administration of justice" as relating only to adjudicatory decision-making activities.

But for purposes of applying the enhancements under 2J1.2, the Government now wants an expansive definition of "administration of justice" – one that would practically bring any governmental activity under the enhancement if there was an "unnecessary expenditure of … resources" caused by the offense conduct.

All sides should acknowledge that there is no authoritative answer in the case law or the Guidelines themselves. Resort to dictionary definitions for a term of art such as "administration of justice" is folly.

But what is empirically true is the following:

- Section 2J1.2(b) was part of the Guidelines when they were first adopted in 1987, effective Nov. 1, 1989.

- The phrase "official proceeding" was added to 18 U.S.C. Sec. 1512(c)(2) as part of the Sarbanes-Oxley Act, passed by Congress in 2002.

- The U.S.S.C. has twice amended Sec. 2J1.2 in response to changes made by Sarbanes-Oxley to the language of other obstructions statutes in the same chapter as Sec. 1512, but neither amendment addressed whether "official proceedings" are subsumed within "administration of justice" as that phrase appears.[2]

- Since "official proceeding" was added to the statute after the U.S.S.C. used the phrase "administration of justice" to cabin the offense conduct subject to the +8/+3 enhancements, the U.S.S.C. could not have intend congressional proceedings to be included within that phrase because they weren't covered by the statute at the time the enhancement was drafted and applied to that statute.

What is the "target" of the enhancement?  Was it to protect a broad category of "governmental activity" under the umbrella banner of "administration of justice," or is it to distinguish violent from non-violent actions directed at the "administration of justice" with its traditional definition?

The Commission created an 8-level enhancement for crimes with a base offense level of 14 – amounting to a 57% increase.  Are violent crimes covered by Sec. 2J1.2, but not involving the "administration of justice" as defined therein, less serious such that level 14 is enough and nothing further be given due to the violence?  Is it the factual circumstance of "violence" -- or

---

[2] Amendments 647 and 653 changed 2J1.2 by increasing the base offense level and adding another enhancement that deals with document destruction. They also added an upward departure provision concerning some obstructive conduct. Separately, Amendment 647 also purported to address "new offenses created by the [Sarbanes-Oxley] Act," but all the amendment did with respect to § 1512(c) was to add it to the Guidelines Appendix A (the Statutory Index).

the desire for broad application of the 8-level enhancement -- that motivated the Commission to create such a large enhancement above the base offense level?

    4. <u>The +3 Enhancement for an Aggravated Role Is Not Supported</u>.

The Government's defense of this enhancement comes down to 8 "facts" -- literally: 1) Rhodes' text that Minuta was "one of my most trusted men"; 2) Minuta "recruited" others to "be prepared to act on short notice"; 3) Minuta sent ONE text message to a Proud Boy repeating sentiments expressed by Rhodes; 4) Minuta made reservations for three rooms at the Mayflower Hotel; 5) Minuta stayed at the hotel in Vienna where Rhodes, James, Greene, etc., stayed; 6) Minuta was a passenger in the "lead" golf cart driven by Josh James; 7) Minuta "led" the second group – as in he was physically the first in line – at various points along the way while walking around the Capitol from west to east until reaching the Columbus doors; and 8) Minuta was in direct communication with Rhodes throughout the day on January 6.

At no point does the Government acknowledge that Brian Ulrich and Michael Greene both testified that Josh James was the "leader" of the Stone PSD. Greene testified that all his communications about the Stone PSD were with James. At no point does the Government inform this Court that James ADMITTED he was the leader of the Stone PSD, and that he was in a leadership position over Minuta.[3] Attached under seal as Sentencing Exhibits Min-1, Min-2, Min-3, Min-4, Min-5, and Min-6 are excerpts from the transcript of James grand jury testimony dated June 22, 2022, and the 302s of multiple FBI interviews of James starting June 18, 2021.

---

[3] SA Joanna Abrams 302 of an interview of James on 6/21/22:

> JAMES believes he was in a leadership position over ROBERTO MINUTA because he gave orders to MINUTA.

Minuta reserved three rooms at the Mayflower after telling those in the "DC Op Jan 6, 2021" Signal chat that he could book hotel rooms at a discount -- his mother-in-law worked for Marriott.  One of the rooms was supposed to be for him, but all three were taken on January 4 by Grods, Ulrich, and Jackson – none of whom Minuta knew or communicated with.  Because of that, James invited Minuta to stay in James' hotel room in Vienna which had 2 beds.

Regarding the golf cart, walk to the east side, and entrance through the Columbus doors, the Government seems to be suggesting – literally – that being "first in line" in a group is a basis for an aggravating role as "leader" or manager?   That the Government seems to be making that claim underscores the lack of substance in its argument for an aggravating role enhancement.

As evidence at trial showed – and as was admitted by the FBI witnesses – cellular telephone communications were sporadic on January 6.  Michael Greene testified to that, and Josh James told the FBI that during his multiple interviews.  There is no EVIDENCE of actual communications between Minuta and Rhodes on January 6 – only telephone records showing connections their two numbers connected at various points during the day.  The unreliability of the records as proof calls took place was shown in video of James, at 3:17, engaging in his confrontation with Officer Mendoza, while the phone records relied upon by the Government showed James' phone was in communication with Greene's phone at that same time.

5. <u>The +2 Enhancement for Obstruction Is Not Supported</u>.

The Government states Minuta has "no evidence" he deleted the video from Signal at the request of a third party. The level of duplicity in this claim by the Government is jaw-dropping – Josh James told the FBI in an interview he asked Minuta to delete the video.[4]

The Government alleges that Application Note 4(D) supports the +2 enhancement. But, by its very terms the enhancement only applies to "willful conduct," and the Government ignores Application Note 1:

> "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was <u>purposefully calculated, and likely, to thwart the investigation or prosecution</u> of the offense of conviction."

With regard to the disposition of Minuta's cellular telephone, the evidence at trial was ONLY than the FBI did not find the phone at the locations searched -- that's it. The Government makes a generic claim that acquitted conduct can still be the basis for "relevant conduct" that supports a sentencing enhancement. This argument doesn't save the Government here – there was no evidence that Minuta discarded his phone – none.

Based on the evidence, the +2 enhancement under Sec. 3C1.1 does not apply.

6. <u>3553 Factors and Relevant Conduct</u>.

Just to punctuate the lack of material evidence supporting its sentencing recommendation, the Government reaches back in time for evidence of anti-government animus expressed by Mr.

---

[4] From SA Palian's 302 of the June 18, 2021, interview of James:

```
    JAMES woke up the next morning and read the news on his phone. He felt
panic. MINUTA posted a video on Signal that depicted JAMES inside the
Capitol Building. JAMES told MINUTA to delete the video. After JAMES
```

Minuta that had nothing to do with the election's outcome or the "transfer of power." The Government highlights prior FIRST AMENDMENT protected activity on issues involving the Second Amendment, due process (denial of liberty and property related to COVID shutdowns), and the sanctity of the franchise – ballot integrity.

The Government highlights Mr. Minuta video comments on November 7, 2020, after media outlets had called the election for President Biden. So what? It was after November 7 that Texas sued Pennsylvania in the Supreme Court regarding changes to Pennsylvania election laws, and election contests were filed in multiple states. What the media said regarding the election outcome is irrelevant. But it is particularly irrelevant with regard to Mr. Minuta because he had already publicly stated his view that neither party's candidate was to his liking. The Government introduced videos into evidence recorded days after the election where Mr. Minuta's views in that regard were made manifest.

As to his Second Amendment protest activity in January 2020 and thereafter, context is important. Virginia has long been an "open carry" state. Following the Democrat takeover of both houses of the Virginia Legislature in the 2019 elections, then-Gov. Northam and the legislature began efforts to pass a series of "gun control" measures. The rally attended by Mr. Minuta in January 2020 -- where he first met Stewart Rhodes -- was a political rally opposing the proposed legislation. This was pure political speech criticizing proposed state legislation targeting a federal constitutional right.

Regarding the "civil disobedience" engaged in by Mr. Minuta in April and May 2020, the Government's attempt to criminalize his speech by connecting it to this case should have Civil Rights Era leaders turning over in their graves. Mr. Minuta was being denied his liberty and property – the ability to pursue his craft and earn a living – by the COVID shutdown orders in

New York State.  He advertised his intentions to engage in civil disobedience.  He met with elected leaders and police officials about his plan and his purpose.  He violated the law as a form of protesting the passage of the law – no different in kind that sitting at a segregated lunch counter or in the wrong place on a city bus.

    7. Request for +3 Variance under Sec. 3A1.4, Note 4.

Mr. Minuta drove to Washington D.C. late in the evening on January 5, 2021, having flown with his family from Texas to his home in New Jersey earlier that day.  He spent a few hours overnight from January 5-6 in the hotel room of Josh James in Vienna because the room he reserved for himself at the Mayflower Hotel had been taken by others.  He spent approximately 7 hours at or near the Intercontinental Willard Hotel on the morning of January 6 as part of the Stone PSD.  When Stone decided to not go to the rally at the Ellipse, or later to the Capitol, Minuta and the other PSD members went back to the Mayflower Hotel where they watched the events happening at the Capitol on TV.  James received direction from Greene to "Get to the Capitol" – and NOTHING else, according to James.  Minuta and the five other members of the Stone PSD rode to the Capitol in two golf carts – along a path from which they could not see any violence. They arrived on the Capitol ground at approximately 2:45 – 10 minutes after nearly all police presence on the West Side had departed and gone inside the Capitol building. There was no violence between the police and rioters on the West Side at 2:45. Between 2:45 and 3:10, Minuta on two occasions berated and harangued USCP officers protecting approaches to the building, but made no effort to breach the police line in either instance.  At 3:11, Minuta followed James up the steps to the landing outside the Columbus Doors.  At 3:14, Minuta followed James to the Columbus doors where they paused to speak momentarily with 5 or more USCP officers standing at the opening – following behind a line of 9 USCP officers who entered

just ahead of them. They passed in between those five officers without incident. At approximately 3:17, James engaged in a physical confrontation with Officer Mendoza just inside the doors to the Rotunda – with Officer Mendoza striking the first blow as testified by Officer Jackson. Minuta was several feet behind James at this point. The confrontation caused the crowd behind James to push in, and Minuta was caught in that push by the crowd. After extricating himself, and while leaving, Minuta again exchanged angry words with a USCP Officer. Mr. Minuta was in his car on the way back to New Jersey by 6:00 pm.

That is the sum total of Mr. Minuta's ACTIONS on January 5-6.

For this, the Government seeks a 3-level upward variance under the Terrorism enhancement.

8. <u>Minuta is Not Obligated to Respect or Acknowledge Good Faith on the Part of DOJ</u>.

Almost the entirety of Pages 140-141 are deserving of being ignored. A defendant has no obligation to in any way acknowledge the legitimacy of the case brought against him with a one-sided presentation to a grand jury, or evidence ginned-up by prosecutors for purposes of trial. He's entitled to stand on his First Amendment rights to criticize the actions and motives of his Government seeking to imprison him, and to call it tyrannical when it deprives citizens of their liberty and property without due process, or violates their constitutional rights as set forth in the Bill of Rights.

Dated: May 16, 2023                             Respectfully submitted,

                                                /s/ William L. Shipley
                                                William L. Shipley, Jr., Esq.
                                                PO BOX 745
                                                Kailua, Hawaii 96734
                                                Tel: (808) 228-1341
                                                Email: 808Shipleylaw@gmail.com
                                                *Attorney for Defendant*