**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ELMER STEWART RHODES III,**<br>**KELLY MEGGS,**<br>**KENNETH HARRELSON,**<br>**JESSICA WATKINS,**<br>**ROBERTO MINUTA,**<br>**JOSEPH HACKETT,**<br>**DAVID MOERSCHEL,**<br>**THOMAS CALDWELL, and**<br>**EDWARD VALLEJO,**<br><br>           **Defendants.** | **Case No. 22-cr-15-APM** |

<u>**GOVERNMENT'S OMNIBUS REPLY SENTENCING MEMORANDUM**</u>

Through their sentencing memoranda, ECFs 563 and 566-73, the defendants seek to retry this case. But they cannot escape two juries' verdicts finding them guilty of significant conspiracy and obstruction charges. The defendants were not mere trespassers or rioters, and they are not comparable to any other defendant who has been convicted for a role in the attack on the Capitol. The defendants request inappropriately lenient sentences without addressing specific sentencing factors, especially the grave need for deterrence. None of the defendants' arguments refute the government's well-founded request, ECF 565, that the Court impose lengthy terms of incarceration for their historically dangerous efforts to oppose by force the lawful transfer of power following the 2020 presidential election.

**I.    GENERALLY APPLICABLE ARGUMENTS**

The defendants base their allocutions on a misunderstanding of the law and the evidence at trial, an erroneous analysis of certain Sentencing Guidelines provisions, and a misapplication of

1

the factors this Court must consider under 18 U.S.C. § 3553(a).

## A. Arguments Regarding the Defendants' Culpability

The defendants argue that, as a matter of law, they are innocent.   While they argue that attacking the Capitol was not part of "the plan" prior to the afternoon of January 6, their crime was actually broader than any "plan" or any particular building.   *Cf. United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (holding that conspirators need not have "agreed on the details of their criminal scheme") (citations omitted).   Their crime was a conspiracy.   *See Pinkerton v. United States*, 328 U.S. 640, 643-44 (1946) (criminalizing the *agreement* itself).   And their conspiracy had an object far weightier than obstructing Congress—the defendants agreed to oppose the United States government by force.   Similarly, the defendants mistakenly focus on physical presence (or not) inside the Capitol.   But the charges are not premised on whether a defendant trespassed—or was even in D.C. at all.   Their agreement is more dangerous and merits a far longer sentence of incarceration than for a defendant who merely entered the Capitol building or alone obstructed Congress.   *See Iannelli v. United States*, 420 U.S. 770, 778 (1975) ("[C]onspiracy can be punished more harshly than the accomplishment of its purpose.").

Indeed, the evidence showed that a larger, more pernicious conspiracy to forcibly oppose the transfer of power from Donald Trump to Joseph Biden existed as early as November 9, 2020, when Rhodes, on a recorded GoToMeeting attended by Meggs, Harrelson, Watkins, Hackett, and other conspirators, advocated for his followers to travel to D.C., organize an "armed QRF" outside D.C. to support operations inside D.C., and prepare to "fight."   Gov. Exs. 1000.1-1000.11; *see also* 10/6/22PM Tr. at 2045 (testimony of Abdullah Rasheed: "It sounded like we were going to war with—we were going to overthrow the United States government and start shooting everybody.").   One day later, Rhodes instructed the Oath Keepers "what we must do": follow the

example of Serbians who had achieved regime change in their country by "[m]illions gather[ing] in [the] capital," breaking through police barricades, and "storming" the legislature.  Gov. Ex. 1002.  These strategies and objectives formed the blueprint for the conspiracy and what these defendants ultimately accomplished.

### B. Arguments Regarding the Applicable Sentencing Guidelines

All defendants agree that Section 2J1.2 is ultimately the appropriate Guideline for the three conspiracy counts, the obstruction of Congress count, and the obstruction of justice counts.[1]

*Section 2J1.2(b)(1)(B)*.  The defendants claim that this provision is inapplicable because they did not personally damage property or personally assault a law enforcement officer.  But several defendants did *personally* threaten injury to an officer and engage in conduct that could injure those officers—including Meggs, Harrelson, Hackett, and Moerschel (pushing past USCP Officers Marc Carrion and Ryan Salke guarding the East Rotunda doors), Watkins (pushing into MPD Officers Christopher Owens and Anthony Jackson and their platoon guarding the Senate), and Minuta (pushing into MPD Officers Jackson and Jose Mendoza in the Rotunda).  And the juries already found every defendant except Caldwell guilty of conspiring to *use force* against the government, *see* 18 U.S.C. § 2384 (Rhodes, Meggs, Minuta, Hackett, Moerschel, Vallejo), and/or of conspiring to *use force, intimidation, or threats* against Members of Congress, *see* 18 U.S.C. § 372 (Meggs, Harrelson, Watkins, Minuta, Hackett, Moerschel, Vallejo).  These jury findings necessarily satisfy Section 2J1.2(b)(1)(B)'s requirement that the "offense involved . . . threatening

---

[1] While at one point Harrelson appears to argue that he should be sentenced for uncharged misdemeanors (40 U.S.C. § 5104(e)(2)(D) or 18 U.S.C. § 1752(a)(2)), *see* ECF 573 at 15, he also concedes the applicability of Section 2J1.2 for his felony convictions, *see id.* at 24.  Harrelson also baldly claims that he "was found not guilty of any conspiracy."  *Id.* at 25.  He is wrong. The jury found him guilty of violating Count Four (18 U.S.C. § 372), a conspiracy to impede Members of Congress.

to cause physical injury to a person, or property damage."

Moreover, even for those who did not personally threaten injury or property damage, based on the full scope of their "relevant conduct" (*see* U.S.S.G. §§ 1B1.3(a)(1)(A), (a)(1)(B), and (a)(3)), the defendants are culpable for their co-conspirators' actions and the resulting harm. For instance, a jury has already found beyond a reasonable doubt that co-conspirator William Isaacs interfered with Officer Carrion and that Isaacs, Connie Meggs, Laura Steele, and Sandra Parker unlawfully contributed to the damage of the East Rotunda and Columbus doors. Accordingly, each defendant's "relevant conduct" includes damage to property and threats to injure under Section 2J1.2(b)(1)(B).

*Section 3E1.1.* Rhodes, Meggs, Watkins, and Caldwell also wrongly claim that they ought to receive acceptance-of-responsibility credit under Section 3E1.1, because Rhodes "met with law enforcement agents on multiple occasions and voluntarily surrendered his phone and passcode," Rhodes PSR (ECF 548 at 49), Meggs "never received any plea offer," ECF 569 at 17, Watkins "offered to plead guilty to everything except Seditious Conspiracy," ECF 566 at 20-21, and Caldwell went to trial merely to "assert and preserve issues that do not relate to factual guilt," ECF 563 at 23.

They are wrong on both the facts and the law. Factually, on May 2, 2022, the government sent a letter (Ex. Sent-Omnibus-2) to all defendants explaining the statutory penalties and expected Guidelines ranges, setting a deadline for plea negotiations, and advising each defendant to contact the government if they were "interested in discussing a potential plea offer." Rhodes, Meggs, and Caldwell did not; they therefore "put[] the government to its burden of proof of trial" and did not "clearly" accept responsibility. U.S.S.G. § 3E.1.1, cmt. n.2. "The guidelines explicitly tell judges that they normally should deny the two-point reduction to a defendant who does not plead

guilty." *United States v. Jones*, 997 F.2d 1475, 1478 (D.C. Cir. 1993) (en banc).

While Watkins engaged in plea negotiations, she steadfastly refused to accept full responsibility for her conduct, never admitting, for instance, that she possessed the corrupt intent. Moreover, in statements from the jail since her arrest and the jury's verdict, Watkins has mocked officers injured on January 6 and decried the proceedings against her.   Rather than "clearly" accepting responsibility, she has eschewed any.

Legally, even a defendant who offers to plead guilty to some but not all charges is not entitled to the downward adjustment—even if the defendant is later acquitted of the charge to which she refused to plead.   *United States v. Dozier*, 162 F.3d 120, 127 (D.C. Cir. 1998).   Indeed, "if a defendant goes to trial, the determination of whether he has accepted responsibility for his crimes will be determined primarily by pretrial statements and conduct."   *In re Sealed Case*, 350 F.3d 113, 118 (D.C. Cir. 2003).   There is no evidence that Rhodes, Meggs, Watkins, or Caldwell has accepted full responsibility for their crimes—either pretrial, at trial, or now on the eve of sentencing.

## C.  Arguments Regarding Section 3553(a) Factors

To address unwarranted sentencing disparities, the defendants point to the government's charging decisions with respect to this conspiracy and/or to other acts of violence during this riot and other civil disturbances.   But those comparators are inapt.   The statute instructs the Court to review the sentences of "defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).

This is not a "January 6 case."   The defendants ought to serve lengthy terms of incarceration because of their participation in a months-long conspiracy that aimed to oppose by force the authority of the United States.   As the Supreme Court recognized, "collective criminal

agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. . . .   Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish."  *Callanan v. United States*, 364 U.S. 587, 593 (1961); *see also Woods v. United States*, 240 F.2d 37, 41 (D.C. Cir. 1956) ("For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime.") (quoting *United States v. Rabinowich*, 238 U.S. 78, 88 (1915)), *abrogated on other grounds by United States v. Southerland*, 466 F.3d 1083 (D.C. Cir. 2006).   Here, the size and prominence of the group, and the magnitude of the group's aims, made the group's agreement particularly malicious and deserving of punishment more severe than other individuals who acted alone on January 6.

Similarly, the fact that certain individuals have not yet been charged as part of this conspiracy does not in any way minimize the culpability of these defendants or justify a lesser sentence for them.   "Section 3553(a)(6) requires consideration of 'the need to avoid unwarranted sentence disparities among *defendants* with similar records who have been found guilty of similar conduct,' but not uncharged individuals who may have committed the same crimes." *United States v. Lacson*, 177 F. App'x 751, 752 (9th Cir. 2006) (emphasis in original).   *See id.* (finding no error in sentencing judge's decision to not consider the fact that other culpable individuals were never charged); *see also United States v. Reid*, 401 F. App'x 499, 501 (11th Cir. 2010) (per curiam) (holding that a co-conspirator who was never charged is not a "valid comparator for § 3553(a)(6) purposes"); *United States v. Docampo*, 573 F.3d 1091, 1093 (11th Cir. 2009) (same).   A person who has not been charged cannot, by definition, have been found guilty of similar conduct.   The purpose of this statutory provision is not to second-guess the government's prerogative in its

charging decisions, but rather to ensure relative consistency across the country among judges who impose sentences after convictions for "similar conduct." There are no similarly situated defendants.

## II.    DEFENDANT-SPECIFIC ARGUMENTS

### A. Stewart Rhodes

The man who set in motion a seditious conspiracy to stop the lawful transfer of power following a free and fair U.S. presidential election deserves to be sentenced accordingly.

Referencing without citation "evidence adduced at trial," Rhodes seeks a downward departure under Section 5H1.11 for his military service and civic contributions. ECF 570 at 4-5. He also cites these factors as grounds for departing or varying downwards under Section 5K2.0(a)(1)(A) and 18 U.S.C. § 3553(a). *Id.* at 5-13. Rather than grounds for leniency, these are aggravating factors: they highlight the oath he betrayed and the position of trust he abused in leading the seditious conspiracy for which he was found guilty.

Prior civic or charitable contributions "are not ordinarily relevant" under the Guidelines. U.S.S.G. § 5H1.11; *see United States v. Dyce*, 91 F.3d 1462, 1470 (D.C. Cir. 1996) ("Before a district court departs on this basis, it must not only find that the defendant is likely to make such contributions, but that he is likely to make them to an extraordinary degree."). And prior military service only justifies a departure where it is "present to an unusual degree and distinguish[] the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.11. There are no such circumstances here. The only evidence of Rhodes' military service is that he served in the United States Army as a paratrooper from June 1983 through November 1989. Gov. Ex. 3004; 11/4/22AM Tr. at 7036-38. Rhodes noted no medals, commendations, or extraordinary acts in describing his service during his testimony at trial, nor does he present any at sentencing. *Id.* To

the contrary, in describing why he did not complete Special Forces training, Rhodes explained that in the second phase, "I was slotted to be weapons expert but they changed me to COMMO against my will, and I was just too immature to learn morse code at 19 and I just kept making too many errors and so I washed out unfortunately."   11/4/22AM Tr. at 7037.

Rhodes asserts that the character of the Oath Keepers reflects the character of the man who created it.   ECF 570 at 13.   The government agrees.   Rather than contribute to civic service, the Oath Keepers intentionally inflamed tensions in areas afflicted by civil disorder.   *See* Gov. Ex. 9110 at 8:15 (bystander to group of armed Oath Keepers, including Rhodes, Meggs, Harrelson, Watkins, and Hackett: "Your presence here ups the game significantly.   The best thing that you all could do for Louisville is not be here.").   Rhodes knew this fact and yet encouraged his followers to incite violence with rivals.   *See* Gov. Ex. 1000.3 ("You gotta be willing to go to D.C. and street fight Antifa.   And you gotta get them to street fight."); 10/6/22AM Tr. at 1922 (John Zimmerman: Rhodes instructed Oath Keepers "that we should dress up as elderly or be like a single parent pushing a baby carriage with some weapons in the baby carriage so that if we could entice them to attack us, then we can just give them a beat-down.").   For Rhodes, the Oath Keepers' insertion of themselves into crisis situations was not about helping—it was about contributing to and taking advantage of the chaos.   *See* Ex. Sent-Rhodes-3.11 (Tasha Adams: "He's not in this for the politics; he's in it for the mayhem and the violence.").[2]

---

[2] Ms. Adams' observation is supported by Rhodes' own words as far back as February 2009, when he admitted in a post to The Mental Militia Forums that he recruited law enforcement and military members precisely so that he could use them for political violence.   Rhodes said: "But especially when it comes to gun confiscation, there are many [members of law enforcement] who are most certainly on our side, and since that may well be the spark of the next revolution, I do my best to radicalize the cops against that one issue, at least."   Ex. Sent-Rhodes-11.   He explained that he "write[s] more for [the military] than for the cops, urging them to keep their oaths when the time

Rhodes also hoists his Yale law degree and position of authority in the Oath Keepers as factors warranting a lighter sentence.  ECF 570 at 8-9.  After the 2020 presidential election, however, Rhodes saw an opportunity to foment political violence, and he exploited his law degree and his platform as the leader of the Oath Keepers to recruit co-conspirators into a seditious conspiracy to stop the lawful transfer of power.  Rather than mitigation, Section 3B1.3 would support an upward adjustment for Rhodes' misuse of his "position of trust" as the leader of the Oath Keepers and for his abuse of a "special skill" as a Yale law graduate.  *See, e.g.*, Gov. Ex. 1002 (Rhodes' Nov. 10, 2020 Call to Action letter, signed "Stewart Rhodes, Founder of Oath Keepers, Yale Law School graduate"); Gov. Ex. 1005 (Rhodes' Dec. 14, 2020 Open Letter); Gov. Ex. 1008 (Rhodes' Dec. 23, 2020 Open Letter).

Finally, Rhodes remarkably continues to claim that his calls for revolution during the time period of this conspiracy were only "in regard to after January 20," ECF 570 at 14, as though that is a factor in his favor.   On January 20, 2021, Rhodes appeared on Alex Jones' "InfoWars" show and told the audience they needed "to just declare [President Biden] to be illegitimate and refuse to comply with anything that comes out of his mouth, anything he signs, anything passed as so-called legislation," and to "raise militias" to prepare to "walk the path of the Founding Fathers and declare your independence from that illegitimate regime."[3]   Upon release (and potentially even while incarcerated), Rhodes will likely continue to organize his followers to forcibly oppose the government and the laws of the United States.   A sentence of 25 years of incarceration is

---

comes.   If it comes to a revolution, how many soldiers 'just say no' and sit it out, or even join the resistance."   *Id.*   With sufficient support from police and soldiers, Rhodes thought he "could decide the whole shootin match right up front."   *Id.*

[3] mediamatters.org/oath-keepers/oath-keepers-leader-stewart-rhodes-calls-militia-members-prepare-violence-against

warranted to thwart this corrupt and criminal mission, providing both specific deterrence to Rhodes and general deterrence to imitators.

## B. Kelly Meggs

Kelly Meggs' selective quotation of the PSR claiming that he is culpable for the "actions of, 'the . . . mob of rioters,'" ECF 569 at 10-11 (alteration in original), provides an inaccurate view of the PSR's findings.   It is not correct that under the theory advanced by the PSR and the government, every defendant convicted of violating 18 U.S.C. § 1512(c)(2) would be subject to the eight-point enhancement in Section 2J1.2(b)(1)(B) for the actions of every other rioter. Rather, the PSR correctly finds that Meggs was "part of a mob of rioters that caused damage to the Capitol Building's East Rotunda Doors and Columbus Doors, as well as caused injuries to Capitol Police officers guarding the doors to the building."   PSR ¶ 134.   In other words, Meggs' relevant conduct includes the actions of others acting in concert with him during the violent breach of the East Rotunda doors around 2:39 p.m. (as well as his co-conspirators' actions).   Indeed, not every defendant convicted of 18 U.S.C. § 1512(c)(2) for a role in attacking the Capitol has received a Section 2J1.2(b)(1)(B) enhancement.

Meggs argues that his leadership role within the Oath Keepers does not warrant the adjustment in Section 3B1.1.   ECF 569 at 16.   But factually, Meggs had a leadership role *in the conspiracy*.   Dolan, Young, and Berry all testified that Meggs controlled the group while at the Capitol building, including entering the building.   And legally, a leadership role in an organization that is used to further a criminal objective, even if the organization is not per se illegal, *can* warrant a Section 3B1.1 adjustment.   *See* ECF 565 at 45 (citing D.C. Circuit cases on this point); *see also United States v. Rubenstein*, 403 F.3d 93 (2d Cir. 2005); *United States v. Rubashkin*, 718 F. Supp. 2d 953 (N. D. Iowa 2010); *United States v. Biheiri*, 299 F. Supp. 2d 590, 609 (E.D. Va. 2004).

Meggs falsely claims that, after his arrest, his son launched a fundraiser with GiveSendGo without Meggs' knowledge.   ECF 569 at 5.   But Meggs repeatedly told his son what to write on the GiveSendGo and to link to it from a different website he had his son start.   Ex. Sent-Meggs-6 (1/2/23 jail tablet text message: "On the website . . . [h]ave a page with all the give send gos.").

Finally, Meggs' claim that "upon returning to Florida, he resigned from the Oath Keepers," ECF 569 at 5, is misleading.   He continued to send messages in Oath Keepers' Signal chats and directly to other conspirators, including telling Joshua James that his Florida team would travel to be with Rhodes in Texas when there were "shots fired."   ECF 60 at ¶ 50(d) (James Plea Statement of Facts).   In any event, any purported resignation from the Oath Keepers was a cover for the crimes he and his co-conspirators had committed.

## C.  Kenneth Harrelson

Harrelson's sentencing memo is filled with outlandish claims with no evidentiary support.[4] He claims that he wasn't listening attentively during Rhodes' November 9 GoToMeeting, because it was his birthday.   ECF 573 at 18-19.   That claim is dubious; regardless, the fact that he joined the meeting *on the night of his 40th birthday* shows his dedication to Rhodes and Meggs rather than his lack of involvement.   He claims he thought he only recorded a video *outside* the Capitol. *Id.* at 21.   But he sent the entire video to Meggs within hours of breaching the building, and then deleted the message through which he transmitted the video.   And by the time he testified at his detention hearing two months later, the photo of himself in the Rotunda, *holding up his phone while appearing to take a video*, with Graydon Young's hand on his shoulder, had been in heavy

---

[4] "A defendant at sentencing may argue that the government's evidence is insufficient without putting forward any affirmative evidence."   *United States v. Carter*, 591 F.3d 656, 662-63 (D.C. Cir. 2010).   But any affirmative evidence must have "sufficient indicia of reliability to support its probable accuracy," U.S.S.G. § 6A1.3(a), and its unsupported factual assertions lack such indicia.

11

rotation in the news.   Gov. Ex. 1098.10.   Harrelson claims he didn't intentionally dispose of the

AR-15 rifle he brought to the QRF hotel to hide it from law enforcement, but rather he had

"temporarily swapped weapons" with some unnamed person "so he could put a special paint job

on his friend's weapon."   ECF 573 at 22.   In addition to being incredible on its face, Harrelson

sponsored his wife to testify at his detention hearing that there were no AR-15 rifles in the house

at all—just their son's AirSoft rifle.   Ex. Sent-Harrelson-6 at 9.   Harrelson claims he received

"legal advice" from an unnamed lawyer that he would only be fined for trespassing.   ECF 573 at

22-23.   But as he now must admit, he coordinated with Meggs to delete chats about "hiding the

tools and shit" after news of co-conspirators' arrests were made public.   In other words, he knew

about the arrests (not mere "fines") when he was deleting messages and hiding guns (not mere

"tools").

Continuing his baseless claims, Harrelson submits that Meggs "wrote one text message in

which he made a typo" by naming Harrelson rather than Greene as the "ground team leader."

ECF 573 at 28.   But Meggs actually wrote three different Signal messages, to two different

groups, over two different days, specifically noting Harrelson's appointment and role.   *See* Gov.

Ex. 6863 (Msg. 1.S.159.695) (Jan. 3: Meggs telling national group "DC OP: Jan 6 21" that he

added Harrelson to that group and that Harrelson would be the "Ground Team lead in Florida");

Gov. Ex. 6870 (Msgs. 85.S.193536.A, 85.S.193536.B) (Jan. 4: Meggs telling Florida-focused

group "OK FL DC Op Jan 6" that they had a "27 man team" total, that "Gator 6 [Harrelson] runs

the ground team," "assist[ed]" by two other men, and that "[o]ther state leaders can be in direct

contact with Gator 6 [Harrelson] and then you handle your team as he needs.").   Indeed, both

Dolan and Berry testified that they reported to Harrelson.   *See, e.g.*, 10/18/22PM Tr. at 4078

(Dolan: "The group that I came to understand that if I was going to go further within the Oath

Keepers was what they called the Green Team, which I believe was headed up by Kenny Harrelson.").

Harrelson also makes a number of other erroneous claims. He asserts, for example, that his yelling "treason" and "this is our fucking house," as he entered the Capitol building cannot be considered a threat because Members of Congress had already been evacuated and it was a "pure expression of constitutionally protected speech." ECF 573 at 11, 21. While the two Houses had gone into emergency recess by 2:29 p.m., several Members of Congress were still physically inside their respective chambers when Harrelson breached the building ten minutes later. *See* 1/6/23AM Tr. at 3315-39 (Jamie Fleet describing the presence of Members of Congress in the chambers past 2:39 p.m.); Gov. Ex. 1516; ECF 565 at 10-14. And people who worked for those Members of Congress, like the eight staffers for Speaker Pelosi who were hiding in the dark under a table in her conference room, were certainly still present and nearby as Harrelson uttered his threats. Gov. Ex. 1056.0263.0215FF; Ex. Sent-Omnibus-1.1 and 1.2. Indeed, Dolan testified that he *wanted* and *intended* for Members of Congress to hear their chants and to be intimidated. *See* 10/18/22PM Tr. at 4133-34 ("I wanted them to hear and feel the anger, the frustration, the rage that I felt. They're betraying the country, and I wanted them to know that and stop doing it. . . . maybe they could be scared into doing the right thing."). And this Court already dispensed with the specious argument that Harrelson was merely exercising his First Amendment rights when he uttered his threats. ECF 558 in Case No. 21-cr-28, at 47-49; *see also United States v. Rahman*, 189 F.3d 88, 115 (2d Cir. 1999) ("[A] line exists between expressions of belief, which are protected by the First Amendment, and threatened or actual uses of force, which are not.") (citing cases).

Oddly, Harrelson also claims that his illegal presence in the Capitol did not materially affect Congress' recess and suggests that an expert witness or an evidentiary hearing is necessary.

ECF 573 at 26-27.   But, as USCP Inspector Lanelle Hawa and Jamie Fleet both testified, each and every rioter, Harrelson included, contributed to the need for additional security and sweeping. 10/26/22AM Tr. at 5428-29; 1/4/23AM Tr. at 2768-86; 1/6/23AM Tr. at 3315-18, 3352-55.   And Harrelson's membership in the conspiracy incorporates the "relevant conduct" of his co-conspirators; surely the need to sweep approximately 20 people out of the building materially affects the conduct of Congress.

Finally, Harrelson argues that restitution is not available, because he did not personally damage any property or physically injure any person.   ECF 573 at 13-14.   But the Court has the authority to order restitution for loss sustained "as a result of the offense," which is not limited to the defendant's personal actions.   The "offense" is the offense of conviction, ECF 565 at 172, which can (and here, does) include the actions of people whom Harrelson aided and abetted and those with whom he conspired.

### D. Jessica Watkins

*First*, Watkins argues that Section 3B1.1 does not apply because "the Ohio State Regular Militia (OSRM) was [not] an extension of the Oath Keepers."   ECF 566 at 14.   This is simply false.   Watkins explained that OSRM was "connected with other militia units . . . and we coordinate our missions with theirs."   Gov. Ex. 6617.A (Msg. 192.T.350).   For Watkins, January 6 was one such coordinated mission.   In any event, Watkins was certainly an organizer and leader in the overall "criminal activity," regardless of the OSRM's status vis-à-vis the Oath Keepers. Watkins contends she did not exercise "any degree of control over other participants to achieve a criminal act," ECF 566 at 14, but not only did Watkins recruit others including Donovan Crowl and the Parkers, she instructed them to bring their weapons, arranged for her group to stay at the QRF hotel, and on January 6, ordered those whom she brought to D.C. to march to the Capitol and

14

then push toward the Senate chamber.

While Watkins *did* control others, she also erroneously claims that Section 3B1.1 *requires* control.  *See* ECF 566 at 14 (citing *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998)).  But her cited quote from *Graham* is "dicta" because "control is just one of the factors to be considered."  *United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (Randolph, J., concurring).  The enhancement is properly applied, for example, to a defendant who played "a coordinating or organizing role," or whose "expertise alone . . . made the operation possible."  *Id.* (quoting *United States v. Brown*, 315 F.3d 929, 932 (8th Cir. 2003), and *United States v. Kelly*, 204 F.3d 652, 657-58 (6th Cir. 2000)).

*Second*, Watkins ignores and distorts her testimony at trial.  Citing to *United States v. Montague*, 40 F.3d 1251 (D.C. Cir. 1994), she claims the government must meet a clear-and-convincing standard, rather than preponderance-of-the-evidence, to find she provided false testimony.  ECF 566 at 17.  This is incorrect; the D.C. Circuit specifically overruled this heightened standard following a 1997 amendment to the Sentencing Guidelines.  *See United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) ("This court construed the amendment to mean that while proof of perjury by clear and convincing evidence had formerly been required, such allegations could now be proven by a preponderance of the evidence.") (citations omitted).

Factually, Watkins implausibly claims "the Government fails to show that Ms. Watkins deleted the messages in question."  ECF 566 at 16.  At trial, Watkins testified precisely to that fact.  *See* 11/17/22AM at 9588 (Q: "And you deleted the Signal application off your phone?" A: "Eventually I did.").  Deleting the Signal application would delete *all* messages.  Watkins also claims that she did not know that police officers were on the other end of her group's pushing attempt in the Senate hallway.  ECF 566 at 12.  But, at trial, Watkins was confronted with her

prior statement to the FBI that she was three-to-four people away from the police officers at the time.   11/17/22AM at 9580.   Further, Watkins is captured on video shouting "*they* can't hold us." Watkins knew then, as she knows now, that "they" were the outnumbered police officers guarding the Senate.

### E.  Roberto Minuta

Minuta details his family's history dating back to "Mussolini," ECF 568 at 18-19, his advocacy for "sound money" like "Gold and Silver," *id.* at 17, and his opposition to 2020 coronavirus "vaccinations" and government shutdowns of "mom-and-pop businesses" like his tattoo shop, *id* at 19-21.[5]   To the extent he mentions his conduct, he attempts to excuse it by justifying his words as "First Amendment absolutism" and "Second Amendment advoca[cy]," *id.* at 23-24, and his actions as "verbal belligerence" and "folly" trespass, *id.* at 25, 27-28.   The essence of his entire sentencing memo can be summed up in one phrase: lack of remorse.

Over two years after his arrest, and now nearly four months after the jury's verdict, Minuta continues to repeat the lies he spread on the Newsmax "documentary" that he tried to help law enforcement on January 6 and did not assault any officers.   *See id.* at 6, 25.   The jury saw it differently.   So did Officer Jackson.   *See* 1/6/22AM Tr. at 3402-04 (testifying that when Minuta was pushing forward with James, they forced the officers "back deeper into the Rotunda" and crushed his partner).   The Court should see it differently, too: Minuta himself made it clear when he yelled, "There's violence *against patriots by the D.C. police* so we're en route . . . to the Capitol

---

[5] Minuta does not mention that, in May 2020, he opened his business in direct defiance of the coronavirus restrictions; by August 2020, he had received over $196,000 in government assistance (Economic Injury Disaster Loans); and in February 2021, he had received over $18,000 in additional government assistance (Paycheck Protection Program payments).   *See* https://www. us aspending.gov/search/?hash=9110b00ad71f267c7c733c0807211885 (last accessed on May 15, 2023).

Building right now" (on the way to the Capitol); "Get these cops out.   It's our fucking building." (inside the Capitol); and "That's the police being escorted by the people. . . . [C]ause its our fucking building" (outside the Capitol).   Gov. Ex. 1508.   That Minuta continues to lie about helping police in the face of incontrovertible evidence to the contrary illustrates just how far from remorseful and deterred Minuta is.

### F.  Joseph Hackett

Hackett inexplicably and unbelievably recasts his involvement with the Oath Keepers as nothing more than an effort to achieve security on behalf of himself and his family.   This is simply not credible.

His assertion for why he joined the Oath Keepers is inconsistent with the evidence and his own words.   He claims that, "scared by events he witnessed in his literal backyard, Mr. Hackett discovered the Oath Keepers and believed he could learn . . . protection from its members."   ECF 572 at 12.   Hackett's engagement with the Oath Keepers, however, extended beyond his own backyard and was more offensive in nature.   Hackett traveled with the Oath Keepers to Louisville, Kentucky, the site of protests following the fatal shooting of Breonna Taylor.   He did so against the advice of his state chapter leader at the time, Mike Adams, who warned that traveling with guns would not help the situation and would only make the Oath Keepers targets.   12/16/22PM Tr. at 1600.   Moreover, Hackett engaged in firearms training with Meggs, Harrelson, and others, that was specifically for "offensive" engagement and learning where and how to shoot to kill.

Hackett's travel to D.C. for January 6 similarly had no connection with personal security and protection against "vandals" entering his residential community.   ECF 572 at 12.   Neither did Hackett's professed ire toward elected officials.   Instead, the evidence shows Hackett was motivated to travel to D.C. with the Oath Keepers because of his frustration with the outcome of

the 2020 presidential election.

### G. David Moerschel

Moerschel's staging an AR-15 rifle and Glock semi-automatic handgun outside D.C. before storming inside the Capitol building is arguably one of his most aggravating circumstances warranting a lengthy sentence.   But he blows past those facts by simply stating, "He packed his gear including an AR-15," and he "left his firearm in a hotel room in Virginia."   ECF 567 at 2. He does not explain why he brought firearms across the country to the D.C. area for January 6. But Moerschel's own words at the time, which he does not address, make clear why: to prepare to oppose the execution of laws governing the transfer of presidential power by any means necessary, up to and including force.   Gov. Ex. 9514 (Msg. 1.S.656.9846) ("IMO [in my opinion], any members in DC should absolutely have firearms somewhere (legally) nearby."); *Id.* (Msg. 1.S.656.11302) ("Maybe our role on Jan. 6 (as Patriots) their will be more kinetic and less for 'show of force,'").   And he did not bring just any firearms, he brought his "battle pistol" that he preferred because of its "extra knock down power."   *Id.* (Msg. 1.S.656.10441).   If Moerschel "lacked harmful intent" and was just "along for the very foolish ride," ECF 567 at 2, why did he need his battle pistol and a rifle "nearby"?

Moerschel claims he left his firearms at the QRF hotel in Virginia "because he did not want to violate any of the D.C. weapons laws."   ECF 567 at 2.   But there is no evidence that Moerschel investigated whether he and the Oath Keepers could lawfully store their firearms and travel with them into D.C.   If Moerschel were simply trying to be safe, he would not have left his rifle and handgun under the care of another member of the conspiracy whom Moerschel now admits he had just met on January 4.   ECF 567 at 2.   And he would not have contributed those firearms to an arsenal.   *See* 10/12/22AM Tr. at 2728 (Terry Cummings: "I had not seen that many weapons in

one location since I was in the military."). The fact is, Moerschel left those firearms in the QRF hotel because he was a knowing and intentional member of a seditious conspiracy to stop the transfer of power, and he was armed for success.

Moerschel also submits that a four-level decrease in his offense level is warranted under Section 3B1.2(a), but he ignores the facts detailed above and erroneously limits the scope of his analysis to just his case and not the average participant in the criminal activity. *See* U.S.S.G. § 3B1.2, cmt. n.3(A) ("This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than *the average participant in the criminal activity*.") (emphasis added); *Rahman*, 189 F.3d at 159 (affirming the trial court's rejection of mitigating adjustments for seditious conspirators, adding that "[a] reduction will not be available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be 'minor' or 'minimal' as compared to the average participant in such a crime"). While he may not warrant an aggravating role adjustment, that does not mean his actions were "minor" or "minimal." In fact, his very inclusion and conviction in the seditious conspiracy case reflects his heightened culpability and awareness of the overall criminal objectives. *See* U.S.S.G. § 3B1.2, cmt. n.3(C). Moerschel's conduct does not warrant a mitigating role adjustment when viewed in light of his conduct, the whole conspiracy, and average participants in such criminal activity.

Far from "political posturing," ECF 567 at 7, a significant sentence would be justified by the egregious facts in this case, including Moerschel's, and would serve a critical deterrence function moving forward. *See Rahman*, 189 F.3d at 149-60 (affirming significant sentences of incarceration for *all* defendants convicted of the seditious conspiracy).

### H.  Thomas Caldwell

*First*, Caldwell claims his medical conditions exempt him from incarceration.  ECF 563 at 1.  His health, however, did not hamper his offense.  During the conspiracy, Caldwell was mentally sharp enough to provide logistics and intel help to the Oath Keepers and physically strong enough to march across D.C. and, in his words, "assault" the Capitol on January 6.  Since his arrest, Caldwell has, on multiple occasions, made statements to the media about his health during his incarceration that are untrue, which should further cast doubt upon his current claims.  *Compare* Ex. Sent-Caldwell-3 at 10 (claiming he was denied medications); Ex. Sent-Caldwell-8 at 21:43 ("During my entire incarceration, I was deprived of all of my medicines."), *with* Ex. Sent-Caldwell-9 at 5 (summary of Caldwell's requested and received medical provisions).

*Second*, co-conspirator Paul Stamey's proffered statement to the FBI is not credible.  Stamey claimed he was immediately "horrified" by what rioters did on January 6, Ex. Sent-Caldwell-10 at 67, but he wrote to Caldwell on January 7, "We need to link up across the country.  The gauntlet was thrown down yesterday," Ex. 6733 (Msg 1.S.696.18574).  Further, Stamey's claim during his proffer that the QRF would never have entered D.C. for any purpose, armed or otherwise, *see* Ex. Sent-Caldwell-10 at 118-25, was directly contradicted not only by Caldwell's own messages, but by common sense.  When the government confronted Stamey with the facts that he and his co-conspirators drove across the country, gathered rifles, distributed maps of "landing areas" and roads into D.C., and then waited in hotel rooms with the weapons, he simply replied, "I know that looks bad."  *Id.* at 124.

*Third*, Caldwell seeks a four-point reduction for minimal role in the offense and compares his role, not to those in the charged conspiracy, but apparently to all January 6 rioters.  He fails to point to any other person who organized a QRF hotel for firearms, staged his own firearm there,

sought a boat to transport weapons from the hotel to co-conspirators waiting in D.C., agreed to provide logistics and intel for a large-scale conspiracy, breached the west side of the Capitol, offered to lie and conceal evidence for co-conspirators after January 6, and deleted his own evidence.   There is simply no basis for a mitigating role adjustment.

*Fourth*, Caldwell similarly claims that he "assisted" in the government's investigation. That is patently false.   He deleted all communications with a co-conspirator and deleting selected messages on Facebook that by context involve January 6 and efforts to obtain a boat.   For the majority of those messages, the grand jury, the trial jury, and the Court will never know what Caldwell plotted.

### I.   Edward Vallejo

Vallejo continues to point to his self-serving statements about "antifa" on the evening of January 6 and on January 7 as evidence that he was not part of the seditious conspiracy. [6]   His surrounding conduct and statements, however, reflect just how culpable and dangerous he is.

On the morning of January 6, Vallejo called for guerilla war.   On the evening of January 6, Vallejo flatly declared, "We are at WAR."   On the morning of January 7, Vallejo "probed the defense line" of law enforcement and military guarding the Capitol.   Later that morning, Vallejo took to a podcast and declared that he was "waiting for orders from Stewart Rhodes."   His travel companion, Kandaris, further stated that they are prepared for "all aspects" going forward and said, "Are there more people coming?   If they do, what's gonna happen?   It's not really plausible to

---

[6] One of the alleged "antifa" videos that Vallejo circulated showed Proud Boy Dominic Pezzola using a police shield to destroy a window at the Capitol to gain entry to the building.   Prior to January 6, Proud Boy Leader Enrique Tarrio circulated a photo of Pezzola with Defendant Minuta and the caption "Lords of War", "#j6" and "#j20."   Gov. Ex. 6773 (Msgs. 2055.P.1-2).   And, in mid-December 2020, Minuta messaged Pezzola that "Oathkeepers president [Stewart Rhodes] is pretty disheartened.   He feels like it's go time, the time for peaceful protest is over in his eyes.   I was talking with him last night."   Gov. Ex. 6773 (Msg. 245.T.1.1).

non-violently protest anymore. . . . So the question becomes when we realize that this wrong he been done uhm what are the next steps?   I mean is this the shot heard 'round the world moment? I don't know."   Vallejo then traveled to meet Rhodes, who he identified as his commander and who was calling for a bloody civil war.

Vallejo spends considerable time citing the allegedly exculpatory grand jury testimony of Kelly Carter.   Carter, however, was not involved in the Oath Keepers (not a member, not on any Signal or text message conversations, and not present during the Vallejo/Kandaris podcast). Further, after January 6, Carter chose to fly back to Arizona rather than return with Vallejo and Kandaris, who sought to meet with Rhodes in Texas to learn "next steps."

Vallejo also cites his support from members of the community to argue for leniency.   In his own words, however, his community not only abandoned him during the period of the conspiracy, but Vallejo took their silence for affirmation.   *See* Gov. Ex. 1054.Tr. ("You know what I've been telling people?   I've been telling people for years I'm the guy that everybody said, 'no Ed, you can't shoot them yet, it's too soon.   No Ed, you can't shoot the bastards yet, it's too soon.'   Well I've been telling them for about five, six months ago.   They quit telling me.").

## III.    CONCLUSION

The Court should impose the sentences of incarceration (and other conditions) recommended in the government's sentencing memorandum, ECF 565.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    _____/s/_____
Jeffrey S. Nestler
Assistant United States Attorney
D.C. Bar No. 978296
Troy A. Edwards, Jr.
Alexandra Hughes
Louis Manzo
Kathryn Rakoczy
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530

## <u>Index of Additional Sentencing Exhibits</u>

- Sent-Omnibus-2 (Government's Letter to Defendants)

- Sent-Rhodes-11 (Mental Militia Forums Post)

- Sent-Caldwell-8 (Podcast)

- Sent-Caldwell-9 (Caldwell Jail Medical Records)

- Sent-Caldwell-10 (Paul Stamey Interview excerpts)