**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| | **)** | |
| **v.** | **)** | **Case No. 22-cr-00015** |
| | **)** | |
| **ROBERTO MINUTA** | **)** | |
| | **)** | |
| | **)** | |
| **Defendant** | **)** | |
| | **)** | |

**DEFENDANT ROBERTO MINUTA RESPONSE TO THE COURT'S ORDER**
**DATED MAY 29, 2026**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
Attorney for Defendant

Defendant Roberto Minuta hereby responds to the Court's Order dated May 29, 2026, for the purpose of addressing the Court's mistaken reliance on *United States v. Ammidown,* 497 F.2d 615 (D.C. Cir. 1973) as a basis for conducting a further inquiry into the Government's justification for seeking dismissal of this case pursuant to Rule 48(a).

Scrutiny of *Ammidown* makes clear it is not helpful for this purpose – beyond the fact that it came 43 years prior to the D.C. Circuit's decision in *United States v. Fokker Services B.V.,* 818 F.3d 733 (D.C. Cir. 2016). The Circuit's decision in *Fokker Services* addresses limits of a district court's discretion to review the Executive Branch's exercise of prosecutorial discretion, fitting that authority within the cabining framework of Separation of Powers. The outcome of *Fokker Services* truncates – if not altogether forecloses – the inquiry this Court suggests it needs to conduct as to the Government's motion pursuant to *Ammidown.*

The language in *Ammidown* has been cited for many years as supporting the proposition that a district court should supervise the government's exercise of prosecutorial discretion in moving to dismiss a criminal case by examining whether the motive(s) are contrary to the public interest. But the language in *Ammidown* suggesting that to be true is dicta -- *Ammidown* did not involve a Rule 48(a) dismissal. The defendant was charged with first-degree murder. A disposition was reached pursuant to Rule 11 where the defendant agreed to plead guilty to second-degree murder with the government moving to dismiss the first-degree murder count as part of the agreement. However, the district

court did not believe second-degree murder was an appropriate charge under the facts and refused to dismiss the first-degree murder count. "In this unusual case the trial judge rejected a plea bargain struck between the prosecution and the defense on the ground that *the public interest required* that the defendant be tried on a greater charge."  Ammidown, 497 F.2d at 617.

> The trial judge, however, refused to approve the agreement and accept the lesser plea. With full understanding of the prosecutor's concern with the importance of Ammidown's agreement in connection with its successful prosecution of Lee,[1] the court nonetheless decided that under Rule 11 of the Federal Rules of Criminal Procedure it had the discretion to refuse the plea when it found that the crime was so heinous and the evidence of guilt so overwhelming that the public interest would be ill-served by a judgment of second degree murder, which it referred to as a "tap on the wrist."

*Id.* at 618.

The question before the Circuit Court was whether the trial court had the discretion to refuse to dismiss a charge **under Rule 11** where it was a term of a plea agreement.

As an initial matter, it must be recognized that *Ammidown* involved the question whether the trial court had the authority to decide what MUST be done based on its view of "the public interest", as contrasted with the question under Rule 48(a) as to whether the Government's motive(s) in making the motion must be found by the court to not be contrary to "the public interest" as explained more fully herein. The former – what "must" be done – does not turn on the motives of the government.  That makes the discussion of Rule 48(a) in *Ammidown* entirely dicta since even its observations about Rule 48(a) were not necessary to its holding as to Rule 11.

Since there was no clear authority regarding the extent of discretion under Rule 11, ("Although the rule provides that a trial court "may refuse to accept a plea of guilty," it fails to delineate the circumstance under which it may do so" *Id.* at 619), the *Ammidown* Court surveyed cases in other jurisdictions regarding Rule 48(a)'s "leave of court" requirement.  It opted to analogize to the discretion granted in determining the extent of any similar unspecified judicial discretion to deny motions to dismiss under Rule 11.

> There are no precedents on the problem before us, whether the plea, endorsed by the prosecutor, may nonetheless be rejected by the trial judge because of his conclusion that the defendant should be tried on the higher charge. Rule 11 and the existing case law seem to provide no guide, although one does find in the commentaries isolated phrases voicing the fear that the judge should not permit the plea bargain to become the means whereby the hardened criminal escapes justice. Neither is there any scholarly discussion of a conflict between the authority of the prosecutor and the trial judge to accept pleas to lesser included offenses in the interests of justice. Discussion of the roles of judge and prosecutor has most often concerned the area of dismissals of criminal indictments.

*Id.* (footnote omitted).

The *Ammidown* Court made a series of observations about the holdings of those other courts on Rule 48(a), and then analogized those observations and holdings to the question under Rule 11 which had no such language.

Because those observations were not necessary to the Court's decision, its observations about Rule 48(a) and the extent of judicial discretion in deciding a dismissal motion are dicta from a case that involved only Rule 11.

Four years after *Ammidown* the Supreme Court addressed -- but did not resolve – whether the "leave of court" requirement in Rule 48(a) gives district courts authority to deny a dismissal motion on "public interest" grounds.  In

*Rinaldi v. United States*, 434 U.S. 22, 29 n.15 (1977) the Court noted it had not addressed the meaning of the "with leave of court" clause but expressly declined to establish its meaning in that decision on the basis that it was unnecessary to do so.  While some courts have cited Footnote 15 in the Opinion to support an inquiry into the reasons for the government's motion, that is a misreading of Footnote 15.  It extracts one observation by the Court about two opinions cited therein, while ignoring the import of the note as a whole – which is to not endorse those opinions.

Footnote 15 reads in its entirety as follows:

The words "leave of court" were inserted in Rule 48(a) without explanation. While they obviously vest some discretion in the court, **the circumstances in which that discretion may properly be exercised have not been delineated by this Court.** The principal object of the "leave of court" requirement is apparently to protect a defendant against prosecutorial harassment, e.g., charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection. [Citations omitted]. But the Rule has also been held to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest. See *United States v. Cowan*, 524 F.2d 504 (5th Cir. 1975); *United States v. Ammidown*, 497 F.2d 615, 620 (D.C. Cir. 1973). **It is unnecessary to decide whether the court has discretion under these circumstances, since, even assuming it does, the result in this case remains the same.**

Id. at 29.  (Emphasis added).

The Supreme Court cites *Ammidown* without endorsing or adopting the Circuit's holding.  The Court expressly stated in Footnote 15 that the scope of discretion given to district courts by the "with leave of court" phrase has never been established – and then expressly declined to endorse the view that the "with leave of court" provision grants trial courts the authority to deny motions

to dismiss on the vaguely defined notion of what was in "the public interest." The Court only noted that addressing that question was not necessary to its decision in the case.

But *Fokker Services* does apply here because there the D.C. Circuit found that any exercise of judicial discretion to review the Executive's exercise of prosecutorial discretion to dismiss is severely constrained by the broader constitutional prohibitions arising out of "separation of powers."  The Circuit's admonition of the district court in *Fokker Services* did not involve the question of what the statutes or rules allow district courts to do.  Claim of discretionary authority by district courts must be evaluated within the constitutional framework of ***what "separation of powers" prohibits district courts from doing***.

The Circuit described the district court's justification as follows:

> According to the [district] court, approval of an [Deferred Prosecution] agreement in which the defendant had been "prosecuted so anemically for engaging in such egregious conduct for such a sustained period of time and for the benefit of one of our country's worst enemies" would "promote disrespect for the law."  [*United States v. Fokker Services, B.V.*, 79 F. Supp. 3d 160, 167 (D.D.C. 2015)]. The court further noted that certain employees had been permitted to remain with the company; that the agreement contained no requirement for an independent monitor; and that the amount of the fine failed to exceed the revenues Fokker gained from the illegal transactions. *Id.* at 166. Based on those considerations, the court rejected the DPA as an "[in]appropriate exercise of prosecutorial discretion."

*Id.* at 167.

While this Court need not be a "rubber stamp" in granting a motion to dismiss, that does not mean this Court has the authority to review the

Executive's reasons for moving to dismiss when it does so as an exercise of its prosecutorial discretion.  The holding in *Fokker* is that the scope of judicial discretion – whatever its source – must always be evaluated within the "separation of powers" framework that places certain discretionary decision-making exclusively within the Executive Branch. One of those is the exercise of prosecutorial discretion to dismiss an already filed case.

The Circuit noted in *Fokker* "The district court's order marks the first time any federal court has denied a joint request by the parties to exclude time pursuant to a DPA...." *Fokker Services at 737.*  The Court went on:

> Decisions to initiate charges, or to dismiss charges once brought, "lie[] at the core of the Executive's duty to see to the faithful execution of the laws." *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986).

*Id.* at 818 F.3d at 741.

The Circuit also observed:

> Indeed, "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, **or whether to dismiss a proceeding once brought**." *Newman v. United States*, 382 F.2d 479, 480 (D.C. Cir. 1967).

*Id.* (Emphasis added.)

And finally:

> As with the "leave of court" language in Rule 48(a) and the "public interest" authority in the Tunney Act, we construe the "approval of the court" language in § 3161(h)(2) in a manner that preserves the Executive's long-settled primacy over charging decisions ***and that denies courts substantial power to impose their own charging preferences.***

*Id.* at 818 F.3d at 743.

But there is a related concept in play here, captured by the axiomatic phrase "Bad facts make bad law."  That concept has already impacted the government in this and more than 340 other cases related to the events of January 6 resulting from the government's decision-making as reflected in the Supreme Court's decision in *Fischer v. United States*, 603 U.S. 480 (2024).

There the Supreme Court held that the application of 18 U.S.C. Sec. 1512(c)(2) – the "catch-all" obstruction provision – only applied in a narrow factual circumstance that was not found in the theory employed by the government in its charging decisions, prosecutions, and sentencings related to the events of January 6.  For more than three years the government interpreted the "catch-all" provision expansively to serve as a "dragnet" of any conduct, of whatever kind, that it could make use of to convince the trier of fact that defendants "obstructed" the Congressional proceedings on that day.  In *Fischer* the Supreme Court repudiated this reading of the statute and held that its plain meaning meant it applied only where there the allegedly criminal conduct impaired the integrity or availability of evidence for use in the "official proceeding" in question and not simply disrupting the proceeding itself.

The Supreme Court remanded *Fischer* for further proceedings consistent with its narrow interpretation of the statute.  That left the government with the option to retry any cases on that narrower theory as contrasted with the "dragnet" approach it used to obtain convictions under its expansive definition.

It is worth noting that in the seven months that followed between the Supreme Court's decision in *Fischer* and the issuance of pardons by President

Trump on January 20, 2025, the Department of Justice under the stewardship of the prior Administration did not attempt to retry a single case remanded to the district court under the narrowed application of Sec. 1512(c)(2).   Further, in 71 cases pending trial when *Fischer* was decided, the government moved to dismiss the Sec. 1512(c)(2) counts in every case rather than prosecute that count at trial.

A better justification for questioning the decision-making of the Department of Justice in how it pursued these cases under the prior Administration would be hard to imagine.

By pushing the expansive and previously untried "dragnet" application of Sec. 1512(c)(2), the government ended up with an adverse outcome in the Supreme Court that significantly narrowed what had been, up to that point, an effective threat that might have dissuaded obstructive behavior.

"Bad facts make bad law" becomes embodied in unfavorable appellate outcomes that the Department of Justice must thereafter grapple with in future cases.  In fact, the adverse outcome in *Fischer* was the seventh Supreme Court decision over a period of 19 years where the Department of Justice lost -- unanimously in five of the seven cases – after advocating in the District and Circuit Courts for an expansive application of a criminal "obstruction" statute. Each time the problem was application of a statute to set of facts seemingly far beyond that contemplated by Congress.[1]

---

[1] The six cases prior to *Fischer* were *United States v. Arthur Anderson*, 544 U.S. 696 (2005)(9-0 in favor of defendant); *United States v. Skilling*, 561 U.S. 358 (2010)(6-3 in favor of defendant); *Yates v. United States*, 574 U.S. 528 (2015)(9-0 in favor of defendant); *United States v.*

As this Court expressly recognized on the record when rendering certain decisions throughout the course of the Oath Keeper prosecutions, there were significant issues – many involving questions of first impression – regarding the definitions of terms in the statutes used by the government.  This Court forthrightly acknowledged at the time that its best judgments still reflected the views of only one jurist, and others at the appellate level might later disagree. That is precisely what happened in *Fischer.*  There was risk to DOJ with continuing to defend the decision-making of the prior administration that could have consequences via adverse decisions as to application of 18 U.S.C. Sec. 2384 (Seditious Conspiracy) and 18 U.S.C. Sec. 272 (Interference with Officers) in the future much like the consequences of *Fischer* dramatically narrowing the utility of Sec. 1512(c).

This Court heard overwhelming evidence – contradicting the Government's thrice-repeated "evolving" narrative over three trials – that there was no "plan" by the Oath Keeper organization to attack the Capitol on January 6.

Special Agent Palian, described by other FBI Special Agents as the "quarterback" of the entire investigative effort focusing on the Oath Keepers organization, answered questions by defense counsel Fischer in the first trial wherein he admitted that in the hundreds of interviews and investigative leads

---

*McConnell*, 579 U.S. 550 (2016)(8-0 in favor of defendant); *Kelly v. United States*, 590 U.S. 391 (2020)(9-0 in favor of defendant); and *United States v. Percoco*, 598 U.S. 319 (2023)(9-0 in favor of defendant).

followed by the FBI, *not one witness knew of or described a plan* by the Oath Keepers in advance of January 6 to breach the Capitol in order to halt the proceedings taking place inside.

This Court is also aware that the Government provided to the defense its records of Confidential Human Sources it had inside the Oath Keepers organization in the days, weeks, and months leading up to January 6 – more than a dozen in all – and not one of those CHSs informed the FBI that the Oath Keeper organization was making plans to take over the Capitol on January 6. One even told the FBI he/she would have known of such a plan if there was one given his/her position in the organization. These records remain subject to the Protective Order.

The Defense had subpoenaed Greg McWhirter, former Vice-President of the Oath Keepers, to testify as a defense witness. The day before he was scheduled to fly to D.C., the New York Times published an article[2] with anonymous sources that identified him as an FBI CHS. McWhirter then suffered a "health episode" that prevented him from boarding his flight to D.C., and the defense was unable to secure his testimony for another day before presentation of the defense case ended. The defense had no motive to "out" its own witness and cause him to be unavailable to offer favorable testimony. The only party with a motive to keep McWhirter from testifying was the government.

With the Government's theory of a pre-planned "seditious conspiracy" completely discredited – it requires an "agreement" – the government resorted

---

[2] https://www.nytimes.com/2022/11/08/us/politics/oath-keepers-trial-january-6.html

to the "last gasp" of a prosecutor's dying conspiratorial narrative – the desperate plea for the jury to find an "implied" agreement by "inferring" the existence of such from concerted conduct, i.e., advancing up the East Steps of the Capitol in a "stack" formation.  This became the final pitch made by the prosecutors to the jury in closing arguments in all three cases.

But the "stack" – much like the references to the "QRF" -- only exposed the ignorance of the prosecution team to the meaning of such military jargon. In fact, by the third Oath Keeper trial this court ruled that the government could not use such terms any longer under Rule 403 because they had not been adequately defined and the continued use would likely only serve to confuse the jury.[3]

Even in the face of the paucity of evidence regarding the existence of any agreement or "plan" to go inside the Capitol and commit the crime of "sedition," this Court denied motions under Rule 29 on the basis of one primary conclusion – the Court's view that defendant Kelly Meggs would not directed the group he led to advance up the East Steps and enter the Capitol without having been expressly told to do so by Stewart Rhodes during the phone connection reflected on cellular company records that began at 2:31 pm and continued for 4 minutes according to those records.

---

[3] The Court certainly recalls the testimony of Michael Greene, an Iraq and Afghanistan combat veteran ridiculing and mocking the inaccurate use of military terms by the prosecutors and FBI agents throughout the course of the cases.  This was particularly insightful given the fact that a large number – though not all – of Oath Keeper members had military service – including combat deployments -- and certainly understood the vernacular – as contrasted with the "lack of understanding," to phrase it mildly, of the government's representatives in the case who freely tossed around terms they did not understand.

But:

- The only evidence that such a call took place was the "line connection" listed on the records.  No witness testified to there being an actual connection or conversation between the three phones reflected in the records – Stewart Rhodes, Kelly Meggs and Michael Greene.

- Rhodes and Greene both testified that no conversation took place even if the records reflect a connection because of technical problems with the cellular service caused by the large crowd, and because the crowd noise was so loud outside that it was impossible to hear any other person on the call even when a call did go through.

- Both Rhodes and Greene testified to numerous efforts to make contact by phone with others – Greene and Rhodes were both trying to connect with Joshua James, the "leader" of the Roger Stone Personal Security Detail that remained at the Mayflower Hotel.  That group included Defendant Minuta and four others, all of whom remained throughout the afternoon at the hotel until leaving at approximately 2:30 pm.

- Joshua James was a cooperating defendant who the Government could have called to testify to the existence of any phone calls, but it chose to not call him.

- In interviews reflected in FBI 302s, James told the FBI that he was never able to establish telephone contact with Greene or Rhodes notwithstanding several efforts to do so throughout the time his group was at the Mayflower Hotel. He told the FBI he made many efforts to call Greene and Rhodes without success, and he decided to take his group from the Mayflower to the Capitol on his own and not based on any instruction given to him by Rhodes or anyone else.

- That testimony would have undermined the Government's claim that Rhodes had given any instructions to Meggs in any phone call during the same time frame that James said he was unable to get any calls to go through or hear anyone on the other end of the call when they did.

- When the Government failed to call James as a witness, his attorney communicated to the defense that James would invoke

his Fifth Amendment rights if called as a defense witness because he had pled guilty but not yet been sentenced.

- The ONLY testimony of any witness that linked a supposed instruction given by Rhodes to Meggs during the 2:31 phone call – the existence of which is based only on a cellular record showing a line connection -- came from Caleb Berry.  He testified that in the "huddle" just after the 2:31 phone connection ended, Kelly Meggs told the group they needed to go inside the Capitol and stop Congress from acting to certify the election of Pres. Biden.  He did not testify -- because he did not know – that Meggs was told to do that by Rhodes.  This Court came to that conclusion based on the assumption Meggs would not have taken that step without express direction from Rhodes to do so.

- Caleb Berry did not make any reference to a "huddle" or any instruction by Kelly Meggs in the handwritten statement he drafted himself prior to his first meeting with the FBI after he decided to cooperate.

- Caleb Berry did not mention a huddle or any instruction by Kelly Meggs in his first interview with the FBI as reflected in the 302 of his interview.

- It was only after the first interview, and after discussions between his attorneys and the Prosecutors, that Caleb Berry traveled to D.C. and testified before the grand jury.  During that testimony, for the first time, Berry claimed that there was a "huddle" after the phone call and before going up the stairs, and that Kelly Meggs told the group in that huddle they were going inside the Capitol to stop the proceedings.  Berry was so anxious for the grand jury to know that information that he volunteered it at least 3 times in non-responsive answers to questions posed to him by the AUSA as reflected in the transcript of his grand jury testimony used to cross-examine him at trial.

- Over three trials and dozens of witnesses, including testimony by other cooperating defendants, not one other person corroborated Berry's account, and not a single witness testified to what Rhodes, Meggs, Greene, James, Minuta, and/or any other person discussed during any of the supposed cellular telephone calls that are reflected in line connections shown on the records of their cellular telephone accounts.

- There is not a single piece of evidence that explains the testimony from cooperator James Dolan, confirmed by Rhodes in his own testimony, that when Rhodes was later told by Meggs that members of the Oath Keepers had gone inside the Capitol, Rhodes' reaction was words to the effect of "That was a stupid thing to do." This was also confirmed by Michael Greene during his testimony in both the first and third trials.

- Without the Berry testimony, the Government would have lost all evidentiary support for the theory of an implied agreement as reflected by concert of action by the Meggs group, later supported by the arrival of the James Group with Defendant Minuta.

- But even the theory offered by the Government about concert of action between the Meggs Group and the James Group bordered on the moronic.  The Government argued since James Group went around the north end of the Capitol to the East Entrance, that was evidence of coordination with the Meggs Group which had gone inside the Capitol through the East Entrance more than 30 minutes earlier.  There was NO EVIDENCE of communication between the two groups. The Government made this claim in the third trial as the basis to argue that defendant Greene orchestrated the "maneuvering" of the two groups in his role as "On the Ground Commander."  But there are only two sides of the Capitol – the East and the West – meaning it was a 50-50 proposition even randomly that the two groups would enter the same side of the Capitol.  Further, there was a crowd numbering in the tens of thousands of people on the West side of the Capitol when the James Group arrived at the Capitol grounds around 2:45 pm, shortly after the Capitol Police and MPD Officers on the West Side had all retreated to the interior of the building.

- After entering through the Columbus Doors, two members of the James Group moved forward with the crowd into the Rotunda, while three other members were separated behind them and stood next to Capitol Police Officers at the door.  The sixth member stayed outside.  At no time did any member of the Meggs Group meet inside with any member of the James Group. That reflected some masterful "coordination" between the two.

The upshot of the above is that the "narrative" of the Government's

theory of a "conspiracy" to commit the crime of sedition when Oath Keeper

members entered the Capitol was shot-through with evidentiary deficiencies, contradictions and fabrications.

The basis for the Government's motion to dismiss is likely no more complicated than that it lacks confidence of the legal and evidentiary foundations upon which the charges reflected in the indictment rest. Its fear in that regard is perfectly justified by the evisceration of its use of Sec. 1512(c) by the Supreme Court in *Fischer* – sanctioned at the trial court level by every Judge of the District Court for the District of Columbia save one.

One possible conclusion to draw from the Government's decision to file motions to vacate the convictions in the Circuit Court, and now to dismiss the indictment in this Court would be that they eliminate the risk of another *Fischer*-like result on other important issues. The calculation might be that it is better to not risk such outcomes by trying to defend the prosecutorial decision-making of the prior administration.

Date: June 5, 2026

Respectfully Submitted,

/s/ William L. Shipley
William L. Shipley
PO Box 7154
South Lake Tahoe, CA 96158
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*